UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  24-cv-62080-MD

JAMELL DEMONS,

      Petitioner,

v.

SHERIFF TONY GREGORY, et al.,

      Respondents.

_____/

### BSO'S RESPONSE IN OPPOSITION TO DEMONS' PETITION FOR A WRIT OF HABEAS CORPUS

COMES NOW Respondent, Gregory Tony in his official capacity as Sheriff of Broward County, Florida, hereinafter ('Broward Sheriff's Office,' 'BSO'), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(1) & (6) and *Younger* abstention files their 'return' or response in opposition to the Petition for Writ of Habeas Corpus and moves for the Petition to be denied and or dismissed because (**I**) the Petitioner has failed to exhaust his state court remedies prior to filing this Petition for a writ of habeas corpus, because (**II**) *Younger* abstention applies, because (**III**), Eleventh Amendment concerns and *Rooker-Feldman*, because (**IV**) because BSO's restrictions on Petitioner's privileges were implemented for legitimate security and safety concerns, because (**V**) Petitioner's grounds for relief in his Petition fall outside the core of habeas corpus and are therefore not cognizable in a habeas corpus petition, and (**IV**) because the Petition is untimely filed and in support states as follows:

### FACTS AND PROCEDURAL POSTURE

1.    Petitioner, Jamell Demons, colloquially know by his stage name as "YNW Melly[1]" stands accused of capital homicide for shooting two of his friends and fellow rapers, Anthony Williams

---

[1] Petitioner is a professional musician and rapper with several of his songs, including a song named "Murder on my Mind," a song that details petitioner shooting and killing a friend, making the Billboard top 200 charts prior to his pretrial detention.

and Christopher Thomas, Jr. early in the morning of October 26, 2018, while driving in his car with his accomplice, Cortlen Henry. *See* probable cause affidavit, attached hereto as Exhibit "1."

2.  Plaintiff's criminal case was docketed as 19-001872CF10A and is **still pending** in Broward County Circuit Court before the honorable Judge Fein. *See* Broward County, Clerk of the Courts, https://www.browardclerk.org/ (perform "Case Number Search" for Case Number 19-001872CF10A); *see also* Fed.R.Evid. 201(b)-(d); *McDowell Bey v. Vega*, 588 F. App'x 923, 926–27 (11th Cir. 2014) (holding that district court properly took judicial notice of state court's docket sheet); *see also* Trial Court docket sheet attached hereto as Exhibit "2."

3.  Petitioner was ordered by the trial court presiding over these charges **to be held without bond.** *See* state Trial Court order denying bond and order on Petitioner's request to remove BSO's condition of confinement, attached hereto as Exhibit "3." The State of Florida is seeking the death penalty against Petitioner for his crimes. His trial is currently scheduled for September 10, 2025.

4.  Petitioner's other pending criminal case, a witness tampering case, in which he is alleged to have tampered with witnesses for his pending homicide case ***while in BSO's custody***, amongst other allegations, is also still pending and is docketed as 23010594CF10A. *See* booking report and probable cause affidavit for Petitioner's witness tampering charges, attached hereto as Exhibit "4." He was also ordered by the trial court **also held without bond for that case as well.** The circumstances of these witness tampering charges will be discussed in detail below.

5.  Since his arrest on February 13th 2019, Petitioner has been held in pretrial confinement in BSO's custody. When Petitioner first arrived in BSO's custody, he was housed in a housing unit and was afforded his phone and video visitation privileges, as is any other inmate.  He was also permitted phone privileges with all his counsel.

6.  In every housing pod in BSO's jail system, there is a dayroom. Inmates are allowed to leave their cells to go into that dayroom during the day. In that dayroom, there is a television and communal seating. In the dayroom, inmates have access to a Kiosk, a computer terminal in which an inmate can login and submit commissary requests, medical requests, grievances and read the inmate handbook, amongst other things. Also in the dayroom is a video visitation system terminal where inmates can make video calls with family, friends, and counsel. Video calls made to counsel are not recorded. Inmates may also access a telephone by using a personal PIN number to initiate video and phone calls to family and friends. These calls are recorded and may be monitored, and

inmates are not permitted to use or share their PIN numbers with other inmates, as this circumvents the security measures for monitoring these calls.

7.    Additionally, inmates may use the telephone to call their counsel via a non-recorded line.

8.    However as will be discussed in more detail than the undersigned wished was necessary, due to Petitioner's and, unfortunately, one of his trial counsel's conduct, over the course of four years which threatened the security and safety of jail operations, BSO jail administrators found it necessary to restrict Petitioner's phone and video privileges, and to provide him alternative means to communicate with counsel, family and friends.

9.    As of today, Petitioner is housed in an entire housing pod by himself and still otherwise has all the amenities afforded to other inmates, other than phone and video privileges.

10.  His current living conditions are far from "cruel or unusual punishment," and even in Petitioner's own words, his current housing arrangements are very desirable. *See* Letters mailed by Petitioner, attached hereto as Exhibit "5." These letters were mailed by Petitioner while he was in was in a different facility than his current housing assignment, but the conditions of his housing in an entire housing pod by himself are the same.

11.  Petitioner describes being housed in a housing pod by himself as, "shit dis bih like a mini mansion bih!" and that it was "waay better" than his previous housing situation in which he was in a housing pod with other inmates. *Id*. at *1.  Petitioner also states that he has "better food," and "I got a whole unit to my self w/a basketball court, TV all day." *Id*. It's enigmatic that Petitioner now seems to be taking the position in this action that his housing arrangements are less than desirable.  The same sentiment is shared with other letters Petitioner sent to his family and someone named "Slime." *Id*. at * 5, 7.

12.   It's also puzzling that Petitioner comes now before this Court and is contesting his phone and video visitation restrictions, when Petitioner's trial counsel indicated in a hearing on these issues before the state trial court that he was not contesting these phone restrictions conditions and admitted that these restrictions were warranted for Petitioner repeatedly violating jail rules. *Infra*, Exhibit 12 at *12, lines 19-23

13.  As far as Petitioner's access to his numerous attorneys, he still is permitted to confer with them and his investigators, in person and as much as they wish. The records reflect that Petitioner has taken full advantage of this opportunity and has met with counsel and his investigators in

person, **over two hundred times**, while in the custody of the Sheriff's Office. *See* Visitor Log attached hereto as Exhibit "6."

14. Likewise, although Petitioner is no longer permitted phone calls or video visitation with friends and family, he is allowed to send written mail to his family and friends.

15. As will be abundantly clear from this response, BSO's regulations and minor restrictions on Petitioner's privileges are objectively reasonable and for legitimate penological reasons and in response to very serious security concerns arising from Petitioner's conduct, which is examined in more detail below.

16. However, prior to detailing those circumstances and addressing the Constitutionality of the current restrictions on Petitioner's jail privileges, it's worth pointing out that the Petition should be denied for numerous other procedural and legal reasons not directed to the merits of the Petition. The Court need not reach the merits of the Petition in denying it.

17. First, the Petition should be dismissed or denied for the simple fact that he has not fully exhausted his state court remedies prior to filing this habeas corpus petition filed under 28 U.S.C. § 2241. It is **mandatory** for a pretrial detainee to exhaust his state court remedies, and Petitioner has failed to do this concerning the allegations in his Petition for a writ of habeas corpus.

18. Second *Younger* abstention applies.

19. Third, to the extent Petitioner is challenging the state trial court orders that denied his motion for release on monetary bond and the denied his motion to removal of BSO's jail restrictions, *see* Exhibit 3, the petition is barred by *Rooker-Feldman* and the Eleventh Amendment.

20. Fourth, Petitioner's grounds for relief fall outside the core of habeas corpus and are therefore not cognizable in a habeas corpus petition, and the relief requested is also not cognizable.

21. Finally, the Petition should be dismissed because it was untimely filed.

22. As to the merits of Petitioner's claims, even though the Court need not reach the merits of his claims due to the numerous other procedural and legal issues, it is evident from the circumstances that BSO's actions in revoking Petitioner's phone and video visitation access are related to legitimate penological purposes and for the safety and security of the facility, and quite frankly, it would be difficult to imagine a better factual example of a facility being justified in restricting video and phone privileges of a pretrial detainee than what has occurred with Petitioner.

23. When Petitioner first arrived in BSO's jail, on February 13, 2019, he was afforded all the privileges all other inmates are given, including phone and video visitation.

4

24.  However, within the first 30 days of his incarceration, it was discovered that Petitioner was violating jail facility rules and regulations, which began a continuous and escalating pattern of behavior and conduct putting the safety and security of the BSO Detention facilities at great risk of harm *resulting in Petitioner being charged with additional criminal offenses*, including Tampering with a Witness in a Capital Proceeding, Conspiracy to Commit Tampering, Solicitation to Commit Tampering, and Plan/Direct Criminal Gang Activities, for offenses occurring between the dates of April 10, 2023 and July 22, 2023, all while he was in the custody of BSO using both his *jail phone and video visitation privileges* in furtherance of these crimes.

25.  After reviewing the circumstances, it will seem quite bold, to put it mildly, and vexatious that Petitioner comes now before this Court and asks to be *released from pretrial detention* for his pending capital homicide and witness tampering charges for which he faces the penalty of death, and in which he was ordered **to be held without bond by the trial court**, all because of the restriction of his privileges due to his and one of his trial counsel's conduct that created numerous security and safety issues.

<u>**Timeline of security and safety incidents**</u>

26.  The entire timeline of the security and safety incidents created by Petitioner's conduct are too numerous to fully cover, but it's worth pointing out the most salient incidents.

27.  Major Kevin Corbett who is in command of BSO's Department of Detention Bureau of Investigations and Projects, compiled a memorandum that documents the timeline of events involving Petitioner Demons over the past few years that lead to his privileges being restricted from his own knowledge and from reviewing internal BSO documents, communications, the Petitioner's contact logs, visitor logs, disciplinary records, incident reports, video and recorded phone calls. *See* Timeline Summary of Events for Inmate Jamell Demons and attestation affidavit, attached hereto as Exhibit "7." The Petitioner's contact logs also reflect many of these events. *See* Petitioner's contact logs, attached hereto as Exhibit "8."

28.  The first concerns with Petitioner's behavior began on March 13, 2019, when Petitioner received an Internal Disciplinary Report, "D.R.," written for violations of Conduct Which Disrupts, Unauthorized Phone Use, and Unauthorized Phone Act. *See* Petitioner's Disciplinary Reports, attached hereto as Exhibit "9" at *24; *see also* Exhibit 7 at *3. It was discovered that on February 17, 2019, Petitioner, who was housed in unit 7A2, initiated communication with his co-defendant, Henry Cortlen CIS 371900050, via a three-way call. Henry Cortlen is a co-defendant

is Petitioner's pending capital homicide case. Inmates are not permitted to communicate with other incarcerated co-defendants within the jail facilities for safety and security reasons.

29.   A review of the jail security camera system verified that both inmates were present in their housing units communicating on the phone.  Petitioner was found guilty and received 30 days disciplinary confinement with loss of privileges by the D.R. hearing committee. *Id*.

30.   On March 29, 2019, because of policy violations regarding the usage of the phone, Petitioner had his phone privileges restricted to attorney calls only from March 29, 2019, to April 12, 2022. Between March 3 and March 15, 2019, there were a total of 24 phone calls made from an account associated with Petitioner.  *Id*. at *4. However, the inmate making the calls was not Petitioner, but another person portraying himself as Petitioner. This inmate got a civilian to put money onto another female's phone. Petitioner participated in the violation of policy as he initiated the call by using his unique PIN and having his voice verified before the calls could be placed. *Id*.

31.   On June 24, 2019, Petitioner was counseled for being disrespectful towards staff, stating to the deputy that "she needs to go home, with her stank ass pussy, we know its stank because you be at work all day." Exhibit 7 at *4; *see also* Exhibit 8 at *9.

32.   On July 19, 2019, Petitioner received a D.R. for Threatening Another and Refusing to Obey an Order while housed in unit 6D. Petitioner refused a verbal order to return to his cell after being disrespectful to staff. Petitioner stated, "fuck that shit I ain't doing that shit." The deputy attempted to provide a custodial touch to escort him to his cell and Petitioner then pushed his hand away and stated, "don't touch me motherfucker you don't know who I am." Petitioner continued, "**I'll have my people take care of you in the streets**." Exhibit 7 at *5; Exhibit 8 at *11-12; Exhibit 9 at *22.

33.   During the disciplinary hearing for the July 19, 2019 incident, Petitioner stated to the disciplinary committee that he never threatened the deputy or disrespected him. *Id*. Petitioner was found guilty, and he received 20 days disciplinary confinement with LOP and ten days probation. During the hearing, Petitioner asked if could serve his lockdown on the 8th floor because "I'm a celebrity and I don't want inmates in my face" and requested "what can I do to get there?"

34.   On September 12, 2019, Petitioner received a D.R. written for Threatening Staff and Conduct Which Disrupts while in unit 7B2. Petitioner used his towel to clog the toilet until the entire housing pod was flooded with water. Exhibit 7 at *5; Exhibit 9 at *20.  The deputy entered the unit to turn off the water when Petitioner stated, "**yes I flooded now go get your sergeant ill beat you all's ass I have real lawyers to get me out of here**." *Id*. Petitioner was found guilty and

received 20 days disciplinary confinement with LOP and ten days probation. Petitioner admitted to flooding the cell but denied threatening staff. *Id*.

35.   On September 25, 2019, Petitioner was placed on room restriction for passing/receiving items under another inmate's door.  Exhibit 7 at *5; Exhibit 8 at *18.

36.   On November 26, 2019, Petitioner refused orders to go back to his cell, stating "Ya'll gonna stop fucking with my visits, ask about me. I'll flood this bitch." Exhibit 7 at *5; Exhibit 8 at *21.

37.   On December 5, 2019,  Petitioner was moved to a different cell due to masturbating towards female staff. *Id*.

38.   On December 15, 2019, Petitioner was counseled for sitting on the unit table and after several orders to get off stating "Fuck your table, I'm not a inmate, I'm a superstar call the sergeant." Exhibit 7 at *6; Exhibit 8 at *22. Then on December 18, 2019, Petitioner was counseled for talking to inmates in other units while in the vestibule area being escorted to attorney interview and then again upon his return from interview. *Id*. On December 25, 2019, he was counseled again to stop passing notes through the door to the adjacent unit. *Id*.

39.   On January 17, 2020, Petitioner was placed on two-hour room restriction for going to another inmate's cell, upon return from a visit. He refused orders to move stating that he didn't give a fuck and stating to the deputy that she is "a pussy ass hoe." Exhibit 7 at *6.

40.   On February 20, 2020, Petitioner was involved in multi-inmate fight inside the dayroom area of his unit and was given a D.R for his role in the fight. Exhibit 7 at *6; Exhibit 9 at *18.

41.   On October 25, 2020, Petitioner was placed on room restriction for refusing to go back in his cell as he was trying to hide while on the phone. Exhibit 7 at *6.

42.   On April 5, 2021, after being allowed out for a video visit, Petitioner was observed on the phone. Exhibit 7 at *8; Exhibit 8 at *48.  He refused to return to his cell and get off the phone. *Id*. The deputy had to go into the unit, and he still refused. His next video visitation was cancelled as a result. Also, on April 15, 2021, Petitioner was placed on room restriction for being in an unauthorized area on the phone while out for medication rounds. Exhibit 7 at *8.

43.   On May 4, 2021, during a video monitor spot check by Video Visitation staff it was discovered that **Petitioner's attorney, Raven Liberty, was allowing non-attorneys to use her log-in credentials to conduct privileged, non-recorded video visitation with Petitioner**. Exhibit 7 at *8; *see also* Video Visitation Interruptions Records for Jamell Demons, attached hereto as Exhibit "10" at *3. This is a serious security breach and as a result, BSO permanently

restricted all video visitation privileges for Ms. Liberty. *Id*. Ms. Liberty is one of the numerous attorneys hired by Petitioner for his criminal case.

44. On August 17, 2021, Petitioner received a D.R. for Conduct Which Disrupts and Disobeying Facility Regulations, while housed in unit 6C3. Exhibit 7 at *9; Exhibit 9 at *13. Petitioner violated the video visitation policy by engaging and encouraging inappropriate behavior during the visit. Exhibit 10 at *4. Petitioner's mother, Jaime King, was taking pictures of the video visit. *Id*. During the hearing on the disciplinary violation, Petitioner stated, "this is double jeopardy because I already had my visits taken for 90 days." Exhibit 9 at *13. Petitioner was found guilty and received 30 days disciplinary confinement with LOP. *Id*.

45. On August 18, 2021, BSO Department of Detention command modified Petitioner's video visitation privileges due to his refusal to adhere to the visitation rules. All video visits would now have to take place at the on-site Video Visitation Center where staff could more closely monitor the video visits. Exhibit 7 at *9. Up to this date, there had **been 110 different video visitation violations involving Petitioner**. *See generally*, Exhibit 10.  Petitioner repeatedly violated policy, was suspended on multiple occasions, but continued violating visitation rules once reinstated. Exhibit 7 at *9.

46. On April 7, 2022, due to Petitioner's constant manipulation of the phone system, an order was given that phones are to be always turned off in Petitioner's assigned housing unit when he is out of his cell. *Id*. Only attorney calls with a sergeant on post on-viewing him would be allowed. *Id*.

47. On April 11, 2022, a confidential tip was received regarding Inmates Nicholas Lewis, CIS 251501066, and Petitioner, regarding a plan to escape from the jail by ***having Petitioner's attorney bring in two handcuff keys to aid in the escape***. Exhibit 7 at *9. An Incident Report was written, case #90-2204-003478. *See* Incident report describing the tip about the escape attempt and contraband seizure, attached hereto as Exhibit "11" at *5, 26.

48. Additionally, the confidential tip alleged Lewis was selling drugs, but the informant did not provide any other details about the drugs or location. *Id*. A search was conducted in both inmates' cells;  one metal shank, two razor blades, two Bic Lighters, and 13 rolling papers were found in inmate Lewis's cell. *Id*. at *10, 12. During a strip search of Lewis, 16 pills were also discovered on his person, but he did not have a prescription for. *Id*. As a result of a search of Petitioner's cell, Petitioner was found to be in possession of a pen and excessive amounts of

commissary. Petitioner then received a D.R. written for Possession of Unauthorized Articles while housed in unit 8C3. Exhibit 9 at *12. During the hearing Petitioner stated, "I had no idea the pen was there." Petitioner was found guilty and received 30 days probation. *Id*

49.   Because some of the information received from the informant was verified, and because one of the allegations from the informant was that was that Petitioner's attorney would be bringing in handcuff keys, BSO temporarily suspended in-person attorney visitation for both inmates. Exhibit 7 at *9.

50.   On April 13, 2022, BSO resumed in-person visitation for Petitioner's attorneys, Raven Liberty, David Howard, and Stuart Adelstein, but for security purposes the visits were conducted in the bond room, through a glass barrier, separated rooms sharing a window and a telephone to minimize the risk of contraband or handcuff keys from being given to petitioner. Exhibit 7 at *9.

51.   On August 25, 2022, Petitioner was given a D.R. for Conduct Which Disrupts and Unauthorized Use of Telephones, while housed in unit 8B2. Exhibit 7 at *10; Exhibit 9 at *10. Petitioner was discovered using Inmate Brown Arvis's telephone PIN to utilize the phone. *Id*. During the disciplinary hearing Petitioner stated, "I did use his pin without his knowledge." *Id*. Petitioner was found guilty and received 30 days disciplinary confinement with LOP.

52.   On September 7, 2022, Ms. Liberty filed a motion in Petitioner's criminal case to remove all of Petitioner's visitation and communication restrictions. Exhibit 7 at *10; *see also* Exhibit 3.

53.   On September 15, 2022, Petitioner, despite his phone restrictions, conducted a relay phone call to his girlfriend, Erran Barnett, through another inmate, who was using a third inmate's unique PIN. *See* Exhibit 7 at *10. At the 3 minute 30 second mark of the call, Barnett says to the relay inmate, "Did he see my pictures? I sent ***her*** my pictures, like days ago…" The relay inmate repeats "Did you send him your pictures?" She says, "**His lawyer**." The relay inmate says "No, he did not get them." Barnett says, "No? Tell him if ***she*** don't got them to him by next week imma beat her ass."   Barnett continued discussing Petitioner's ***female attorney*** in the call. At the 11 min 25 second mark of the call, the relay inmate reiterates "My job is to repeat everything that goes on, on this phone." *Id*.

54.   Raven Liberty is the only ***female attorney*** retained by Petitioner in his criminal case. It should be noted that attorneys **are prohibited** from bringing personal items into the jail and passing them to an inmate, and doing so is a criminal violation of Florida law and jail rules. This relay phone call made on Petitioner's behalf in violation of jail security rules, coupled with the

previous incidents involving violations of phone and video visitation rules, heightened security concerns regarding Inmate Petitioner and his attorney, Raven Liberty, that she may not only smuggle in contraband photos of Petitioner's girlfriend, but also continued concerns she was the one discussed by the CI to smuggle Petitioner a handcuff key during visitation.

55.  On September 16, 2022, Petitioner **was again** allowed to use the phone to call his lawyer. Instead of calling his lawyer, Petitioner utilized another inmate's PIN to call his girlfriend Barnett. *Id.*   At the 7 minute 30 second mark of the call, Petitioner tells her "Hey, I'm supposed to be talking to my lawyer. Whenever they call you, be like 'Is this Ms. Liberty? Is this this person? Just be like yup, yup, yup'." *Id*. Erran Barnett responds, "When who calls?"  Petitioner responds, "When I call, they going to be 'is this the lawyer for Jamell?' Just say, 'yes'." Petitioner says, "When are they going to do that?" Petitioner says, "One of these days. Be prepared." *Id*.

56.  On September 21, 2022, BSO reinstated regular, non-barrier, in-person visitation for Petitioner's attorneys, David Howard and Stuart Adelstein. However, barrier visits were maintained for Ms. Liberty due to heightened security concerns regarding her specifically. *Id*.

57.  On September 27, 2022, a hearing in the criminal trial court was held on Petitioner's Motion to Remove Visitation, Communication, or Interaction Restrictions. *See* Trial Transcript for Petitioner's motion, attached hereto as Exhibit "12"; *see also* Exhibit 3. During the hearing, BSO Assistant General Counsel Christian Tsoubanos attended on behalf of BSO and asked Ms. Liberty if she received or accepted photographs from Petitioner's girlfriend, but Petitioner's attorney Stuart Adelstein instructed Ms. Liberty not to answer, and that she did not need to answer that question. Exhibit 12 at *25, lines 13-25. Later in the hearing, the question was posed a second time to Ms. Liberty but again Mr. Adelstein interrupted advising her that she did not need to answer.  *Id*. at 28, lines 22-25.  Ms. Liberty did not answer the question. *Id*.

58.  During this hearing, Petitioner's effort to get Ms. Liberty to smuggle photographs of his girlfriend into the jail as contraband was also discussed. *Id*. at *11-14.

59.  During the hearing, BSO Assistant General Counsel Christian Tsoubanos revealed that from February 13, 2019, until September 21, 2022, Petitioner has continuously violated BSO jail phone rules by facilitating three-way calls to speak with his co-defendant, utilizing other inmates' personal identification numbers, "PIN," to make calls, and conducting relay calls using other inmates to send messages on his behalf. *Id.* at *6, lines 12-25. During this time **3041 calls were made by Petitioner,** or other inmates on Petitioner's behalf, to his girlfriend Erran Barnett, alone.

**Only 22 of these calls** were made using Petitioner's PIN number. *See* Demons' phone logs that document him using his pin number and other inmates PIN numbers to call his girlfriend, attached here to as Exhibit " 13"; Exhibit 12 at *8, lines 1-3.

60.   Furthermore, Mr. Tsoubanos provided information to the trial court that on September 22, 2022, while on complete phone restriction, phone PINS for four different inmates were used by Petitioner to facilitate calls made by him and other inmates, to include those inmates making relay calls for Petitioner. Exhibit 12 at *11, lines 13-20; Exhibit 7 at *11. Additionally, Mr. Tsoubanos provided information that on September 26, 2022, just one day prior to the hearing, an inmate used another inmate's PIN to make calls for Petitioner. This included a three-way call to Petitioner's mother requesting that she add $100 on his account and another un-identified person's account. *Id*.

61.   During the hearing, Petitioner's counsel, Mr. Adelstein, **conceded there were phone violations and did not contest BSO's phone restrictions any further.** *Id*. at *12, lines 19-23.

62.   At the conclusion of the hearing, Judge Siegel did not restrict BSO from utilizing **barrier visits for Ms. Liberty**. Exhibit 12 at *28, line 13. BSO was instructed to find an alternative barrier space, other than the bond room, to accommodate the entire defense team to meet with Petitioner **which BSO complied with by October 8, 2022**. *Id*. at *29, lines 8-10. BSO was not ordered to reinstate Petitioner's phone or video visitation privileges.

63.   On October 27, 2022, Petitioner received a D.R. for Conduct Which Disrupts, while housed in unit 8B2. Exhibit 9 at *6. The Investigations Division discovered that Petitioner had passed a note from unit two to unit one, instructing inmate Lamar Johnson to make an unauthorized telephone call from Petitioner and to share his personal telephone PIN. *Id*. During the disciplinary hearing Petitioner admitted that he slid the note, however according to Petitioner the note did not request for the inmate to make a call. *Id*. Petitioner was found guilty and received 15 days lockdown with LOP. *Id*.

64.   On November 15, 2022, a letter was discovered by the BSO mailroom that appeared to be suspicious. Petitioner was listed as the letter's sender, with a return address of PO Box 9356, and the letter was addressed to the Law Firm of Erran Barnett, 2604 Elk Horn Drive, Little Elm, Texas. The address was confirmed to be a residential address and not an attorney's office. Erran Barnett is the girlfriend of Petitioner who he had previously told to identify herself as an attorney when he was only allowed attorney's phone calls. Petitioner received a DR for this incident. *Id*. at *4.  The

contents of inmate legal mail addressed to attorneys are not monitored by jail personnel, and this letter was an attempt by Petitioner to circumvent the jail's mail security rules.

65. On November 29, 2022, it was discovered that Petitioner used Inmate Marcos' CIS 132201044, phone PIN to call his girlfriend Erran Barnett, forty (40) times since November 19, 2022. Exhibit 7 at *11. Also, on November 29, 2022, Inmate Dexter Scott made a call for Petitioner to Petitioner's mother because Petitioner's phone privileges were restricted. *Id*. Petitioner said he wanted posts on Instagram about this incident.

66. On November 30, 2022, due to numerous and repeated violations of the phone use rules, Petitioner was not allowed to use the phone under any circumstances. Exhibit 7 at *11.

67. On December 1, 2022, Petitioner was found with inappropriate photos of a female. *Id*. at *12; Exhibit 8 at *84.

68. On December 3, 2022, BSO Main Jail command received communication about a social media post made by Petitioner on his Instagram account containing a photograph of Petitioner in the jail. *Id*. at *12-13. The post referenced command staff names and alleged mistreatment in the jail. *Id*. The post caused serious concerns about the possibility that Petitioner had access to a cell phone. A search of Petitioner and his cell was conducted with negative results for a potential cell phone. *Id*.; *see also* Exhibit 8 at *85-86.

69. On February 7, 2023, a letter was discovered in the BSO mail marked confidential legal mail that was returned by the United States Postal Services (USPS) due to a nonexistent address. Exhibit 7 at *13-14; *see also* incident report for petitioner's mail tampering, attached hereto as Exhibit "14." Sending a letter to a nonexistent address is a known method used by inmates to communicate with one another to conduct criminal activity while in custody. Exhibit 7 at *13. In this method, the inmate sending the purported legal mail uses the name of the inmate that he intends to receive the letter as the letter's sender and sends it though USPS to a non-existent address hoping it is returned to the inmate listed as the sender of the letter. Because the letter is purported to be legal mail, it is intended to be delivered to the other inmate without security staff reading the letter. *Id*. at *14. The content of the letter was reviewed, and security staff determined that the letter was sent from inmate Alexander, Gregory CIS 222200222, also housed at the Main Jail Bureau, unit 6B1 cell 2. The return address of the letter was Petitioner, Jamell Demons, housed in unit 5C2 cell 9. Alexander wrote that he was sent to confinement for helping Petitioner contact his friends and family. *Id*. Petitioner at the time had no phone privileges due to witness tampering charges.

Alexander told Petitioner that he still wants to help him. *Id*. Alexander received a D.R. regarding this matter. *Id*.

70.   On February 15, 2023, Inmate Taylor, Carrington, CIS 502102708, made a call to Erran Barnett, for Petitioner. Exhibit 7 at *14.

71.   On February 17, 2023, Petitioner received a D.R. for Conduct Which Disrupts, Unauthorized Use of Telephone, and Disobeying Facility Regulations, while housed in unit 5C2, based upon the phone call that Petitioner had Taylor make on his behalf. Exhibit 7 at *14. Through an investigation, it was discovered that Petitioner placed a note under his cell door to provide it to another inmate who was on their allotted cell time out.  *Id*. The inmate placed the note under Taylor's door. *Id.* Taylor was observed on the security camera system making a phone call for Petitioner while reading from the paper he was provided. The phone call was made to Jamie King, Petitioner's mother. *Id*. The DR was thrown out due to a technicality of the infraction time being documented one-minute different from the narrative. *Id*.

72.   On September 1, 2023, after receiving information that Inmate James Howard CIS 502001763, housed in unit 5C3, was in possession of "kites," which are letters/notes, written by Petitioner, housed in the adjacent unit 5C2, requesting that Howard make unauthorized calls and/or to contact others on behalf of Petitioner, a search of 5C3 was conducted. Exhibit 7 at *15; *see also;* Incident Report for Inmate James Howard's possession of kites, attached hereto as Exhibit "15." Several handwritten letters/notes suspected to be from Petitioner were removed from Howard's cell and photos were taken of phone numbers suspected to be associated with Petitioner. *Id*. On the same date, information was provided indicating Inmate Terrence Mathis, CIS 501803422, may also have in possession of kites written by Petitioner. The kites were given to Mathis in the past to make unauthorized calls and to contact others on behalf of Petitioner. *Id*. A search was conducted on 7C1 cell 15, assigned to Mathis, and additional kites were removed from this cell. *Id*. The kites gathered from the two cells were collected and handed over to a BSO Special Investigations Division, (SID), Detective who received the items on September 28, 2023. *Id*.

73.   On September 19, 2023, a BSO SID Sergeant contacted a Department of Detention Bureau of Investigations and Projects, "BIP," Lieutenant to advise him that he and his team had been communicating with an informant. Exhibit 7 at *15. The BSO SID Sergeant informed the BIP Lieutenant that current inmates YNW Melly, (a/ka/ Inmate Jamell Demons, i.e. Petitioner), Vot, T-Man, and Stunna are currently selling "paper dope" with laced fentanyl and abdominal fluid to

molly which is sprayed onto the mail and later used by sniffing it, smoking it, or placing it over your tongue and letting it absorb. *Id*. According to the informant, these inmates are receiving the laced mail from an unknown outside source and selling it to other inmates in exchange for commissary, money, and food. The informant further advised that he has personally bought the laced mail from inmates, YNW Melly, T-man and VOT on several different occasions. *Id*. According to the informant he advised that YNW Melly a/k/a Petitioner is a current gang member who reps the BLOOD set, and that YNW Melly was providing him and other inmates the narcotics. *Id*.

74.  On September 22, 2023, BIP Deputies spoke with the confidential informant to obtain information on any paper dope being brought into the jail. The informant state that "Melly the rapper" a/k/a YNW Melly, a/k/a Jamell Demons, currently had a yellow document with the mentioned laced paper dope. *See* Incident Report, attached hereto as Exhibit "16." A BIP K-9 Deputy and a BIP Sergeant responded to the Main Jail unit 5C2 cell 9 and conducted a thorough search of Petitioner's cell and legal paperwork. *Id*. The mentioned yellow papers with drugs were not located. *Id*.

75.  On October 3, 2023, a Probable Cause Affidavit was submitted for witness tampering by Petitioner and his accomplices in a capital murder case. Exhibit 7 at *16; *see also,* Probable cause for Petitioner's separate witness tampering criminal case, attached hereto as Exhibit "17." This case is docketed as Broward case no. 23010594CF10A. Petitioner's co-defendant in the murder, Cortlen Henry, who was released on monetary bond, and remanded into custody, **no bond,** after being charged with witness tampering for sending and receiving phone calls and messages to Demons to conspire to harass, scare, and intimidate the witness for their pending homicide charges. His case is pending as 23010643CF10A.

76.  The probable cause affidavit for the witness tampering charge states that detectives became aware of Petitioner's witness tampering activities when detectives reviewed jail telephonic evidence and witness testimony that indicated that Petitioner and his accomplices were introducing narcotics laced paper into the jail. Exhibit 17 at *12. While investigating Petitioner's gang activity, Detectives reviewed all the jail calls made to Petitioner's girlfriend, Erran Barnet, and to Jameson Francois, who had been facilitating three-way calls for Petitioner while he was in BSO's custody. *Id*.  Through this sophisticated system, Petitioner was able to speak with persons outside of the jail including with his co-defendant, Henry Cortlen, ***who the trial judge ordered he not speak with***,

as well Petitioner's girlfriend, and others. Petitioner primarily used PIN numbers of other inmates to call his co-defendant and other individuals outside the jail or had other inmates make those calls for him. *Id.*

77. On April 19, 2023, an inmate on behalf of Petitioner called Petitioner's co-defendant, Henry Cortlen, and told him to tell one of the witnesses to Petitioner's current homicide case to "…shut the fuck up, tell him to stop talking about that." *Id.* at *15. Cortlen replied to the inmate calling on behalf of Petitioner that he is keeping the witness away from court. *Id.* Detectives also discovered other recorded conversations between Cortlen and Inmate Mathis concerning narcotics smuggling in the jail on paper documents laced with drugs. *Id.* at *17.

78. On October 17, 2023, Petitioner was add-charged for his criminal actions while in-custody for the following charges: Directing the activities of a criminal gang, solicitation to commit tampering, and conspiracy to commit tampering. Those add on charges are still pending and are docketed in Broward Circuit Court, as case no: 23010594CF10A.

79. On March 29, 2024, BSO's Internal Affairs Division responded to Petitioner's housing unit. A BSO deputy and detention technician assigned to Petitioner's unit were relieved of duty and suspended after it was discovered they were providing Petitioner contraband, including lewd photos of unknown females. *Id.*

80. On March 29, 2024, another search was conducted in Petitioner's housing unit. *See* incident report attached hereto as Exhibit "18." Papers containing pictures and 2 kites were discovered in Petitioner's cell. *Id.* at *3-4. A BSO SID Detective and Sergeant were advised of the kites found. *Id.* As a result of the events and manipulation of staff, coupled with the many previous security breaches and alleged witness tampering, Petitioner was relocated to the Paul Rein Facility, to a housing pod to be housed by himself. Exhibit 7 at *19.

81. On April 13, 2024, Petitioner was counseled for asking personal questions to staff about what the staff member would do if he had a million dollars. Exhibit 8 at *119.

82. On August 12, 2024, Petitioner was relocated back to the Main Jail Bureau and housed in a unit by himself.

83. To date, Petitioner has had **249 visits** from his attorneys and investigators. *See* Exhibit 6.

84. In sum, Petitioner has utilized other inmates, BSO staff, his attorney, and other individuals in his circle to assist him with facility rule violations and security breaches, and, most importantly, the abuse of his phone and video visitation privileges to the point that no other alternatives exist

other than to restrict access to both privileges for the security and safety of the facility, and for the safety other individuals outside the jail, the witnesses to his homicide charges, whom petitioner has sought to silence.

85.   There is also evidence that Petitioner has been involved with smuggling/selling drugs in the jail, and through his mother and girlfriend, payments have been made to other Bloods gang members for illegal activities. Petitioner has not only violated internal jail rules, jeopardizing safety and security of operations, but he has committed additional crimes which he has been charged with, including tampering with witnesses and other charges.

86.   Even though he is a high-risk administrative inmate, Petitioner is treated like a general population inmate for housing purposes, where he is allowed out of cell time during Bravo and Charlie shifts just like other general population units.

87.   Petitioner has free reign to use the television and shower during his time out. Exhibit 7 at *18. Petitioner is getting recreation at the same schedule as other administrative inmates, as weather permits. *Id.*  He is allowed to send/receive mail as any other inmate with no restrictions on regular or privileged mail. *Id.* Petitioner's attorneys, with the exception of Ms. Liberty, have normal, non-barrier, attorney visitation access. *Id.* Ms.  Liberty also is permitted to visit with Petitioner in the same manner as other attorneys, but for legitimate security reason, it is restricted to barrier visits. *Id.*

88.   Petitioner's only restrictions on privileges are his phone and video visitation use. *Id.* The restrictions were placed for legitimate safety and security reasons, based upon pervasive documented violations of jail security rules. Further, Petitioner may communicate with family, friends, and his attorneys through written correspondence.

89.   Due to the numerous incidents described above, which are only an accounting of some of the more serious disciplinary and security incidents involving Petitioner, his current conditions of confinement are objectively reasonable and related to security and safety concerns and Petitioner's claims to the contrary raised in his Petitioner's petition [ECF No. 1] are against the sheer weight of the evidence that justifies such security measures, and cannot be described as anything other than vexatious.

90.   Accordingly, the Petition should be dismissed or denied as discussed in the ensuing memorandum of law and argument.

**A.** **Petitioner did not exhaust his mandatory state court remedies concerning the issues in the Petition for a Writ of Habeas Corpus prior to filing suit**

It is well established that pretrial habeas petitions **must be denied** if the petitioner did not exhaust state court remedies concerning the issue prior to filing in federal court. This includes the requirement to bring the issue before every level of review available in the state court system, including the Florida Supreme Court prior to initiating habeas proceedings in Federal Court. *See e.g.*, *Thomas v. Crosby*, 371 F.3d 782, 812 (11th Cir. 2004)("Among the most fundamental common law requirements of § 2241 is that petitioners **must first exhaust their state Court remedies**."); *Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015); *Fain v. Duff*, 488 F.2d 218, 223 (5th Cir. 1973) (holding that the state exhaustion requirement applies to all habeas corpus actions); *Stack v. Boyle*, 342 U.S. 1, 4, 72 S. Ct. 1, 3, 96 L. Ed. 3 (1951)(requiring exhaustion of state court remedies for pre-trial commitment and bail matters); *Moore v. DeYoung*, 515 F.2d 437, 442 (3rd Cir. 1975).

In Florida, orders concerning conditions of confinement, access to counsel or an order appealing an order denying monetary bond for pretrial detainees are subject to interlocutory appeal as a writ of habeas corpus pursuant to Art. V, § 4(b)(3), Fla. Const. and Fla. R.App. P. 9.030(b)(3). This is a remedy available to Petitioner. Likewise filing a habeas corpus petition in state court is the correct mechanism, under Florida law, to challenge an inmate's housing assignment to "close management." *Banks v. Jones*, 232 So. 3d 963, 966 (Fla. 2017). This habeas relief in state court is also a remedy available.

*Discussion*:

The Petition alleges that Petitioner "has continuously sought relief in State Court which relief has been useless," and that "[b]ringing these Constitutional deprivation to the attention of the State Court and State Authorities has not provided relief." [ECF No. 1 at *8]. Respectfully, these assertions are misleading *to put it mildly.* It is quite evident from publicly available records that Petitioner has failed to exhaust his state court remedies regarding the allegations in the Petition. From the face of the judicially noticeable docket in Petitioner's criminal case, there has been no notice of appeal filed from any trial court ruling on matters raised in the Petition, nor any extraordinary writ filed in the trial court or in Florida appellate courts regarding the allegations in the Petition concerning access to counsel or other conditions of confinement. *See* Broward

County, Clerk of the Courts, https://www.browardclerk.org/ (perform "Case Number Search" for Case Number 19-001872CF10A).

In Fact there *have* been appeals in the trial court proceedings by Petitioner and the State of Florida, including:

> *State of Florida v. Jamell Demons*, 4D2024-0407, 4D2024-0408 docketed 02/16/2024, a petition for a writ of certiorari filed by the State of Florida challenging trial court order precluding cross examining defense witness
>
> *State of Florida v. Jamell Demons*, 4D2024-0420, docketed date 02/19/2024, State of Florida Appealing non final order on pretrial ruling on admissibility of evidence
>
> *State of Florida v. Jamell Demons*, 4D2024-0248, docketed date 01/29/2024, State of Florida appealing non final order that order granting petitioner's motion to suppress
>
> *State of Florida v. Jamell Demons*, 4D2022-1874, docketed date 07/11/2022, State of Florida filed writ of prohibition vacating July 6th, 2022 order precluding State from seeking death penalty

And in the Supreme Court of Florida, Petitioner filed the following case:

> *Demons v. State of Florida,* SC2023-0078, docketed date 01/17/2023, Jamell Demons filing notice to invoke discretionary jurisdiction to contest Florida's 4th District Court of Appeals decision in 4D2022-1874 that overruled trial court's decision to preclude seeking death penalty against Demons

*See* Florida Appellate Case Information system, https://acis.flcourts.gov/portal/search/party (perform "Party Criteria, Name" search for "Jamell Demons"); *see also* Appeals records, attached here to as Exhibit "19."

Even though the State and Petitioner have taken the opportunity to hotly contest the issue of the death penalty and other pretrial motion practice issues, it is evident that Petitioner has failed to file any appeals or any extraordinary proceedings in the Florida appellate courts directed at either challenging the September 27th, 2022 trial court order denying petitioner's motion to remove visitation, communication, or interaction restrictions or any other of the allegations in the present petition. [ECF No. 1].

Because Petitioner has failed to exhaust his state court remedies by failing to bring the issues raised in this Petition before the Florida 4th District Court of Appeal and the Florida Supreme Court, his Petition for a Writ of Habeas Corpus must be dismissed. *Thomas v. Crosby*, 371 F.3d

782, 812 (11th Cir. 2004)) ("Among the most fundamental common law requirements of § 2241 is that petitioners must first exhaust their state court remedies.") (Tjoflat, concurring).

**B. <u>Younger abstention bars this petition as it seeks to review a trial court order denying petitioner's request to modify his pretrial release conditions and it will unduly impact his criminal proceedings.</u>**

"When a petitioner seeks federal habeas relief prior to a pending state criminal trial the petitioner must satisfy the 'Younger abstention hurdles' before the federal courts can grant such relief." *Hughes v. Att'y Gen. of Fla*., 377 F.3d 1258, 1262 (11th Cir. 2004) (quoting *Kolski v. Watkins*, 544 F.2d 762, 766 (5th Cir. 1977)).

The Supreme Court in *Younger* held that the "…state criminal proceeding offered a sufficient forum for the plaintiff to raise his constitutional defense, abstained from hearing the plaintiff's claim and stated the general rule that a federal district court must refrain from enjoining pending criminal state court proceedings except under special circumstances." *Green v. Jefferson Cnty. Comm'n*, 563 F.3d 1243, 1250 (11th Cir.2009). "In order to decide whether the federal proceeding would interfere with the state proceeding, [the court] look[s] to the relief requested and the effect it would have on the state proceedings. The relief sought need not directly interfere with an ongoing proceeding or terminate an ongoing proceeding in order for *Younger* abstention to be required." *Foster Children v. Bush,* 329 F.3d 1255, 1276 (11th Cir.2003)(citations omitted). As the Eleventh Circuit has put it: "The question ... is threefold: first, do [the proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Id*. at 1274 (quotation omitted).

Additionally *Younger* abstention is not triggered unless the federal relief would create an undue interference with state proceedings and the state proceedings at issue involve orders that uniquely further the state courts' ability to perform their judicial functions. *Wexler v. Lepore*, 385 F.3d 1336, 1339 (11th Cir. 2004). "A plaintiff's requested relief may unduly interfere with the state proceeding if it would disrupt the normal course of action in the state proceeding, even if the relief sought would not terminate an ongoing proceeding." *Davis v. Gregory*, No. 20-12716, 2021 WL 2944462, at *1 (11th Cir. July 14, 2021)(citing to *31 Foster Children*, 329 F.3d at 1276). The touchstone of this inquiry is whether "the requested federal relief would result in meticulous and burdensome federal oversight of state court or court-like functions." *Wexler*, 385 F.3d at 1340.

Thus, the Eleventh Circuit has stated that "the *Younger* doctrine as preventing federal courts from being the grand overseers ... [or] supervisor[s] of state litigation or the state court." *Id.* at 1341.

**<u>Discussion</u>**:

There cannot be a greater example of interference with a state court proceeding than granting the relief that Petitioner is requesting in this case, namely pretrial release for pending capital homicide charges in which Petitioner faces the death penalty. Granting such relief would be directly contrary to **<u>the order of the state trial court order that Petitioner be held in BSO's custody with no monetary bond</u>**. The Petitioner, by filing this Petition, is challenging the order dated September 27, 2022, issued by the trial court presiding over petitioner's criminal case in Broward Circuit Court, that denied his motion to remove visitation, communication, or interaction restrictions. Additionally, in essence, Petitioner is challenging the trial court's orders that that he be held in pretrial confinement **<u>for his pending death penalty case without monetary bond</u>**. *See* Exhibit 3. There is clearly an "ongoing state judicial proceeding" implicated. *31 Foster Children*, 329 F.3d at 1274.

Likewise, the "proceedings implicate important state interests" as it is a criminal prosecution in which the State of Florida has a keen interest to prosecute. *Id.* Furthermore, there are state court remedies, as already explained above in BSO's argument that this Petition should be dismissed for failure to exhaust state court remedies, that Petitioner can avail himself of concerning his conditions of confinement, including filing either an appeal of the trial order dated September 27, 2022 denying his motion concerning his conditions of confinement, or through filing a petition for a writ of habeas corpus in the state courts. *Lewis v. Broward Cnty. Sheriff Off.*, No. 20-14603, 2021 WL 5217718, at *2 (11th Cir. Nov. 9, 2021)(citing to *31 Foster Children v. Bush*, 329 F.3d 1255, 1279 (11th Cir. 2003))(Dismissing § 2241 petition filed by BSO pretrial detainee as being barred by *Younger* abstention that there were state court remedies available to petitioner since he "…failed to challenge the state court's bond decision or file a state habeas petition."). Likewise, Petitioner never appealed the trial court's order that denied pretrial release on bond or filed anything in the Florida appellate courts concerning his conditions of confinement.

Additionally federal involvement in this case to grant the relief Petitioner requests would be an "undue interference" in the state criminal proceeding and "result in meticulous and burdensome federal oversight of state court or court-like functions." *Wexler,* 385 F.3d at 1340–41. Petitioner's habeas petition that challenges the state court's order denying his motion for pretrial

release on monetary bond and his motion to remove visitation, communication, or interaction restrictions are better suited for the Florida appellate courts to review, not in a United States District Court.

Furthermore, Petitioner is requesting is to **be released while he is being prosecuted for a capital homicide case in which the State of Florida is seeking the penalty of death and in which trial court ordered him to be held with no monetary bond.** Petitioner, in essence, is appealing the trial court's order denying that he be released on a monetary bond in addition to the other issues he raises. There cannot be a greater example of undue interference than a federal court ordering the release of a pretrial detainee held for murder charges on a no bond hold, and as is explained below in more detail, this relief is not even available for conditions of confinement habeas corpus petitions. It's worth noting that ordering the release of the Petitioner, without the state trial court, State Attorney's Office of the 17th Judicial Circuit, and the Florida Attorney General, who typically handles criminal appeals, being noticed or having the opportunity to weigh in on this issue, would significantly interfere in the pending criminal case as it would result in extreme prejudice to the State Attorney's Office and State of Florida, and also be violative of the 11th Amendment.  BSO is being put in the position of having to respond to what is essentially an appeal of an order denying Petitioner's request to be released on monetary bond and other condition of confinement issues that are better suited to be litigated in Florida Courts, where the State Attorney's Office and or the Florida Attorney General's Office would be responding.

 At its core, Petitioner is requesting an appeal of the state trial court's order denying him monetary bond, and also other decisions concerning his conditions of confinement. These issues are not only better suited for litigation in the Florida appeals courts, but federal case law requires that be litigated in state court. As such the Court should dismiss or deny the Petition pursuant to Rule 12(b)(1), since *Younger* abstention is applicable and the Court should abstain from weighing in on matters best left to the pending criminal proceeding and the state appellate courts.

## C.  Eleventh Amendment concerns and Rooker-Feldman

There is a significant Eleventh Amendment concern in even entertaining what Petitioner is requesting this Court do. BSO is acting as an arm of the State of the Florida in holding Petitioner in pretrial custody without monetary bond pursuant to an explicit order of a Florida state trial court judge. *See* Exhibit 3. To provide the relief that Petitioner is requesting, i.e., modifying the state court's order which denied any pretrial release or bond for the petitioner, would be violative of the

Eleventh Amendment. M*iccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm.*, 226 F.3d 1226, 1231–34 (11th Cir.2000). Although, generally, there is a habeas corpus exception to the Eleventh Amendment, at its core Petitioner is requesting release from BSO's custody, and by doing so is challenging the state trial court's order denying his motion for release on monetary bond. Petitioner has rewrapped this issue as a habeas corpus petition, but nonetheless is challenging the state court's order denying him monetary bond or release for his pending capital homicide death penalty case.

Additionally, *Rooker-Feldman* bars this Petition. Although generally a habeas corpus under filed under 28 U.S.C. § 2254 is not barred by *Rooker-Feldman*, what Petitioner is doing by filing this § 2241 petition is challenging both the trial Court's procedural and pretrial state court's rulings on denying him monetary bond and the trial court order denying his motion to remove BSO's jail restrictions, not a final judgment. *Behl v. Peters,* 749 F. App'x 852, 855 (11th Cir. 2018); *see also* Exhibit 3. Petitioner is "the losing party in state court" and is impermissibly using the federal courts, "seeking review and rejection of that judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 291, 125 S.Ct. 1517, 1526, 161 L.Ed.2d 454 (2005).

**D. <u>BSO's restrictions on Petitioner's phone and visitation privileges are reasonable and were implemented for valid security and penological reasons due to Petitioner's extreme and well documented abuses of those privileges</u>**

As noted above, the Court need not reach the merits of Petitioner's claims as its evident that he failed to exhaust his state court remedies, and because of the other issues as pointed in BSO's response. However, even on the merits, the restrictions BSO has placed on Petitioner's phone and visitation privileges while incarcerated in BSO's jail in pretrial confinement, are objectively reasonable and Constitutional under, *infra*, *Turner, Bell, Jacoby* and *Magluta*, given the numerous security related issues both Petitioner, and one of his attorneys, created.

While the conditions of confinement in which a convicted inmate are held are scrutinized under the Eighth Amendment's prohibition on cruel and unusual punishment, the conditions under which a pretrial detainee, like Petitioner, are held are reviewed under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 1872 n.16, 60 L.Ed.2d 447 (1979). The Fourteenth Amendment's Due Process Clause prohibits state jail officials from punishing a pretrial detainee " 'prior to an adjudication of guilt in accordance with due process of law.' " *Jacoby v. Baldwin Cty*., 835 F.3d 1338, 1344 (11th Cir. 2016) (quoting

*Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). But jail officials may " 'subject [a pretrial detainee] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution.' " *Id.* at 1344-45 (quoting Bell, 441 U.S. at 536-37, 99 S.Ct. 1861). "Whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Id*. at 1345 (alteration adopted) (internal quotation marks omitted). "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell*, 441 U.S. at 540, 99 S.Ct. 1861.

Additionally, "whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citing *Bell*, 441 U.S. at 538, 99 S.Ct. at 1873). "[A]n expressed intent to punish on the part of detention facility officials" is sufficient, but not necessary, to establish unconstitutional pretrial punishment." *Bell*, 441 U.S. at 538, 99 S.Ct. at 1873–74; *see also McMillian*, 88 F.3d at 1564. "[A] court [also] permissibly may infer that the purpose of the governmental action is punishment" if the "restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless." *Bell*, 441 U.S. at 539, 99 S.Ct. at 1874. In *Jacoby*, the Eleventh Circuit clarified that "*Bell* effectively creates a two-part test. First, a court must ask whether any "legitimate goal" was served by the prison conditions. Second, it must ask whether the conditions are "reasonably related" to that goal." *Jacoby*, 835 F.3d at 1345.

Additionally in *Turner*, the Supreme Court developed a modified level of scrutiny to analyze certain constitutional claims involving inmates that challenge regulations of a prison. To pass constitutional muster, a prison must show that a challenged regulation is "reasonably related to a legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 90, 107 S. Ct. 2254, 2262, 96 L. Ed. 2d 64 (1987). To analyze whether a reasonable relationship exists, *Turner* outlines four factors to guide courts in this inquiry:

(1) whether there is a "valid, rational connection between the prison regulation and

the legitimate governmental interest put forward to justify it";

(2) whether "alternative means of exercising the right that remain open to prison inmates," which is evidence that weighs in favor of the regulation's validity;

(3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and

(4) whether any "obvious, easy alternatives" to the current regulation exist, as "an alternative that fully accommodates the prisoner's rights at de minimis cost to        valid penological interests" is evidence that a regulation is an "exaggerated response"        and not reasonable.

*See Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254 (internal quotations omitted). *Turner* equally applies to claims brought by pretrial detainees. *Wimbush v. Conway*, 768 F. App'x 958, 968 (11th Cir. 2019). *Turner* analysis also applies to a prison's regulation against inmates that affect those who are outside a prison. *Prison Legal News v. Sec'y, Fla. Dep't Corr.*, 890 F.3d 954 (11th Cir. 2018).

**Discussion:**

1. **The restrictions on Petitioner's phone and video are for legitimate security concerns**

As discussed in significant detail above, within one of week of Petitioner arriving in BSO's custody, he started breaking jail rules. *See supra*, BSO's response, ¶¶ 25-84. He was involved in physical altercations with inmates, and both verbally and sexually harassed female staff. More importantly, Petitioner also abused his phone and video privileges constantly which required BSO to revoke his privileges for the security and safety of the facility. Petitioner called his girlfriend, **over three thousand times**, while using other inmates unique PIN numbers, to try to avoid surveillance of his calls, which was in violation of jail rules, and which resulted in disciplinary reports. *See* Exhibit 12; Exhibit 8. It turns out Petitioner was using this communication network between his mother, his girlfriend, and others both inside and outside of the prison, including Henry Cortlen, petitioner's codefendant in his pending homicide charges, to facilitate a wide range of illegal activity including tampering with witnesses outside of the jail who were set to testify in Petitioner's capitol homicide case. Petitioner used BSO's phone and video privileges to instruct individuals outside of the jail to threaten and silence these witnesses for which Petitioner is now facing criminal charges in Broward Case No. 23010594CF10A. *See generally* Exhibit 17. Petitioner is suspected of being involved with smuggling and selling drugs

in the jail. And through his mother and girlfriend, payments have been made to other Bloods gang members regarding their different illegal and illicit activities. Petitioner **has been using BSO's phone system and video visitation systems as a means to accomplish these goals**. *See generally* Exhibits 9, 15, 16, 17, 18.  Through all this, Petitioner has not only violated internal jail rules, jeopardizing safety security of operations, but he has committed additional crimes which he has been charged with and those charges remain pending in state court.

      **Furthermore, with respect to Petitioner's attorney, Raven Liberty's conduct** in abusing BSO's video visitation rules, she **allowed non-attorneys to use her log-in credentials to conduct privileged, non-recorded video visitation with Petitioner which is contrary to jail rules**. Exhibit 7 at *8; *see also* Exhibit 10 at *3. Ms. Raven Liberty was allowing other people to use her privileged video calls with Petitioner, a serious and significant violation of jail security rules.

      Petitioner, in his own words, stated that "**I should get a da burner # from my attorney today**" and stated, "**when I do, fam don't EVER KALL DAT BIH w/ YO PIN!!!**" *See* a "kite" Petitioner wrote to another inmate found by BSO deputies, attached hereto as Exhibit "20." Petitioner also states, "Always use someone elses" and "you gone be da only one wit da code and da #!" *Id*. Clearly, if Petitioner were to have access again to the phone and video visitation, he would continue to break jail rules by using other inmates PIN numbers or have others make calls on his behalf in order to circumvent the jail security rules involving the monitoring and recording of calls. Petitioner's own words indicate that he is seeking to conspire with one of his attorneys to violate the jail's legitimate and necessary security rules.

      Petitioner's **own counsel even agreed that Petitioner violated jail rules,** and did not wish to contest BSO's restrictions on Petitioner's access to the phone and video visitations. Exhibit 12 at *12, lines 19-23. In sum, Petitioner has been continuously violating jail rules since he stepped foot into BSO's jail and has committed new crimes while in BSO's custody. The specific restrictions on Petitioner's phone and video visitation were implemented to curtail not only further efforts by Petitioner to criminally tamper with the witnesses for his pending capital homicide charges, but also to prevent Petitioner from engaging in drug smuggling and other well document criminal activities with his fellow Blood gang members. Preventing criminal activities is clearly a "legitimate goal" and these restrictions are "reasonably related" to that goal." *Jacoby*,

835 F.3d at 1345; *Tanney v. Boles*, 400 F. Supp. 2d 1027, 1040 (E.D. Mich. 2005)(dismissing 14th Amendment claims against jail for restrictions put on inmates phone privileges). Furthermore, Petitioner is permitted to send and receive mail to his family, friends, providing Petitioner with an alternative means of communicating.

Additionally, to the extent Petitioner contests that he did not tamper with the witnesses for his capital homicide charges via BSO's jail system or engaged in drug smuggling or gang activity, he is barred by *Heck v. Humphrey* barred from doing so as he is currently being prosecuted for those charges. *Id.* at 487, 114 S.Ct. at 2372; *see also Newman v. Leon County Sheriff's Office,* No. 4:08cv474/SPM/WCS, 2009 WL 62652 (N.D.Fla. Jan.7, 2009) (dismissing, under *Heck,* pretrial detainee's Fourth, Sixth and Fourteenth Amendment claims brought under § 1983, where resolving those claims in detainee's favor would undermine the validity of his potential conviction on **pending criminal** charges).

2. **The restrictions on Petitioner's access to one of his attorneys, Raven Liberty, are for legitimate security concerns**

Petitioner is also claiming BSO is violating his Sixth Amendment right to counsel by the conditions imposed by the Sheriff's Office. [ECF No. 1 at *7].  The conditions imposed, namely a barrier visits with Ms. Liberty, were done for legitimate security purposes. As already discussed, the 'glass barrier,' [ECF No 1, ¶21] is only in place for attorney visits in which Petitioner's "defense team" **chooses** to bring Ms. Liberty with them. Exhibit 7 at *18. If Petitioner's defense team chooses not bringing Ms. Liberty, then BSO does not require a glass barrier or any barrier to Petitioner from interacting with **any other of Petitioner's counsel**. *Id*. Petitioner is permitted to meet the numerous other attorneys he employs **with no barrier** as much as he wants in private professional visitor rooms, which despite Petitioner's claim, [ECF No. 1 at ¶22], are more than adequate to house all of Petitioner's attorneys and is in a private setting. Petitioner is not required to use the bond room. Additionally, Petitioner's claim that he has not been allowed to see his counsel or in a private setting., *Id*. at ¶ 33, is quite frankly, a misrepresentation. *See* Exhibit 6; Exhibit 8.

As previously discussed, BSO received information from a confidential informant in BSO's jail that Petitioner's attorney was going to attempt to smuggle two keys to handcuffs to Petitioner and inmate Lewis to help them escape. *See* generally Exhibit 11. When Petitioner and

inmate Lewis' cell were searched, drug contraband that the confidential informant indicated was present—was found, which provided veracity to the information. Exhibit 9 at *12. Likewise, a recorded relay call on September 15th, 2022, between Petitioner and his girlfriend spoke of Ms. Liberty conspiring with Petitioner to smuggle in contraband photographs to petitioner. Exhibit 7 at *8. Preventing an individual from smuggling contraband into the jail is clearly a "legitimate goal" and these restrictions, namely a glass barrier between the visitor and the inmate to prevent the introduction of contraband into the jail are "reasonably related" to that goal." *Jacoby*, 835 F.3d at 1345. It's worth noting that Petitioner is still attempting to get photographs of his girlfriend and other women smuggled to him. *See generally* Exhibit 5. Barrier visits to address security concerns are constitutional. *O'Bryan v. Saginaw Cnty., Mich.*, 529 F. Supp. 206, 212 (E.D. Mich. 1981), *aff'd sub nom. O'Bryan v. Cnty. of Saginaw, Mich.*, 741 F.2d 283 (6th Cir. 1984).

3.  **Petitioner's present housing arrangements are far from "cruel and unusual" and were implemented for the security and safety of the facility**

Petitioner's second ground for habeas corpus relief is that his conditions of confinement are "cruel and unusual" and "bare no rational relationship to any legitimate state interest" and violate his rights to due process and equal protection. [ECF No. 1 at *7]. Petitioner also claims this housing arrangement interferes with his preparation for trial. *Id.* at ¶ 38.  As pointed out below, Petitioner's release from BSO's jail is not an available form of relief that this Court may grant, even if this Court were to find for the Petitioner on this or any other issue before this Court. However, in either event, Petitioner's present conditions of confinement are far from cruel and unusual and were implemented for the security of the facility. Petitioner is currently in an entire housing pod, by himself.  A housing pod consists of four or more cells with a large common area, called a dayroom, which has a television, a phone, communal seating, a computer kiosk to place commissary requests, a shower, a bathroom, and other amenities. Petitioner has free access to all these amenities, aside from the phone, generally as much and whenever as he wants. Furthermore, what's curious is that despite his claims now before this Court, the Petitioner, in his own words, describes his current housing arrangement of being in a housing pod by himself as very desirable. *See* generally Exhibit 5.

In either event, placing Petitioner in a housing pod by himself since March of 2024 was done for the security and safety of the facility. From the moment Petitioner stepped foot into

BSO's jail, he has manipulated inmates, BSO employees, nurses, outside accomplices, and his own attorneys in breaking jail rules, and committing crimes. *See generally* Exhibits 7, 9 11, 14, 15, 16, 17, 18. Petitioner most recently was using "kites," or written notes to other inmates that were in his housing pod to direct and participate in drug smuggling in the jail on behalf of a gang, for which Petitioner faces criminal charges. *See generally* Exhibit 17. Petitioner also has consistently convinced other inmates within each housing pod where he has been housed, to use their unique phone PIN numbers to **place thousands of calls**, *see* Exhibit 13, to coordinate various criminal activities, including witness tampering, drug smuggling, and other crimes. *See also* Exhibit 20. Petitioner has explicitly admitted to "shoot[ing] kites" to other inmates during certain staffing shifts when he was housed in a housing pod with other inmates, to avoid detection. *Id*.

Removing Petitioner's direct access to other inmates in his housing pod to prevent him from having access to their phone pins and to prevent the circulation of "kites" used to organize criminal activity is clearly a "legitimate goal" and these restrictions, namely placing petitioner in a housing pod by himself is "reasonably related" to that goal." *Jacoby*, 835 F.3d at 1345. BSO jail staff are consistently monitoring and reviewing the security situation with Petitioner. The conditions of Petitioner's housing and privileges may change in the future, based upon the security and safety needs of the jail. However, as of now, these security measures are needed to maintain the security of the jail system as a whole.

**<u>Conclusion</u>**:

The conditions of confinement imposed on Petitioner were done in response to serious security incidents in BSO's jail, and narrowly tailored to address the security issues caused by Petitioner, while still allowing him to meet with all his counsel in a private setting and also have a means of communicating with family and friends. Petitioner's claims that these conditions of confinement violate his 1st, 5th, 6th, 8th, and 14th Amendment rights do not survive scrutiny, given the circumstances that warranted the imposition of them. Furthermore, Petitioner's request that the Court interfere with BSO's current housing arrangements for Petitioner would **"**seriously hamper [BSO's] ability to anticipate security problems and to adopt innovative solutions**"** to the varied challenges which have arisen with petitioner. *See Turner*, 482 U.S. at 89, 107 S. Ct. 2254. Furthermore "responsible prison officials must be permitted to 'take reasonable steps to forestall

... threat(s) to security, and they must be permitted **to act before** the time when they can compile a dossier on the eve of a riot." *Wolfish*, 441 U.S. at 551, n. 32, 99 S.Ct. at 1880, n.32, *citing Jones v. North Carolina Prisoner's Labor Union*, 433 U.S. 119, 132-133, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

E. <u>**Petitioner's grounds for relief fall outside the core of habeas corpus and are therefore not cognizable in a habeas corpus petition**</u>

The only relief Petitioner is requesting, namely release from BSO's custody, is not a form of relief that this Court can grant. Although Petitioner is seeking equitable relief in the form of immediate release from BSO's custody [ECF No. 1 at *10], his grounds for relief **do not challenge the legality of his pretrial detention**. Nor would a favorable resolution of his Petition entitle Petitioner to release from BSO's custody. Petitioner is challenging the conditions BSO has placed on his housing, his phone, and video visitation privileges, which is not a challenge to the fact or duration of his confinement or the "core" of habeas corpus. This is not a claim alleging that BSO held Petitioner in custody after he posted monetary bond, or that he was ordered released by the trial court judge and BSO kept him in custody, which would be situations be pursuable in habeas corpus. Rather, Petitioner is being held in **pretrial confinement pursuant to a lawful no bond order by the trial court presiding over his pending capital homicide case**. Petitions that challenge only conditions of confinement fall outside of what is pursuable in habeas corpus. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("constitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside [the] core" of habeas corpus); *see also Vaz v. Skinner,* 634 Fed. App'x 778, 781 (11th Cir. 2015) (Generally speaking, a "§ 2241 petition is not the appropriate vehicle for raising an inadequate medical care claim, as such a claim challenges the conditions of confinement, not the fact or duration of confinement."); *Glaus v. Anderson,* 408 F.3d 382, 387 (7th Cir.2005) ("If an inmate established that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; **release from custody is not an option**.")

The Eleventh Circuit has clearly held "**that release from custody is not an available remedy for claims about confinement conditions**, even if a prisoner establishes an Eighth Amendment violation." *Gomez v. United States,* 899 F.2d 1124, 1126 (11th Cir.1990). Instead, "[t]he appropriate Eleventh Circuit relief from prison conditions that violate the Eighth

Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." *Id.*

Since the only relief requested by Petitioner is that "this Honorable Court Order the Petitioner's immediate release from custody[,]" and since release from custody is not an available remedy for a conditions of confinement in a § 2241 habeas corpus petition, the Petition should be denied.

**F. Lack of timeliness**

A one-year statute of limitations applies to the filing of habeas corpus petitions, including § 2241 habeas petitions. 28 U.S.C. § 2244(d)(1); *Peoples v. Chatman*, 393 F.3d 1352, 1353 (11th Cir. 2004) (holding that a state prisoner's § 2241 habeas petition was subject to the one-year statute of limitations in § 2244(d)(1)); *Medberry v. Crosby*, 351 F.3d 1049, 1058–62 (11th Cir. 2003) (holding there was a single habeas corpus remedy for state prisoners governed by both § 2241 and 28 U.S.C. § 2254, and the habeas corpus remedy authorized by § 2241 was subject to the restrictions of § 2254). The limitations period runs from the date on which (1) the judgment of conviction became final; (2) an unconstitutional impediment to filing was removed; (3) a new retroactively applicable right was initially recognized by the Supreme Court; or **(4) facts supporting new claims could have been discovered through the exercise of due diligence**, whichever date is latest. § 2244(d)(1).

*Discussion*:

Petitioner would have known the factual predicate of his claims in the present petition for a writ of habeas corpus by the latest on September 27, 2022, the date there was a state court hearing on petitioner's Motion to Remove Visitation, Communication, or Interaction Restrictions, and the one-year statute of limitations would have accrued at that point and started ticking. Petitioner challenged his current conditions of confinement relating to his phone and video restrictions at that date. The present petition was filed well over a year of after being aware of these conditions of confinement, and as such the Petition is time barred or otherwise untimely.

*Conclusion*

WHEREFORE, Broward County Sheriff's Office respectfully request that the petition for habeas corpus be dismissed and or denied and attorneys fees be granted to BSO.

*Respectfully submitted,*

*/s/ Colin Tillinghast Hayes*

**Colin Tillinghast Hayes, Esq.**
Assistant General Counsel
Office of the General Counsel
Broward County Sheriff's Office
2601 West Broward Boulevard
Fort Lauderdale, Fl 33312
Colin_Hayes@sheriff.org
Tel. (954) 831-8920
FL Bar No.: 0119192
***Counsel for respondents***

*/s/ Christian Tsoubanos*

**Christian Tsoubanos, Esq.**
Senior Assistant General Counsel
Office of the General Counsel
Broward County Sheriff's Office
2601 West Broward Boulevard
Fort Lauderdale, Fl 33312
Christian_Tsoubanos@sheriff.org
Tel. (954) 831-8920
FL Bar No.: 42699
***Counsel for respondents***

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF, which will serve a copy of the aforesaid via Notice of Electronic Filing upon all parties identified on the attached Service List on this 13th day of December, 2024.

.

*/s/ Colin Tillinghast Hayes*
**Colin Tillinghast Hayes, Esq.**
Assistant General Counsel

## SERVICE LIST

**Via ECF/Email:**

**Michael A. Pizzi, JR., P.A.**
Florida Bar No. 079545
6625 Miami Lakes Drive, Suite 316
Miami Lakes, FL 33014
Tel: 786.594.3948
Fax: 305-777-3802
mpizzi@pizzilaw.com