1          IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
               IN AND FOR BROWARD COUNTY, FLORIDA
2                    CASE NO. 19-001872CF10A

3
     STATE OF FLORIDA,
4
             Plaintiff,
5
     -vs-
6

7     JAMELL DEMONS,

8             Defendant.
     _____/
9

10                          -   -   -

11

12          HEARING BEFORE THE HONORABLE JUDGE SIEGEL

13

14               TUESDAY, September 27, 2022
           BROWARD COUNTY COURTHOUSE, COURTROOM 7870
                    FORT LAUDERDALE, FLORIDA
15                  10:00 a.m. - 12:30 p.m.

16

17

18
     Reported By:
19   AMBER N. GAMBEL, Court Reporter
     Notary Public, State of Florida
20   BAILEY & ASSOCIATES REPORTING, INC.
     Fort Lauderdale Office
21   Phone - 954-358-9090

22

23

24

25

```
 1    APPEARANCES:

 2        On behalf of the Plaintiff:
          KRISTINE B BRADLEY, Esquire
 3        LAW OFFICE OF THE STATE ATTORNEY
          201 SE 6th St
 4        SUITE 655
          Fort Lauderdale, FL 33301-3303
 5        954-831-6955

 6        CHRISTIAN TSOUBANOS, ESQUIRE.
          BROWARD COUNTY SHERIFF'S OFFICE
 7        2601 W Broward Blvd
          Fort Lauderdale, FL  33312
 8        954-831-8923

 9        On behalf of the Defendant:
          RAVEN RAMONA LIBERTY, Esquire
10        LAW OFFICE OF RAVEN LIBERTY
          153 NE 97th St
11        Miami Shores, FL 33138-2332
          305-459-0756
12
          STUART ADELSTEIN, ESQUIRE.
13        ADELSTEIN & MATTERS, P.A.
          2929 SW 3RD AVENUE
14        SUITE 412
          MIAMI, FL 33129.
15        305-358-9222

16                           -   -   -

17

18

19

20

21

22

23

24

25
```

 1        (Thereupon, the following proceedings were had):

 2             THE COURT:  Demons who's present in the

 3        courtroom.  I see Mr. Demons here and Christian was

 4        here.  Good morning.

 5             MR. ADELSTEIN: Ms. Liberty filed a motion

 6        indicating that we're having problems

 7        communicating -- with being allowed to communicate

 8        with our client to prepare for trial.  And let me

 9        explain the accommodations that were given to us.

10             Because of certain so-called representations

11        back, I think, in March, the jail informed us that

12        the only way we could see Mr. Demons is through the

13        glass and no-contact visits.  The room they provide

14        for us was the room on the first floor where I'm

15        told they write bonds.  All of us cannot fit in

16        that room, number one.  Putting two people in that

17        room is very difficult.  One has to stand behind

18        the other, but more importantly, you can hear all

19        of the conversations because I could hear the

20        conversations next door in the room.

21             In addition to that, there was information

22        relayed to Ms. Liberty by the County Attorney's

23        Office, I believe, questioning whether or not she

24        was qualified and wanted to know what conversations

25        she was having with Mr. Demons because she spends

1    quite a bit of time with him.

2        Number one, I believe this is improper for a

3    lawyer -- for the government or lawyer, any lawyer,

4    to ask another lawyer what conversations he or she

5    is having with a client, unless they believe there

6    is some impropriety.

7        Number two, we cannot all fit in the room.  I

8    will say that the county attorney has advised us,

9    just recently, that both myself and David Howard

10   are now allowed to have contact visits with him; is

11   that correct?

12       MR. TSOUBANOS:  As of 9/21.

13       MR. ADELSTEIN:  Ms. Liberty cannot and our

14   investigator cannot, who is in the courtroom,

15   cannot have it, and that is creating a real

16   constitutional issue for us for preparing for

17   trial.

18       I've attempted to talk to the county attorney

19   to find out the so-called impropriety he believes

20   would have caused such an action, because quite

21   candidly, in 40 years of practicing law, I've never

22   seen this done.

23       I will say that I represented a lawyer down in

24   Dade County who was accused of bringing in

25   contraband, it turne2d out to be a legal pad for

 1    his client.  At first the county forbid him from

 2    entering any jail.  They ended up modifying it when

 3    the county attorney down there, the state attorney,

 4    and the chief -- or warden down there, and at least

 5    accommodated that lawyer by allowing him in and

 6    seeing him under glass but in a normal room.  Not a

 7    little, I would say, room, not even eight-by-eight,

 8    and that's why we're here.

 9         I am lead to believe that the county attorney

10    is going to tell us why they have taken this

11    step -- or these steps against our investigator and

12    Ms. Liberty.

13         THE COURT:  Okay.

14         MR. TSOUBANOS:  Judge, Christian Tsoubanos.

15         So we're here based on the last court hearing

16    that we had back in April. At that hearing I told

17    the Court that Ms. Liberty's video visits were

18    banned because she set up several -- 10, 20 --

19    video visits using her confidential lawyer pin, and

20    gave that pin out to other people.

21         MS. LIBERTY: I object to that, Your Honor.

22    There is no proof of that.

23         THE COURT:  Can you relax for a minute?

24         MR. TSOUBANOS:  We do have proof of that, Your

25    Honor.  In the beginning she told us that was her

1    legal assistant setting up the video visits, which

2    that's a lie.  So the video visits were banned. Ms.

3    Liberty told us she didn't know.  She didn't know

4    she wasn't allowed to do that.

5        THE COURT:  So what happened?

6        MR. TSOUBANOS:  He would set up video visits

7    for other people, sign into the visits with her

8    pin.  So the visits were not recorded, and they

9    were confidential like lawyer visits, and they

10   weren't lawyers.

11       THE COURT:  Okay.

12       MR. TSOUBANOS:  So dating back from when he

13   was originally booked in, in 2019, Mr. Demons has

14   been given countless DR's for violation of our

15   phone privilege policy by conducting calls not

16   using his own pin but a pin assigned to a specific

17   inmate, using other people's pins, and he conducts

18   relay calls.

19       We have -- just to give the girlfriend's

20   number -- the 469-297-8441.  Since March of 2019,

21   that number has been called or attempted to call

22   from jail 341 times just to that number, and yet

23   Mr. Demons' pin only accounts for 100 of those

24   calls.  The rest of them were done by inmates

25   either by third-party relay, another way would be

1    on his phone from his cell, and they would

2    communicate back and forth.  And so I have a copy

3    for counsel that they can have.

4         MR. ADELSTEIN:  We're not contesting the

5    problems with --

6         THE COURT:  Let him finish.

7         MR. TSOUBANOS:  This is the Sheriff's

8    presentation.

9         THE COURT:  Let him finish.

10        MR. TSOUBANOS:  All this leads up as to why

11   Ms. Raven Liberty's privilege for in-person is not

12   available.  So here is a copy for the State and a

13   copy for the Court.  We would like that to go in

14   the court file.

15        THE COURT: Okay.  That's fine.  That's dealing

16   with the motion that's here and brought by the

17   defense.

18        MR. TSOUBANOS:  We also --

19        MR. ADELSTEIN:  Judge --

20        THE COURT:  Hold on.

21        MR. ADELSTEIN:  I would like to make an

22   objection, please.  We previously asked for the

23   documents they were going to be presenting to the

24   Court and were now just given what is close to

25   3041 --

1          THE COURT:   3041 telephones calls.

2          MR. TSOUBANOS:   It's a ledger of calls that

3     were --

4          THE COURT: Hold on.

5          MR. ADELSTEIN:   He is obligated to give us

6     this prior to the hearing instead of walking in and

7     ambushing --

8          THE COURT:   Okay.   So I set this thing quick.

9     I don't have a problem resetting it for next week.

10    I don't.

11         MR. TSOUBANOS:   We didn't provide other

12    evidence to them ahead of time so they could

13    manipulate their testimony and come up with a

14    plausible explanation.

15         MR. ADELSTEIN:   Objection.   Manipulating and

16    coming in to lie?

17         MR. TSOUBANOS:   It's on the recordings, Judge.

18         THE COURT: Well, here's the deal.   It's on the

19    recordings.   They're entitled to information you

20    intend to use at a hearing.   I don't have a problem

21    with --

22         (Multiple speakers.)

23         MR. TSOUBANOS:   This is --

24         THE COURT: Unless there's an appropriate

25    investigation that actually will be going on, this

1     is something that we need to do it in camera -- may

2     be the best way to do it, outside the presence of

3     the public, so to speak, because I'm on Zoom here.

4          MR. TSOUBANOS:  I am going to keep going

5     forward with my reasons why Command Staff Jim Reyes

6     is forbidding in-person contacts.

7          So we had information from a confidential

8     source that one of Mr. Demons' attorneys would be

9     bringing two handcuff keys into the jail facility.

10    When we were in court last time, the Sheriff's

11    Office used the term "contraband."  I don't know

12    where pipe bombs came from in the motion that

13    Ms. Liberty wrote.  I made no mention of pipe

14    bombs.

15         The only contraband that was found and that

16    came from a confidential source is that another

17    inmate had narcotics in his cell, and that was

18    true.  That cell was searched, and the contraband

19    included a lighter.  Prescription drugs that were

20    not prescribed to him were also found.

21         MR. ADELSTEIN:  In his cell or somewhere else?

22         MR. TSOUBANOS:  The confidential source that

23    gave us the information about the two keys is the

24    same, and one of them came out 100 percent true.

25    And with that, they did a search of Mr. Demons'

1     cell for the handcuff keys.  They could have not.

2     There was not an opportunity to bring it in the

3     facility yet.  So we had court on that.

4          So the calls that we provided to the Court, he

5     was given several disciplinary actions against him

6     since he became incarcerated back in 2019.  We

7     allowed -- we suspended his phone privileges for

8     personal calls using his own pin, and we allowed

9     him to still be able to continue to call his

10    attorneys, but then he would manipulate the calls

11    to his attorney by using another inmate's pin and

12    call the same girlfriend.

13         So again he manipulated the contact to his

14    attorneys, and he manipulated that system as well.

15         So back at the last court hearing, all

16    attorneys, based on command staff direction, were

17    limited to barrier visits.

18         On 9/15 of 2022, there was a relay call

19    Mr. Demons did in his cell with another inmate on

20    the phone.  And he was talking to his girlfriend,

21    and she asked if he got -- if Mr. Demons has

22    received the pictures yet.  And she says -- and the

23    inmate relays back, Mr. Demons back to his

24    girlfriend on the phone he had not received them

25    yet.  And she said she gave those to his lawyer two

1    weeks ago and he should have received it.  And she

2    says, "I am going to beat her ass." Then uses her

3    name, Ms. Liberty, in that phone call.

4         Those barrier visits prevent the introduction

5    of contraband into the facility, like personal

6    photographs.  If counsel will look at Statute

7    951.22, the definition of introduce contraband into

8    a facility, the photo.

9         So not only was she talking about Ms. Liberty

10   bringing in the photographs of the girlfriend into

11   the facility, the girlfriend gave them to

12   Ms. Liberty based on the jail phone call.

13        So jumping to September 22nd, we begin to

14   allow him to use the phone to contact his attorney.

15   And he calls his girlfriend again on somebody

16   else's pin and tells the girlfriend, "If anybody

17   comes on the call, just tell them your my attorney,

18   Liberty," to have the call camouflaged.  He's not

19   calling his attorney.  He was calling the

20   girlfriend with somebody else's pin.

21        So based on the phone call that she,

22   Ms. Liberty, is smuggling into the facility

23   photographs of girlfriend, the jail is continuing

24   to ban her specifically from having contact visits

25   with Mr. Demons, and based on the fact that she

1    used Ms. Liberty's name, the two male attorneys are

2    now allowed in-person contact visits because that

3    has dispelled that they are the subject of that

4    introduction of contraband.

5        The jail is done at this point.  We have

6    disciplinary reports, the initial source report,

7    and we have two calls for the Court to listen to.

8    One is 25 minutes long and the other one is

9    probably the same.

10       MR. ADELSTEIN: Judge, I'm not disputing -- I'm

11   not here asking to give Mr. Demons' phone

12   privileges back.  I'm not asking that.  What I'm

13   asking the Court to do is -- there is absolutely no

14   evidence whatsoever, based upon what I just heard,

15   that Ms. Liberty has done anything wrong.

16       We cannot control, as you know, what other

17   people say about us.  And that appears to be

18   everything that's being relied upon.

19       I accept the fact that his phone privileges

20   are denied.  I told him his phone privileges are

21   denied because of his own actions and, based upon

22   what I've learned, that supposedly he used other

23   people's ID numbers to make phone calls.

24       But certainly you cannot, cannot condemn a

25   person based upon what a third person may say about

1          him or her because if we were, I would probably be

2          in jail along with probably half of the defense bar

3          on things that clients have said about us over the

4          years.

5               So far they have presented absolutely nothing,

6          nothing to show that Ms. Liberty has done anything

7          improper to other people.

8               MR. TSOUBANOS:  She accepted photographs of

9          the girlfriend.

10              MR. ADELSTEIN:  You don't know that.

11              MR. TSOUBANOS:  The girlfriend said --

12              MR. ADELSTEIN:  Did you talk to her?

13              MR. TSOUBANOS:  It's on a recorded line.

14              MR. ADELSTEIN:  Did you talk to her?

15              MR. TSOUBANOS:  No.  We have that coupled with

16         the information from a credible source that one of

17         his attorneys was going to bring handcuff keys into

18         the facility for an escape, which causes the

19         Sheriff great concern.

20              MR. ADELSTEIN:  Obviously, they didn't find

21         handcuff keys on his person; so that confidential

22         source lied.

23              THE COURT: The jail has now allowed the

24         attorneys to visit, assuming what Mr. Adelstein

25         says is correct?

1        MR. TSOUBANOS:  It's the bond room.  It was

2    used by Attorney Mishali.  She used that room to

3    prepare for her trial with her client.  It's a bond

4    room.  There are no bond people in that room.  It's

5    the same as a professional visit.  Other deputies

6    are around the perimeter, other attorneys are

7    there.  It's a Plexiglass window.  And, again, that

8    would be for Ms. Liberty to use.  The two other

9    attorneys have been cleared to have in-person

10   contact.

11       MR. ADELSTEIN:  That's the problem.  We're a

12   team.  He may not like the team, but we're a team,

13   and we all can't fit in there.  I also asked him

14   about our investigator, Mr. Hope, who is sitting in

15   the courtroom, what the problem was with him

16   because he can't have any contact visit with him.

17       MR. TSOUBANSO:  He's under the same

18   investigation.

19       MR. ADELSTEIN:  What investigation?

20       MR. TSOUBANOS:  Since September 15th of '22.

21       MR. ADELSTEIN:   If there's an investigation,

22   under the McClain case, the State is obligated not

23   to tell us the nature of the investigation but that

24   one of the lawyers is under investigation because

25   that lawyer, under McClain, may want to curry

 1    favor.  That's exactly what the McClain case stands

 2    for.

 3         We have heard, for the last six months at

 4    least, that there is a so-called investigation.  If

 5    there was an investigation, put it in writing --

 6    don't tell us the nature -- so that the Court can

 7    do a colloquy with our client on whether or not our

 8    client wants to keep that lawyer, understanding

 9    that he or she is under investigation by whatever

10    authority.

11         I don't believe there is an investigation.

12    And what a third-party says about a lawyer and when

13    they do those inquiries find no evidence indicates

14    that maybe they ought to talk to that person and

15    find out why that person might be lying.

16         I'm not here to argue to give Jamell phone

17    privileges.  I'm convinced, from what is occurring,

18    that unfortunately he has not used the phone

19    according to jail instructions.

20         I'm here to say the jail is unilaterally

21    precluding the lawyer to prepare for trial and his

22    constitutional right to sit and discuss this case.

23    In this case if we want to go every day, eight to

24    nine hours a day if we want, the jail cannot tell

25    us when to go. That's not their duty.

```
 1              I tried to talk to the county attorney out in
 2       the hall, and the first conversation he said to me,
 3       "Is Ms. Liberty qualified to handle this case --
 4              MR. TSOUBANOS:  That's not true.
 5              MR. ADELSTEIN:  -- and what's her deal?" It's
 6       none of his --
 7              (Multiple speakers.)
 8              MR. TSOUBANOS:  -- charge safety security of
 9       the jail facility.
10              MS. LIBERTY: Judge, I had a conversation with
11       counsel on the phone, and --
12              THE COURT:  Well, the same thing, what do we
13       want to talk about?
14              MR. TSOUBANOS:  That's not what the jail --
15              MS. LIBERTY:  We gave the floor to to him to
16       talk.  He then went on to say that because I visit
17       Mr. Demons so often and the length of the time
18       visiting, it's unusual, and no attorney is going to
19       spend that much time with their client unless -- he
20       said, "Mr. Demons must be my boyfriend."
21              MR. TSOUBANOS:  No.
22              MS. LIBERTY: He accused me of having an
23       improper relationship with Mr. Demons.  I am
24       surprised today that we're not coming in and he's
25       looking for something else.
```

1          I specifically said also last week, "If any of
2     us are under investigation, you must tell us."
3          He said based upon the contraband report, he
4     came to the decision he was making -- this decision
5     I visit Mr. Demons too often.
6          MR. TSOUBANOS:  That is not correct.  What I
7     told her on the phone what's wrong with visiting,
8     that the command staff made an observation that you
9     have visited Mr. Demons for three to four times
10    with no paperwork at all --
11         MS. LIBERTY: I'm here with no paperwork.
12         MR. TSOUBANOS:  -- not a deposition, nothing.
13    That's very odd behavior for a criminal defense
14    attorney in prepping a death penalty case.
15         MR. ADELSTEIN:  He doesn't know what we have
16    in a death penalty case.
17         Have you ever worked on a death penalty case?
18         MR. TSOUBANOS:  Yes, I was a former
19    prosecutor.
20         THE COURT:  You guys, I need a few minutes to
21    finish this docket, and then we'll continue this
22    hearing.
23         MR. ADELSTEIN:  Yes, sir.
24         MS. BRADLEY: I have to go to Judge Bober.  So
25    about what time were you thinking?

1        THE COURT:  We can do --

2        [!EZ SPEAKER 05]:  I want to make sure any

3    ineffective counsel claims, that those are properly

4    preserved for the record.  I would like you to

5    colloquy the Defendant as to Ms. Liberty, and I

6    want to be present for that.

7        THE COURT:  I can't tell you an exact time.

8        MS. BRADLEY: I'll have my cell phone.

9        (The Court heard other matters on the docket.)

10       THE COURT: I have a doctor's appointment at

11   1:00; so I have to leave at 12:30.  So that's 45

12   minutes for everybody to finish up.

13       Do you want to pick up tomorrow morning?

14       MR. ADELSTEIN:  I can't make it tomorrow, but

15   I'm thinking we can finish it up.

16       MR. TSOUBANOS:  Okay.

17       MR. ADELSTEIN:  I have to finish.  I would

18   like to leave personally.

19       But in any event, Judge, let me first

20   apologize for getting up and raising my voice.  But

21   so far what I've heard from the county attorney

22   office is third-party accusations that apparently

23   have been unfounded.  The keys -- when they

24   searched his room, no keys, no narcotics, no drugs

25   in his cell.

1          Pictures were sent supposedly to Ms. Liberty,

2     but they supposedly were given to Mr. Demons -- and

3     the amount of time that either she spends, I spend

4     or Mr. Howard spends or the investigator spends

5     with Mr. Demons, with all due respect, is none of

6     the county's business in preparing a case for

7     trial.

8          We filed this motion primarily to alert the

9     Court that we believe that we cannot have a secure

10    room to talk to our client to discuss matters

11    concerning the trial because I can hear voices.

12    And that little bond room, I can hear the jailers

13    talking right behind that window.

14         I understand the county has lifted the hold on

15    that accomodation on Mr. Howard and myself,

16    correct?

17         MR. TSOUBANOS:  Yes.

18         MR. ADELSTEIN:  However, there is another

19    member of our team, and that room is not secure.

20    If they wanted to present some evidence other than

21    third-party, which obviously is hearsay, at this

22    moment we need the Court to justify this and give

23    us an opportunity to get this matter out in the

24    open.  We're willing to do that.

25         So far, in my opinion, they are denying him

 1    access to the lawyers of his choice.  Now, what is
 2    being discussed and who is discussing it is
 3    privileged information, unless they can come in
 4    here and say to the Court that a crime either has
 5    been committed or is about to be committed or is
 6    still going on.  So I heard none of that
 7    whatsoever.
 8        We obviously -- no lawyer can control what the
 9    client says over the phone, and that's neither here
10    nor there -- or what we discuss.  To say to the
11    Court we have issues that we cannot adequately
12    discuss the demand case --
13        THE COURT: You're saying without Ms. Liberty
14    or the investigator being present during this time;
15    is that correct?
16        MR. ADELSTEIN:  So Ms. Liberty -- so there are
17    many times, Judge, that Mr. Howard goes alone.
18    There are many times I go alone.  There are many
19    times I go with the investigator, Mr. Hope, and
20    there are times when Ms. Liberty goes alone.  The
21    time we spend is really none of their business
22    unless they can come in hear and say, "We believe a
23    crime is being committed."
24        THE COURT:  So let me start out with the first
25    thing that came up with the phone that the

```
 1    Defendant had with regard to whatever he was --
 2         MR. TSOUBANOS:  It's in the motion.
 3         THE COURT:  -- to try to narrow in on that
 4    issue.
 5         MR. ADELSTEIN:  We accept that.  There's also
 6    issues --
 7         MS. LIBERTY:  I can call other clients that I
 8    have on Securus.  So if I can finish my point, I
 9    was never further allowed the opportunity to, when
10    the allegations were made -- I tried to contact
11    Securus.  I tried to contact the jail.  They told
12    me Securus was a separate entity and that dealt
13    with Securus suspending me.  Because of what
14    occurred in March, you suspended our visitation
15    entirely.  I would just point out one quick --
16         MR. TSOUBANOS:  I didn't stop your visitation
17    entirely.
18         MS. LIBERTY:  -- that we couldn't get in the
19    jail, and that's when they came up with barrier
20    visits in the bond room.
21         MR. TSOUBANOS:  Judge, she's misleading the
22    Court.
23         MS. LIBERTY:  I didn't get to finish telling
24    you what -- when Mr. Demons wants to call me, what
25    happens is a deputy usually calls me first and
```

1    says, "Who is this?" I have my cell phone on my

2    person almost all the time, and then they check and

3    make sure I pick up the phone.

4         I spoke to Mr. Hope outside.  Mr. Hope is the

5    other person who gets phone calls, and it's the

6    same situation.  They call him first to make sure

7    he picked up the phone, and then Mr. Demons is

8    allowed to call.

9         I don't know the allegations of the girlfriend

10   being called and she being told to pretend she's a

11   lawyer.  That's almost impossible.

12        MR. TSOUBANOS:  It's on all the recorded

13   calls.  We don't want to babysit Mr. Demons or

14   these attorneys on this conduct.  I provided the

15   Court the telephone logs of third-party calls, the

16   relay calls.

17        At this point, it's over their misconduct done

18   by Ms. Liberty on video.  She accepted her

19   sanctions and that doesn't go away.  This is a

20   security threat to the facility, acts in this

21   fashion -- let's start there, and then go forward

22   with all of the stuff that happened until we get to

23   today's date.  That's the reason we're here.  This

24   is not one isolated incident.  It's building and

25   building information, and this last incident being

1    investigated, and she's a party to those facts.

2            MS. LIBERTY: So I also was speaking to him

3    last week and there was no investigation.

4            MR. TSOUBANOS:  The introduction of contraband

5    into the facility by Ms. Liberty with the

6    photograph being the last piece of contraband.

7            Ms. Liberty: I have not come --

8            (Multiple speakers.)

9            MR. TSOUBANOS:  -- to have a barrier

10   contraband was handcuff keys supposedly into the

11   facility.  All of these actions prevented the

12   contraband from coming into the facility.  We could

13   catch you bringing it in, then arrest you, but we

14   stopped the conduct ahead of time.  That's the

15   position that the Sheriff's Office has.

16           MR. ADELSTEIN:  Judge, this is what lead to --

17   I don't use Securus and the phone for this very

18   reason, because I believe "Big Brother" also is

19   listening, even though, attorney-client

20   conversations are supposed to be privileged.

21           I want to make it clear, I've done this for

22   30 years, I don't talk to clients on the phone.  If

23   I have something to say, I go see them.

24           I am also lead to believe that the client or

25   the inmate is searched prior to going in to see his

1    lawyer.  And then I'm lead to believe he is

2    searched, I think probably strip searched, after he

3    meets with his lawyer.  I heard no allegations that

4    during those searches, coming out of whatever,

5    lawyer or investigator he was speaking to, that

6    they found contraband on him.  That leads to one

7    conclusion, beyond a reasonable doubt, that no

8    contraband was brought in by any lawyer.

9         MR. TSOUBANOS:  Because the Sheriff's Office

10   stopped it with the barrier visits.  That's the

11   whole point, we stopped it with barrier visits.

12        MS. LIBERTY: Judge, if you would -- sorry.

13        THE COURT:  Go ahead.

14        MS. LIBERTY:  If you listened to counsel

15   earlier, he was complaining he finds it unusual

16   that I come to visits sometimes with nothing on me,

17   no papers, no pen, nothing.  So what is it?  I'm

18   coming with contraband?

19        If I came walking in with pictures, you would

20   see it in my hand because everything that I do has

21   to go through security.  I can't get into the jail

22   with a piece of gum, and this predates any

23   allegations of contraband coming in.

24        I can't have anything in my pocket, period.

25   They search me.  So to say that one key, which has

1    never been found -- I never set the security

2    detector off and been found with keys or pictures.

3         I would also go on to say counsel testified or

4    he proffered to the Court that the conversation he

5    overheard was Mr. Demons was upset because I

6    wouldn't provide pictures to him.  So now she's

7    bringing this contraband in the jail, but yet the

8    conversation --

9         THE COURT: The girlfriend -- it was the

10   girlfriend that was saying that.

11        MS. LIBERTY:  They are complaining about me

12   not delivering these alleged photos.

13        MR. TSOUBANOS:  Very simple, did the

14   girlfriend deliver you pictures to send --

15        MR. ADELSTEIN: That's none of your business.

16        MR. TSOUBANOS:  Did you accept the pictures?

17        MR. ADELSTEIN:  Don't answer.

18        MR. TSOUBANOS:  It could be a criminal

19   investigation -- right?  -- that we're --

20        (Multiple speakers.)

21        MR. ADELSTEIN:  It's none of your business.

22        MR. TSOUBANOS:  It's a security issue for the

23   jail, and that she is banned from coming into the

24   facility with a non-barrier visit.

25        MR. ADELSTEIN:  Will pleading affect the

1    criminal investigation going on against

2    Ms. Liberty?  I'm going to ask the Court to order

3    the county attorney office --

4         THE COURT: I am not ordering them to do a

5    criminal investigation.

6         MR. ADELSTEIN: If they do a criminal

7    investigation, they need to put us on notice that

8    there is one because McClain, I believe, comes

9    right into play.

10        THE COURT:  The issue -- the real issue is the

11   visitation issue that happened with how the

12   visitations are to be accomplished so that no

13   communication can be heard from the outside.  The

14   deputies can hear what is being talked about.  The

15   Sheriff wants it to be a barrier, Plexiglass, so

16   that there is no communications, there is no

17   passing of things back and forth in a room big

18   enough for the individuals to be in during that

19   period of time.

20        Okay.  Ms. Liberty's testimony -- she goes a

21   lot to see him, according to the Sheriff; so I

22   don't see the phone privilege being any violation

23   of his right to counsel.

24        MR. ADELSTEIN:  May I ask is there a criminal

25   investigation going on?

```
 1              THE COURT:  I am not going to tell the
 2         Sheriff's Office how to do their job.  If they
 3         wish, they may.  That's up to them.
 4              MR. ADELSTEIN:  May I inquire?
 5              THE COURT:  I don't know what facility --
 6              MR. ADELSTEIN:  Can I inquire from the county
 7         attorney's office, in the jail what room will
 8         accommodate four people and our client?
 9              MR. TSOUBANOS:  To begin with, changing the
10         professional visit area, everything will still
11         sound loud.
12              THE COURT: You're not going to make them put a
13         phone in every single room to protect four people
14         talking because four people talking anywhere is
15         going to be loud.
16              MR. ADELSTEIN:  We have individuals who will
17         go through clearance to bring in a computer to view
18         certain objects that the State has given us to
19         discuss various times, and we can't -- we can't do
20         it in that room.  They now have us in that bondsman
21         room.  As you walk into the jail, around the
22         corner, it just does not accommodate actually more
23         than one person.
24              The defense team, which is Ms. Liberty,
25         Mr. Howard, Mr. Hope, and I cannot fit nor can we
```

1    properly show documents, certain documents to him

2    and discuss certain documents that the State has

3    given us to show.

4         MS. LIBERTY: This is one incident.  I'm

5    looking at everything that goes on on Zoom right

6    now.  If somebody -- if I look this way, you see

7    everything that is on the screen that's going on.

8         THE COURT: So does the jail have a room

9    available?  That's the next issue.

10        MR. TSOUBANOS:  There is no room that has

11   barrier visits.  It's got to be barrier visits with

12   Ms. Liberty.

13        THE COURT:  I understand this.

14        Can we do the video person visit?

15        MS. LIBERTY: I've been accused of something I

16   have not even had the opportunity to even defend

17   myself.  I never brought any contraband into that

18   jail, that simple.  Because you heard that

19   conversation saying, "Oh, she not sent me

20   pictures," should tell you I never provided any

21   pictures or any contraband to Mr. Demons.

22        MR. TSOUBANOS:  Did you accept the picture?

23        MR. ADELSTEIN: None of your business.

24        MR. TSOUBANOS:  Here we go again.

25        MR. ADELSTEIN:  That not a crime.

```
 1              MR. TSOUBANOS:  It's a conspiracy.  Yes, it
 2         is.
 3              THE COURT:  So with that, what facility is
 4         down there that can accommodate four people and a
 5         barrier?
 6              MR. TSOUBANOS:  We don't have a room for four
 7         people.
 8              THE COURT:  You will find a room for four
 9         people and a barrier in some way, shape, or form
10         for them to be there if Ms. Liberty is there.
11              MR. TSOUBANOS: We'll look into that, Judge.
12         That room will be confidential.
13              MS. LIBERTY: And you can come with two people?
14              MR. TSOUBANOS:  We didn't cause this problem,
15         they did --
16              THE COURT: That's not a choice.
17              MR. TSOUBANOS:  -- with misconduct.
18              THE COURT: It's going to be four individuals
19         going there with barrier.
20              MR. TSOUBANOS:  Yes, we will see what we can
21         do.
22              THE COURT: You need to make accommodations to
23         be able to do it.  I don't know how you're going to
24         do it, but do it.
25              MR. ADELSTEIN: Fair enough.
```

1    THE COURT: Ms. Liberty, unless she's free of

2    any criminal investigation going on because of the

3    individual information you have -- then Mr. Howard,

4    Mr. Hope, and Mr. Adelstein, they don't need a

5    barrier visit.

6    MR. TSOUBANOS:  Mr. Hope needs a barrier

7    visit.

8    MR. ADELSTEIN:  I'm not discussing that with

9    you.

10   THE COURT: Ms. Bee, with the clerk's office --

11   we had a barrier in the entire courtroom to prevent

12   against the spread of COVID.  We did what needed to

13   do be done with the barrier thing that did not

14   inhibit the attorney-client privilege.

15   MR. TSOUBANOS:  You hear everything in the

16   professional visitation rooms.

17   MS. LIBERTY:  At my last visit there were two

18   little kids that I guess was bonding somebody out

19   who realized who I was visiting, and they proceed

20   to just stand at the window and look at YNW Melly.

21   No way was that private.

22   MR. ADELSTEIN: The Court said he was going to

23   get us a new room.

24   THE COURT:  Set up that.

25   MR. TSOUBANOS:  We'll work on it, Judge.

```
 1            MR. ADELSTEIN: We expect an answer.

 2            MR. TSOUBANOS:  It's not going to be today.

 3            MR. ADELSTEIN: I don't expect that. By the end

 4      of the week.

 5            MR. TSOUBANOS:  It probably won't be by the

 6      end of the week.

 7            THE COURT: Next Wednesday, which is the 5th.

 8            MR. ADELSTEIN: Hold on for one second.

 9            MS. BRADLEY:  I believe the courthouse --

10            THE COURT: Neither am I.

11            MR. TSOUBANOS:  I can't do it this week.

12            THE COURT:  Everybody can appear by Zoom.

13            MS. LIBERTY: Maybe there will be a ruling from

14      the Fourth.

15            THE COURT: Let's hope.

16            MR. TSOUBANOS:  We'll filing our documents

17      just to have in the court file.

18            THE COURT: Okay.  I have it.

19            MR. TSOUBANOS:  We have other stuff.

20            THE COURT: You want me to play the 25-minute

21      recording?

22            MR. TSOUBANOS:  If you have time.

23            THE COURT: Not today.

24            MR. TSOUBANOS:  We'll give it to Ms. Bradley

25      and I entered it in the court file.
```

1         THE COURT: The video court file --

2         MR. ADELSTEIN: Give it to Ms. Bradley.

3         THE COURT: We have a future date on Demons.

4    And we'll reset the status next week.

5         (Thereupon, the deposition was concluded.)

6                    -  -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2                              -   -   -

3

4               I, AMBER N. GABEL, Stenographic Reporter,

5      State of Florida at Large, certify that I was authorized

6      to and did stenographically report the foregoing

7      2proceedings and that the transcript is a true and

8      complete record of my stenographic notes.

9                    This Zoom hearing occurred during the

10     COVID-19 pandemic conducted using videoconference

11     technology, and it is therefore subject to the

12     technological limitations of court reporting remotely.

13

14               Dated this 25th day of October, 2022.

15

16     _____

17               AMBER N. GABEL, Court Reporter

18

19

20

21

22

23

24

25