Filing # 138917964 E-Filed 11/19/2021 03:52:40 PM

**IN THE DISTRICT COURT OF APPEAL
OF THE STATE OF FLORIDA
FOURTH DISTRICT**

CASE NO: 4D21-_____
L.T. CASE NO: 19-1872CF10A

MARIAH HAMILTON
and
FELICIA HOLMES
    Petitioners

Vs.

STATE OF FLORIDA
    Respondent
_____/

<u>**PETITION FOR WRIT OF CERTIORARI**</u>

**Background.**

Petitioners, Mariah Hamilton and Felicia Holmes, are non-parties to the underlying litigation, which is a criminal case, State v. Jamell Demons, Broward County case 19-1872CF10A. The defendant in that case is charged with two counts of first-degree murder.

Subpoenas were prepared by the State (Assistant State Attorney Kristine Bradley) directing both Ms. Hamilton and Mr. Holmes to appear at the Broward County Courthouse for

RECEIVED, 11/19/2021 03:54:22 PM, Clerk, Fourth District Court of Appeal

pretrial conferences. Typically, this would indicate the prosecutor believes these people have information relevant to the ongoing prosecution of the defendant and are contemplated as being called as State witnesses, although undersigned counsel, who has been retained for the limited purpose of challenging service, does not have any details on the specifics of what the State hopes to accomplish at these pretrial conferences, nor does it matter for present purposes.

Both subpoenas were prepared listing the Petitioners names and the address of 775 Dryden Circle, Cocoa FL 32926.[1] Someone, presumably the process server, crossed out the street address on both subpoenas and handwrote "3748 Chambers Ln #1" instead. The return of service section of the subpoenas has a check next to "posted" (instead of "served" or "not served"), under that says "Front Door", and lists a date and time (10/1/21 at 0745 for Ms. Holmes, 10/1/21 at 0746 for Ms. Hamilton). They have the same Chambers Lane address handwritten in the "new address section". There is a section of

---

[1] All relevant documents are filed in an Appendix.

the return of service that designates who was served via substitute service, with boxes for "Served Other Person Name", "Relationship", "D.O.B./D.L.", and "Signature".  That section has "Posted" hand written in the "Served Other Person Name" section, lines next to the "Relationship" and "D.O.B./D.L." section, and "N/A (Posted)" in the "Signature" section.  The subpoenas directed Ms. Holmes and Ms. Bradley to appear on October 20, 2021 at 1:00 PM for the pretrial conference.

On October 27, 2021, the State filed two "State's Affidavit for Issuance of Order to Show Cause" regarding both witnesses, which recited the rules regarding posting of service contained at Florida Statutes section 48.031(3)(b) and stated that "Investigator Dowdy located [the respective witness's] Mercedes Benz sedan at 3748 Chambers Lane, Cocoa, Florida and went on three separate occasions to attempt service.  The service was made nineteen days before the required date of appearance.  Also present was a separate Mercedes Benz sedan registered to [the other witness, and stating that Mariah Hamilton is the daughter of Felicia Holmes].  All attempts at contacting the residents were met with negative results."  The "affidavits" were

not sworn to by the process server or anyone with personal knowledge of the facts underlying the service attempts, but rather by the Assistant State Attorney prosecuting the case against Mr. Demons, Kristine Bradley."

On November 7, 2021, counsel for the witnesses filed a "Response to State's Motion for Issuance of Rule to Show Cause and Witnesses' Motion to Quash Subpoenas. This response argued various reasons why the subpoenas were defective, including that they did not comply with the requirements for posted service because the witnesses were not living at the 3748 Chambers Lane #1 address on the dates that service was attempted and have not lived there since. The response also attached affidavits from Mariah Hamilton and Felicia Holmes, both of whom say that they do not live at 3748 Chambers Lane #1, and did not live there on the dates the service was attempted, September 29-October 1, 2021. They say they were living at a specific other address, 150-20th Street #114, Miami Beach FL 33139. There is also an affidavit from Jermaine Hamilton, who states that Felicia Holmes is his ex-wife and Mariah Hamilton is his daughter, that he does live at the

4

Chambers Lane address and did at the time service was attempted, and that Ms. Holmes and Ms. Hamilton do not live there and did not live there at the relevant time.

A hearing was held on the motion on November 8, 2021. The transcript is attached.  The State called Bruce Dowdey, an investigator with the Brevard County (18th Judicial Circuit) State Attorney's Office. (T. 5).  He was asked to serve Felicia Holmes and Mariah Hamilton. (T. 6).  On September 28th, he went to the address typed on the subpoena, 775 Dreyden Circle, and "located the current resident, a male subject who stated he does not know them personally but recognizes the names as past tenants". (T. 6-7).  He also sent to 3748 Chambers Lane, and at 14:40 hours saw a gray four-door Mercedes in a parking lot near the apartment (the "west parking lot area") (T. 7) with no tag but the VIN "match[ed] the Mercedes registered to Mariah Hamilton". (T. 7).  He said he determined that via the DAVID system. (T. 7).  He went to the apartment and knocked and used the Ring doorbell and, apparently after getting no response, left his business card. (T. 8).

On September 29th, he went back to the Chambers Lane address at 07:25 hours and saw the same gray Mercedes with no tag in the west parking lot that did not appear to have been moved. He said there was another Mercedes there that day which was "parked in the driveway located to the north of the front door, which would be considered the parking area for that residence" and it had tag PXPS23 "which came back registered to a Felicia Holmes according to the DAVID". (T. 9). He said it was "correct" that he "again attempt[ed] to make contact with the residents at that address" although he did not say how. (T. 9). The business card he had left the day before was on the ground and he picked it up and "stuck two total" as well as putting a business card on the car. (T. 10).

On September 30, he went back to the location at 08:30 hours. The black Mercedes was there but "had been moved slightly" to a different parking angle. (T. 10). He said he tried to make contact and asked "Did anyone answer?" said "That's correct", although from context it appears he meant they did not. (T. 10). He then went back "[a]t approximately 15:50

hours", both Mercedes's were still there, he tried to make contact again, and he left another business card.

On October 1, he went back at approximately 07:45 and tried to make contact again. (T. 11). He did not ever hear any noise or response from inside. (T. 11). He talked to one person in the area, whose name he did not get, who "stated that when the car comes in, they go directly to the apartment. I asked if he could identify them by a photo lineup and he said he wouldn't even recognize them probably if they were in the same aisle at Publix". (T. 11).

Then, he placed "each [subpoena] in their individual envelope with their name written on the outside and I stuck them in the crease of the door and I stuck them in far enough that the wind could not get them out" and returned the return of service to the State Attorney's Office. (T. 12).

Mr. Dowdey never saw anyone entering or exiting the 3748 Chambers address, and never saw anyone getting in and out of the Mercedes's, and never saw any "loose mail or any item that would indicate Mariah Hamilton or Felicia Holmes resided at that address." (T. 15). He got the 3748 Chambers address from

DAVID (i.e. because it was linked to the vehicle or drivers license information for these witnesses). (T. 15-16).

The State also discussed two "retail installment contracts" for the Mercedes's which listed the witnesses and the 3748 Chambers Lane apartment address, one of which was dated October 26, 2020 and the other August 10, 2020 (i.e. over a year before the attempted service at that address). (T. 20).

The State also said Felicia Holmes was pulled over on September 19, 2021 in Dade County (i.e. the county where her affidavit says she was living, not Brevard County three hours north where the service was posted), and the Miami-Dade Clerk's website had the 3748 Chambers Lane address listed. And, they said that Mariah Hamilton was pulled over in June 2021 in Orange County but gave a different address, 1314 Rosa Park[2]. (T. 21).

---

[2] Undersigned counsel does not know what address this is referring to, but a Google search shows there is no road named Rosa Park or Rosa Parks Avenue, Street, Boulevard, etc in Cocoa. In fact, the only street in Florida that appears to be named after Rosa Parks in Florida is a Rosa Parks Circle in Pensacola. There is a Rosa Drive in Cocoa, but no residential address at 1314 Rosa Drive.

The State argued that they had shown proof of valid service under section 48.031(3)(b) and "because the state has shown that the service was valid pursuant to the statute at the regular place of abode that at this point, it was the burden now shifts to the subject to show that it was not". (T. 22).  The defense argued that the subpoena was not valid on its face, and also argued "Ms. Hamilton and Ms. Holmes normally don't reside at this address.  I have attached affidavits from both, including an affidavit from the current occupant of the residence, Mr. Jerome Hamilton. I can tell you that Ms. Holmes is a traveling nurse and since the beginning of September has been residing in Miami-Dade County.   And there was even evidence for this ticket that she was issued in Miami-Dade County in September. Ms. Hamilton, the ticket that she was issued was not in Brevard County, it was in Orange County.  It was in another county. They have not updated their driver's licenses yet.  But that this is not their actual residence at this point in time." (T. 24-25). The defense said the posted service was invalid. (T. 25-26).

The Court said the subpoenas were facially valid, and "the cars in front of these particular locations were cars that were

registered to the individuals that are listed in the subpoena",
and "the State of Florida requires every driver's license have
your permanent address on it unless it's allowed to be hidden
pursuant to the law.  There's been no testimony that theirs is
allowed to be hidden due to some public record disclosure." (T.
28-29).  The Court said "they listed on every document they had
to provide to the State of Florida their home addresses.  That by
statute is their abode." (T. 29).  The Court did not say what
statute it was referring to. (T. 29).

   After the hearing, on November 12, 2021, the Court issued
two substantively identical Orders on Rule to Show Cause (one
for each witness) which denied the Motion to Quash Subpoenas
and made the following findings of fact "after consideration of
testimony of Investigator Bruce Dowdy and evidence: a. The
subpoena to [the respective witness] is valid, b. The subpoena
meets the statutory requirements to put the witness on notice
for the time and location of their required appearance, and c.
The subpoena was properly served by posting and the service
was valid."  The Orders then directed the sheriff to serve each
witness "whose last known address is 3748 Chambers Lane, #1,

Cocoa, Florida" (despite the witnesses having provided in their affidavits a specific updated address in Miami Beach) by personal service to appear before the Circuit Court judge on November 23, 2021 to be examined as to their failure to appear at the pretrial conference. Upon information and belief, that personal service has not occurred. Both witnesses hired counsel (Ramon Sarmiento who filed the Motion to Quash below and undersigned counsel for this writ) to challenge service but no attorney has been authorized to, or has, accepted service on the witnesses behalf.

## Legal Background

"Statutes governing service of process must be strictly construed and enforced." *Koster v. Sullivan*, 160 So.3d 385, 388 (Fla. 2015). *See also Epstein v. Brunel*, 271 So.3d 1173, 1175 (Fla. 3rd DCA 2019) ("It is well-established in Florida that the service of process requirements must be strictly complied with."

When an appellate court reviews legal issues associated with a motion to quash service of process, that review is *de novo*. *See Davidian v. JP Morgan Chase Bank*, 178 So.3d 45, 47 (Fla.

4th DCA 2015); *Robles-Martinez v. Diaz, Reus & Targ, LLP*, 88 So.3d 177, 179 (Fla. 3rd DCA 2011).

Certiorari is the appropriate avenue for a witness to challenge an order requiring him to testify or denying a motion to quash subpoena. *Ulloa v. CMI, Inc.*, 133 So.3d 914 (Fla. 2013); *Ronchi v. State*, 248 So.3d 1265 (Fla. 5th DCA 2018); *Aero Costa Rica v. Dispatch Servs.*, 710 So.2d 218 (Fla. 3rd DCA 1998).

The relevant statutes are Florida statutes section 48.031 and 48.21. Section 48.21 states that "[e]ach person who effects service of process shall note on a return-of-service form attached thereto the date and time when it comes to hand, the date and time when it is served, the manner of service, the name of the person on whom it was served, and, if the person is served in a representative capacity, the position occupied by the person . . . A failure to state the facts or to include the signature required by subsection (1) invalidates the service, but the return is amendable to state the facts". Section 48.031(1)(a) requires service by "delivering a copy of it to the person to be served . . . or by leaving the copies at his or her usual place of abode with

any person residing therein who is 15 years or older and informing the person of their contents". Section 48.031(3)(b) states that "A criminal witness subpoena commanding the witness to appear for a court appearance may be posted by a person authorized to serve process at the witness's residence if three attempts to serve the subpoena, made at different times of the day or night on different dates, have failed."

## Legal Argument.

There is no dispute that Felicia Holmes and Mariah Hamilton were not personally served with these witness subpoenas, which presumably all could agree would be the preferable means of serving legal process on a person. There was also no substitute service on a person who lived with them at their usual place of abode. Thus the fundamental question presented, which is a question of law subject to *de novo* review, is whether valid posted service occurred in these circumstances. "These circumstances", roughly, are that the process server had two possible addresses he had gotten from the DAVID driver's registration system, he went to one of them

and was told the petitioners did not live there, and he went to the other one and never located anybody who could tell him whether or not the petitioner's lived there. Cars registered to petitioners (without any evidence that petitioners had exclusive use or control of those cars as opposed to, for instance, other family members) were found at the residence. The cars had been registered at that address a year ago. And at least one of the witnesses appeared to have that address on her drivers license when she was stopped three hours south of Cocoa, in Miami (although the other witness apparently had a different address on her driver's license, or gave a different address, when she was stopped, also in a different county, a few months earlier).

The Circuit Court erred first by assigning the burden of proof to Petitioners to show that service of process was invalid. In fact, because the return of service did not contain all of the information that was statutorily required, the burden should have been on the State to show that the service was valid. "The return of service is the instrument a court relies on to determine whether jurisdiction over an individual has been established."

*Koster v. Sullivan*, 160 So.3d 385, 388 (Fla. 2015). As has been established, strict compliance with the rules of service of process is demanded. "[I]f the return is defective on its face, [then] it cannot be relied upon as evidence that the court acquired jurisdiction over the person of the defendant." *Murphy v. Cach, LLC*, 230 So.3d 599, 600, *quoting Klosenski v. Flaherty*, 116 So.2d 767, 768-69 (Fla. 1959). In *Murphy*, the issue was that the process server left the document with "John Doe", a "black-haired white male" who was Appellant's "co-resident". *Murphy* at 600. This was insufficient to make the return of service facially valid, since section 48.21 requires "the name of the person served" to be on the return to establish facial validity. *Id.* at 601. *See also Re-Employment Servs. v. Nat'l Loan Acquisitions Co.*, 969 So.2d 467 (Fla. 5th DCA 2007) (return of service not facially valid because it did not state the date and time to the process "came to hand", or was received by the process server, and rejecting argument that "it is not necessary to include in the return of service the specific date and time the process was received by the process server" because that argument "would vitiate the pertinent provisions of the statute

and we, therefore, reject it", and therefore trial court not permitted to presume that service of process was valid); *Gonzalez v. Totalbank*, 472 So.2d 861 (Fla. 3rd DCA 1985) (presumption of valid service not present when return did not reflect name of person served by substitute service or that they were over 15).

Here, clearly section 48.21 was not strictly complied with. That statute requires four things the return *shall* note: 1) date and time return of service came to hand; 2) date and time served; 3) manner of service; and 4: name of person to whom served. *See also Koster v. Sullivan*, 160 So.3d 385, 389 (Fla. 2015). A simple look at the subpoenas and returns of service shows that they are not in compliance as to **two** of these factors—when the return of service came to hand, i.e. when the process server received it; and the name of the person to whom it was served. There is no information whatsoever as to when the process server received the subpoena, and there is no name of who received the subpoena because nobody did receive it—it was posted. The State would likely respond that it is impossible to comply with the "name" aspect of section 48.21 when service

is posted.   Perhaps so, but this is the statute the legislature wrote and it must be strictly complied with.   Therefore, the party attempting to effect service does not get a presumption of valid service and bears the burden of proof when they post service and a motion to quash is filed—this is a logical result given the reality that with posted service there is no way to verify from the return that the person actually received the notice at issue.   The Florida Supreme Court has squarely ruled that all the section 48.21 information must be included in a summons issued pursuant to section 48.031, in *Koster*.   The holding in that case was that there is no requirement that the return *also* include the information specified in section 48.031, but that the section 48.21 information must be included.   "Section 48.21 clearly and unambiguously requires that a return of service include certain information.   In fact, the Legislature left no discretion in this regard.   In addition to the use of the word 'shall', the Legislature also provided a consequence for failure to comply with the statute's requirements.   Section 48.21 provides that although the failure to state the required facts is not fatal to the cause of action, it does invalidate the service itself".   *Koster* at 390.   If

there is a perceived problem with 48.21 requiring a name and 48.031(3)(b) allowing posted service, that is a "problem" to be remedied by the Legislature, not a Court. In any event, in this case the date and time the process server received the subpoena is also not included, which is alone fatal under section 48.21.

Thus, and contrary to the lower tribunal's ruling, the State was not entitled to the presumption of valid service. They had the burden of proving service, which means proving that the Petitioners actually resided at the address where service weas posted. They clearly did not meet this burden. The fact that cars registered to the Petitioners were seen outside the apartment (which apparently had a parking lot where multiple vehicles parked) certainly does not prove they resided there. People, especially family members, regularly drive each other's cars despite not being on the title or lease/loan documents. And, in this case we have unrebutted affidavits establishing that a family member did live there, but that Petitioners did not. Jermaine Hamilton, the ex-husband of Felicia Holmes and the mother of Mariah Hamilton, lived there. If DAVID information showed that address as one the Petitioners had previously used,

that obviously does not prove they resided there at the relevant time either. Nor does that the address was in the Miami-Dade Clerk's information for a traffic citation one of Petitioner's received less than a month before the incident provide the relevant proof. Florida Statutes section 322.19(2) requires a person change their address on their driver's license within 30 days of changing their legal address or mailing address. The ticket was issued less than 30 days prior to the service attempts, so there would be no lack of compliance. The other Petitioner apparently had a different address when they received a traffic ticket a few months earlier, which cuts against, not in favor of, the State's argument that the Chambers Street address was her residence at the relevant time. Undersigned counsel is aware of no case or statute, and has not located one with research, consistent with the trial court's assertion that an address "listed on every document they had to provide to the State of Florida [with] their home addresses . . . by statute is their abode." To the contrary, people can and do change their residence frequently. Individuals do not have to leave some public record of where they reside in the event somebody wants

to serve them (the way corporations do via a registered agent, for instance). There is a traffic law requirement to update one's address within 30 days to drive, on penalty of receiving a traffic citation, but no law making one's address in the DAVID system their legal residence where valid process can be posted independent of whether they actually lived there. These witnesses submitted affidavits that they did not live there, and even provided the addresses where they were living at the relevant time. The process server never saw these people at the address despite multiple visits, nor did he see evidence they lived there nor did he receive confirmation from anybody that they lived there. The State did not meet their burden.

## Conclusion.

Because the State did not effectuate valid service under the law, the motion to quash service should have been granted, and this Court should issue the writ and so find. Given that currently the lower Court has set a hearing in this case, on this issue, for next Tuesday (November 23, 2021), Petitioner requests that this Court consider acting on an expedited basis.

Petitioner will be filing a motion to stay in the lower court as well based on the filing of this Petition.

Respectfully Submitted,

s/ Daniel Tibbitt____
Daniel Tibbitt, Esq.
Law Offices of Daniel J. Tibbitt
12550 Biscayne Boulevard
Suite 800
Miami, Florida 33181
Telephone:  (305) 384-6160
Fla. Bar Number: 816361
dan@tibbittlaw.com

## **CERTIFICATE OF SERVICE AND FONT**

I HEREBY CERTIFY that this petition was typed in 14 point proportionately spaced Bookman Old Style, and is 3,889 words, and that a true and correct copy of the foregoing was efiled with the Fourth District Court of Appeals, and email served on the Office of the Attorney General at CrimAppWPB@MyFloridaLegal.com, and email served on the Broward State Attorney's Office, at courtdocs@sao17.state.fl.us, and Assistant State Attorney Kristine Bradley KBradley@sao17.state.fl.us, and the Honorable Andrew Siegel at divfk@17th.flcourts.org, and email served on defense counsel for Jamell Demons, Stuart Adelstein at adelsteinslaw@aol.com and David Howard at david@davidhowardlaw.com, this 19th day of November, 2021.

/s/ Daniel Tibbitt
Daniel Tibbitt, Esq.

Filing # 153101205 E-Filed 07/11/2022 05:04:26 PM

RECEIVED, 07/11/2022 05:05:23 PM, Clerk, Fourth District Court of Appeal

## IN THE FOURTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

**STATE OF FLORIDA,**

       **Petitioner,**

       **v.**

**JAMELL DEMONS,**

       **Respondent.**

_____/

**CASE NO.: 4D22-_____**
**L.T. No.: 19-1872CF10A**

## EMERGENCY
## PETITION FOR WRIT OF PROHIBITION
## AND/OR WRIT OF CERTIORARI

COMES NOW, the State of Florida, by and through undersigned counsel, pursuant to Florida Rules of Appellate Procedure 9.030(b)(2) and (3) and 9.100(e), and Article V Section 4(b)(3) of the Florida Constitution, and hereby respectfully petitions this Court for issuance of a writ of prohibition, or alternatively, a writ of certiorari vacating the July 6, 2022 Order entered by the Honorable Andrew Siegel of the Seventeenth Judicial Circuit precluding the State from seeking the death penalty in this case.  Such ruling was an improper interference with the State Attorney's discretion to try Respondent's case as a death penalty case or alternately a departure from the essential requirements of the law resulting in irreparable harm to the State.  In precluding the State from seeking death here, the trial court concluded that a superseding indictment vitiated a prior timely notice of intent to

seek the death penalty and read into the law and associated rule a re-notification requirement. The trial court's ruling elevated the notice requirement to the level of jurisdiction not intended by the Legislature or the rule. The trial court imposed the drastic consequence of barring the death penalty for a failure to file a new notice of intent to seek the death penalty where the superseding indictment merely added language to each count of first-degree murder advising that the murders were committed "for the purpose of benefiting, promoting, or furthering the interests of a criminal gang" under section 775.087(2) Fla. Stat. and section 874.04 Fla. Stat.

## STATEMENT IN SUPPORT OF EMERGENCY REQUEST

The State has filed a separate Request for Emergency Treatment and has styled this pleading as an Emergency because the trial court has set trial and jury selection to begin on July 12, 2022. The State's request for a stay was not ruled on during the July 11, 2022 pre-trial hearing; however, the trial court did continue the case until the next day, July 12.

## JURISDICTION

This Court's jurisdiction for both the writ of prohibition and certiorari arises from Article V, Section 4(b)(3) of the Florida Constitution and Florida Rule of Appellate Procedure 9.030(b)(2)(A) and (3), which authorize this Court to issue extraordinary writs, including writs of certiorari and prohibition.

2

A writ of prohibition is the appropriate remedy to prevent a lower tribunal from the improper use of judicial power. *See English v. McCrary*, 348 So. 2d 293 (Fla. 1977) (explaining that prohibition is an extraordinary writ by which a superior court prevents an inferior court from exceeding or usurping jurisdiction over matters not within its jurisdiction). Also, prohibition is the appropriate remedy when a trial court attempts to interfere with the prosecutorial discretion of a state attorney. *State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986); *Cleveland v. State*, 417 So. 2d 653 (Fla. 1982).

Certiorari jurisdiction is appropriate where there has been a departure from the essential requirements of the law. *Williams v. Oken*, 62 So. 3d 1129, 1132 (Fla. 2011). The Florida Supreme Court has explained that although certiorari jurisdiction cannot be used to create new law, "clearly established law" "can derive from a ***variety of legal sources***, including recent controlling case law, rules of court, statutes, and constitutional law. (emphasis added.) Accordingly, a district court may grant a writ of certiorari after determining that the decision is in conflict with the relevant statute, so long as the legal error is also 'sufficiently egregious or fundamental to fall within the limited scope' of certiorari jurisdiction. *Id.*'" *Nader v. Florida Dept. of Highway Safety & Motor Vehicles*, 87 So. 3d 712, 723 (Fla. 2012) (quoting *All State Ins. Co. v Kaklamanos*, 843 So. 2d 885, 890 (Fla. 2003); *State v. Caamano*, 105 So.3d 18 (Fla. 2d DCA 2012) (quoting *Nader* and granting certiorari

3

relief as the trial court's order departed from the essential requirements of the law as the lower court applied the incorrect statute when it dismissed the charge).

Here, the circuit court improperly interfered with the prosecutor's discretion to prosecute the instant case by precluding the State from seeking death where its Notice of Intent to Seek the Death Penalty was timely, and neither § 782.04 Fla. Stat. nor Rule 3.181 F. R. Crim. P. require a new notice of intent be filed following a superseding indictment. The original April 18, 2019 notice advised the defense of the aggravators and the filing of the superseding indictment did not vitiate that original notice. Further, the trial court departed from the essential requirements of the law by requiring a re-notification where the defense suffered no prejudice, and the imposing of the sanction far exceeded a lawful remedy for any deficiency for not re-noticing the defense of the State's continued intent to seek the death penalty. The State is irreparably harmed and a writ of prohibition and/or certiorari is necessary.

## PROCEDURAL HISTORY

As a preliminary note, jury selection is set to start on July 12, 2022.

Around 4:35 a.m. on October 26, 2018, Cortlen Henry ("Henry") arrived at the Emergency Room of Memorial Miramar Hospital, Miramar, Broward County, Florida. He sought the assistance of medical staff who found two victims, AW in the front passenger seat and CT in the rear passenger seat, suffering from multiple gunshot wounds. AW and CT were pronounced dead by medical personnel at the

scene. Henry informed law enforcement that they were victims of a drive by shooting that occurred near SW 160th Avenue and Miramar Parkway. Further police investigation revealed that this statement was intentionally misleading.

It was determined from security video that around 3:20 a.m. on October 26, 2018, Henry, wearing a black t-shirt[1], Jamell Demoms ("Demons"), and the two victims left the New Era Recording Studio in Fort Lauderdale driving a Jeep Compass. Henry was driving, Demons was seated directly behind the driver, AW was in the front passenger seat, and CT was in the right-rear passenger seat. Cell phone evidence established that the Jeep was driven west and near 4:03 a.m. was stopped for three minutes near Pembroke Road east of US Highway 27. Demons was shown to be "outside stationary" at the time. At approximately 4:32 a.m., Demons was let out of the vehicle and at 4:35 a.m., Henry, now wearing a black hoodie, arrived at the Emergency Room with the victims.

Contrary to Henry's initial report, AW and CT were shot from within the vehicle from the left-rear passenger seat occupied by Demons. Afterwards, while the car was stationary, eight shots were fired from the exterior of the vehicle to make it look like a drive-by shooting had occurred. One Blazer S&W shell casing was found in the interior of the vehicle where Demeons had sat and eight Blazer S&W casings were found at the US 27 scene. Glass consistent with the front and rear

_____

[1] Subsequently, blood stains were found on that shirt.

passenger windows was also found at the scene. A trajectory analysis revealed that at least one shot from the right exterior of the vehicle which struck the left rear passenger door was made while the left rear passenger door was open, and that seat was unoccupied.

The autopsy showed that AW, the front passenger, was shot in the neck from back to front, left to right and in an upward trajectory. AW was also shot in his right shoulder and chest and to the back of his head. All were inconsistent with a drive-by shooting from the exterior of the vehicle as reported initially by Henry. CT's autopsy showed he had a gunshot wound to the left of his face with three-centimeter stippling around it indicating it was fired from close proximity of the victim. The trajectory showed that the lethal wound came from inside the vehicle and was from the left rear passenger seat occupied by Demons. The other wounds to CT's back indicated he was shot in his head, then shot in the back as he was leaning to the left. The wound paths to both victims' heads came from a left to right direction. Ballistic analysis established that the casing from inside the Jeep Compass matched the eight shell casings found at the US Highway 27 scene.

A review of Demons' Snap Chat account showed he made statements that Henry was loyal to him as Henry was the person who drove the victims' bodies to the hospital. On December 4, 2018, Demons released a You Tube documentary promoting his music career in which he stated he had been carrying a gun since he

was in the fourth grade and stated that he and his friends had been the targets of a drive-by shooting in Miami.

On February 7, 2019, the grand jury indicted Demons and Henry on two counts of first-degree murder. (Ex. 1 - Indictment). Demons was arraigned on March 5, 2019 (Ex. 2 – Circuit Court Docket) and on April 18, 2019, the State filed its Notice of Intent to Seek the Death Penalty as required under Rule 3.181 Fla. R. Crim. P. which identified three aggravators: pecuniary gain; heinous atrocious or cruel ("HAC"); and cold calculated and premeditated ("CCP"). (Ex. 3 – Notice of Intent) In the same document, it advised the defense of its obligation under Rule 3.202. Fla. R. Crim. P. and the State's intent to have the defendant examined by state mental health experts should the defense intend to present such evidence. (Ex. 3). On April 9, 2019, the State filed its first discovery submission and continued to fulfill its obligations during the course of the litigation as evidenced by the docket. The parties conducted depositions, litigated motions addressed to evidentiary issues and challenges to aspects of the death penalty. (Ex. 2)

Following additional investigations, on February 18, 2018, the State moved for leave to amend its Notice of Intent to Seek the Death Penalty. (Ex. 4)   On February 23, 2022, it filed a superseding indictment (Ex. 5) in which it added the following language to each count of first-degree murder:

> and JAMELL DEMONS committed the offense for the purpose of benefiting, promoting, or furthering the

7

> interests of a criminal gang, ... 775.087(2), and 874.04 of
> the Florida Statute.

(Ex. 5).  On February 24, 2022, the trial court signed its order denying the State's motion for leave to amend its Notice of Intent (Ex. 6).   Additional discovery, evidentiary, and suppression issues were litigated (Ex. 2) .

On April 27, 2022, Demons filed his Motion to Preclude the State from Seeking the Death Penalty (Ex. 7).  The State responded (Ex. 8) and Demons replied. (Ex. 9).  A hearing was held on the motion and the State is awaiting the transcript. On July 6, 2022, the trial court issued an order granting Demons' motion and precluding the State from seeking death in this case.  (Ex. 10). The trial court concluded that by not filing another notice, the State had not "strictly" complied "with the notice requirements of Rule 3.181 and Section 782.04" following the filing of the superseding indictment, thus, it was precluded from seeking the death penalty. (Ex. 10 at 5).  It is this order that the State seeks a writ of prohibition and/or certiorari review as jury selection for this trial is set to commence on July 12, 2022.

Because trial was to start on Monday, July 11, 2022, the State moved the prior Friday, for rehearing on the July 6, 2022 order (Ex. 10) and for a stay, so it may file a petition with this Court.  During the hearing on Monday, July 11th, the court ascertained that the State would be filing a petition.  However, it did not rule on the State's motions, but instead put the case over until the following day, Tuesday, July

12, 2022. The State is filing this petition as an Emergency Petition as jury selection is set to start July 12, 2022.

## GROUNDS FOR RELIEF

### GROUND I

**THIS COURT SHOULD GRANT A WRIT OF PROHIBITION BECAUSE THE CIRCUIT COURT ACTED IN EXCESS OF ITS JURISDICTION BY READING INTO THE STATUTE A RE-NOTIFICATION PROVISION AND A JURISDICTION COMPONENT NOT EXPRESSLY PROVIDED BY THE LEGISLATURE AND PRECLUDING THE STATE FROM SEEKING DEATH.**

Section 782.04(1)(b), Florida Statutes (2016) and the procedural rule that followed, Rule 3.181 Fla. R. Crim. P., requires the State to file a Notice of Intent to Seek the Death Penalty within 45 days of arraignment. Contrary to what the trial court concluded, the section and rule do not require the State file a new notice each time an indictment may be superseded. The trial court acted in excess of its jurisdiction by reading such a requirement into the section and procedural rule and by imposing the drastic sanction of barring the death penalty. By so doing, the trial court interfered with the prosecutorial discretion of the State Attorney. This improper exercise of the trial court's jurisdiction demands redress through the issuance of a writ of prohibition.

### A. Standard of Review

"The state attorney has complete discretion in making the decision to charge and prosecute." *Cleveland v. State*, 417 So. 2d 653, 654 (Fla. 1982).  Capital punishment is constitutional in Florida, *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), and the State has a legal basis to seek the death penalty in this capital case involving two counts of first-degree murder and a properly noticed intent to prove aggravation in support of that sentence.  It is well settled that "the Florida Constitution prohibits the judiciary from interfering with the prosecutor's decision to seek the death penalty in a first-degree murder case." *State v. Donner*, 500 So. 2d 532, 533 (Fla. 1987). "Where the trial court refuses to permit a first-degree murder trial to proceed as a capital case '[a] writ of prohibition is the appropriate remedy' because the court has 'interfere[d] with the prosecutorial discretion of a state attorney.'" *State v. Jones*, 209 So. 3d 6, 9 (Fla. 2d DCA 2016) (quoting *State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986) and the State has no adequate remedy on appeal.  The Florida Supreme Court has recognized that a trial court's erroneous decision that impedes the State's ability to seek the death penalty irreparably harms the State in a manner that cannot be remedied on appeal because Double Jeopardy principles preclude the State from appealing the decision after a life sentence has been imposed. *Brown v. State*, 521 So. 2d 110, 112 (Fla. 1988). That Court also recognized that the ability to "entertain state petitions for certiorari to review pretrial orders in criminal cases is important

to the fair administration of criminal justice" throughout the State of Florida. *State v. Pettis*, 520 So. 2d 250, 253 (Fla. 1988). The court explained this was true as the State would be deprived of an appellate remedy for "erroneous and highly prejudicial" rulings that impede its ability to prosecute.  A Writ of Prohibition addresses the limits of a court's jurisdiction to act. *Jones*, 209 So. 3d at 9.

### B. Argument

Here, the trial court read a requirement of a re-notification and a jurisdictional bar into §782.04(1)(b) and Rule 3.181, to preclude the State from seeking death where the Legislature did not explicitly require the State to re-notice the defendant of its continued intent to seek the death penalty each time an indictment is superseded.  The trial court's decision to preclude the State from seeking death in this aggravated double homicide prosecution exceeded its jurisdiction and interfered with the State's prosecution of this first-degree murder case as a capital case.  The trial court further exceeded its jurisdiction where the severest sanction was imposed despite the fact that the State had filed a timely Notice of Intent to Seek Death (Ex. 11) following the defendant's original arraignment. Neither the statute nor rule require a re-notification and the defendant was not prejudiced by the lack of a re-notification.  Likewise, the case law addressed to the filing of amended informations or superseding indictments does not support the trial

court's conclusion that such vitiates a prior, timely notice.    The writ of prohibition should issue.

Following the issuance of *Hurst v. Florida*, 577 U.S. 92 (2016) and *Hurst v. State*, the Legislature enacted §782.04(1)(b) which provides:

> In all cases under this section, the procedure set forth in s. 921.141 shall be followed in order to determine sentence of death or life imprisonment. If the prosecutor intends to seek the death penalty, the prosecutor must give notice to the defendant and file the notice with the court within 45 days after arraignment. The notice must contain a list of the aggravating factors the state intends to prove and has reason to believe it can prove beyond a reasonable doubt. The court may allow the prosecutor to amend the notice upon a showing of good cause.

Subsequently, the Florida Supreme Court promulgated Rule 3.181 to address the procedure to be followed:

> RULE 3.181. NOTICE TO SEEK DEATH PENALTY
>
> In a prosecution for a capital offense, if the prosecutor intends to seek the death penalty, the prosecutor must give notice to the defendant of the state's intent to seek the death penalty. The notice must be filed with the court within 45 days of arraignment. The notice must contain a list of the aggravating factors the state intends to prove and has reason to believe it can prove beyond a reasonable doubt. The court may allow the prosecutor to amend the notice upon a showing of good cause.

*In re Amendments to Florida Rules of Criminal Procedure*, 200 So. 3d 758, 759–60 (Fla. 2016).

"It is a fundamental principle of statutory construction that where a statute is plain and unambiguous there is no occasion for judicial interpretation." *Golf Channel v. Jenkins*, 752 So. 2d 561, 564 (Fla. 2000) (quoting *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 454 (Fla. 1992)). Although the Legislature could have, it did not enact a provision in §782.04(1)(b) that stated a new notification must be filed each time an indictment is superseded or amended. The trial court exceeded its jurisdiction by re-writing the statute to require such re-notification, thereby elevating the notice obligation to a jurisdictional requirement, and precluding the State from seeking death in this case. In so doing, the trial court gave the defendant an unauthorized windfall even though no prejudice resulted as the defense had been on notice the State was seeking death in this case since the April 18, 2019 Notice was filed. That Notice satisfied the dictates of §782.04 and Rule 3.181, thus the State met its notice requirements under the statute and rule. Nothing in the superseding indictment vitiated that Notice. The writ of prohibition is warranted.

Prior to *Hurst*, 202 So. 3d at 40 and the passage of §782.04(1)(b), the defendant was held to have sufficient notice of the possible aggravating factors he faced given the limited aggravating factors provided in section 921.141(5), Fla. Stat. See *Tai A. Pham v. State*, 70 So. 3d 485, 496 (Fla. 2011) (rejecting constitutional challenge in part because aggravators do not have to be included in the indictment);

*Lynch v. State*, 841 So. 2d 362, 378 (Fla. 2003) (holding defendant is not entitled to notice of every aggravator in the indictment because the aggravators are clearly listed in the statute) (citing *Vining v. State*, 637 So. 2d 921, 928 (Fla. 1994)). However, in order to give effect to *Hurst* and the requirement that the jury find the aggravating factors unanimously, the State was assigned the duty of giving notice of the aggravating factors it expected to prove beyond a reasonable doubt. The fact that notice is required to be given within certain time limits does not elevate the notice requirement to a jurisdictional requirement nor a statute of limitations because the Legislature and Florida Supreme Court built into the rule a pathway for extensions of time. Rule 3.181 permits amendments for good cause shown and Rule 3.050 Fla. R. Crim. P. provides for an enlargement of time where there is excusable neglect[2] even after the time deadline was missed. The fact that the notice is required

---

[2] Rule 3.050 provides:

> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for good cause shown may, at any time, in its discretion (1) with or without notice, order the period enlarged if a request therefor is made before the expiration of the period originally prescribed or extended by a previous order or (2) upon motion made and notice after the expiration of the specified period, permit the act to be done when the failure to act was the result of excusable neglect; but it may not, except as provided by statute or elsewhere in these rules, extend the time for making a motion for new trial, for

14

at an early stage in the litigation simply takes into account the complex nature of the litigation and the rationale for disclosure earlier in the process to avoid unnecessary and unwarranted delays regarding discovery and investigation. By permitting extensions and amendments, the rule acknowledges that it is not jurisdictional nor an absolute basis for precluding the State from seeking the death penalty.

In finding that a re-notification was required following the superseding indictment, the trial court first noted that this was a matter of first impression (Ex. 10 at 2) then relied on *State v. Chantiloupe*, 248 So. 3d 1191, 1196-97 (Fla. 4 DCA 2018) and the line of cases addressed to the effect of the filing of an amended information. (Ex. 10 at 3, 5). Again, neither the statue nor rule state that a re-notification is required following a superseding indictment. The trial court read *Chantiloupe* too broadly to suggest that the State may be precluded from seeking death where it did not file a new Notice following a superseding indictment. In fact, this Court indicated that *Chantiloupe* was limited to its facts. Also, the cases cited

---

taking an appeal, or for making a motion for a judgment of acquittal.

This Court has also recognized that Rule 3.050 "provides the trial courts with broad discretion to extend any deadline imposed by the rules, except for specifically-enumerated exceptions. Our supreme court has applied Rule 3.050 to extend deadlines in other rules not specifically excluded from the rule. *Davis v. State*, 887 So. 2d 1286, 1289 (Fla. 2004); *see State v. Boyd*, 846 So. 2d 458 (Fla. 2003); *Abreu v. State*, 660 So. 2d 703 (Fla. 1995)." *State v. Chantiloupe*, 248 So. 3d 1191, 1197–98 (Fla. 4th DCA 2018).

by the trial court discussing the effects of the filing of a new information or indictment are addressed to jurisdiction and do not hold that the mere filing of a new information vitiates all of the notices, discovery submissions, and court orders issued in that case prior to the filing of the new information. As such, the April 18, 2019, Notice should have been found to remain in effect following the February 27, 2022, superseding indictment. The trial court exceeded its jurisdiction.

*Chantiloupe*[3] should be found limited to its facts, as this Court stated, where the State never filed a Rule 3.181 notice and failed to offer a basis for "a good faith delay, excusable neglect, or any other circumstances which justify the filing of the

---

[3] In *Chantiloupe*, the State failed to file any notice of its intent to seek death within the 45-day timeframe. *Id*. at 1193. After the defense moved to preclude the State from seeking death, the State sought leave to file its Rule 3.181 notice, identifying two aggravators that were known since the time of indictment, and asserting the defendant would not be prejudiced, but it did not offer a basis for the requested extension "nor any cause for failing to seek the extension until after the deadline had passed." *Id*. In its supplemental memorandum, the State failed to assert "excusable neglect," but merely reasserted the defense was not prejudiced. *Id*. at 1193-94. It was not until the hearing on the defense motion that the State offered that the courthouse had been closed for six days following a hurricane and then the prosecutor had gone on a two-week vacation. *Id*. Believing it could not extend the time for the State to file its Rule 3.181 notice, the trial court precluded the State from seeking the death penalty in *Chantiloupe*. *Id*. at 1194. This Court found that Rule 3.050 and Rule 3.181 permit extensions and the trial court erred when it believed it did not have such authority. However, "based on the specific facts of this case" meaning "the State has failed to allege a good faith delay, excusable neglect, or any other circumstances which justify the filing of the Notice more than 45 days after the date of arraignment," the circuit court did not depart from the essential requirements of the law when it declined to exercise its discretion and grant the State's request for extension. *Chantiloupe*, 248 So. 3d at 1193, 1200.

Notice more than 45 days after the date of arraignment." *Chantiloupe*, 248 So. 3d at 1193, 1200. Such is not the case here. The State filed its Notice on April 18, 2019, and there is no provision in the statute or procedural Rule 3.181 suggesting that a new Notice had to be filed. In *Chantiloupe*, the State never filed a Rule 3.181 notice and offered no reasonable basis for the oversight. Hence, *Chantiloupe* does not support the trial court's reading of the statue and rule and does not support the drastic result imposed below.

Additionally, the trial court relies on *Wallace v. State*, 189 So. 3d 1022, 1028 (Fla. 3d DCA 2016)[4] for the proposition that the filing of a superseding indictment vitiates all previously filed notices and require those notices be re-filed. Such reliance is misplaced as *Wallace* and the other cases cited by the trial court do not stand for that position as is evident from the fact that prior waivers of speedy trial survive the State's amending of an information or filing of a new indictment. *Wallace* provides:

> There is no circumvention of the purpose or intent of the speedy trial rule when the State files charges within the speedy trial time limits and the State files an amended information or a superseding indictment because there is no interruption in, or cessation of, the prosecution, and with the amended information or superseding indictment

---

[4] The trial court's also cited *State v. Anderson*, 537 So. 2d 1373, 1374 (Fla. 1989); *State v. Stell*, 407 So. 2d 642, 643 (Fla. 4th DCA 1981); *Marcario v. State*, 325 So. 3d 1019, 1024 (Fla. 2d DCA 2021); *State v. Belton*, 468 So. 2d 495, 497 (Fla. 5th DCA 1985); *State v. Mulvaney*, 200 So. 3d 93, 95 (Fla. 5th DCA 2015); *Sadler v. State*, 949 So. 2d 303, 305 (Fla. 5th DCA 2007).

the defendant maintains the ability to invoke the speedy trial rule by filing a notice of expiration of the speedy trial period if the defendant did not previously waive his right to a speedy trial. *See Clifton*, 905 So. 2d at 177 (noting that "[t]he filing of an amended information differs significantly from a nolle prosequi, an announcement of 'no action,' and doing nothing to initiate prosecution because ... there is no interruption in, or cessation of, the prosecution ... [and] the defendant maintains the ability to invoke the speedy trial rule"). Dismissal of the charges without the requirement of filing a notice of expiration of the speedy trial period is only available to a defendant when an amended information or a superseding indictment is filed after the speedy trial period has expired and the defendant has not previously waived his right to a speedy trial. *Clifton*, 905 So. 2d at 178.

Because the State charged Thomas and Wallace within the speedy trial period, Thomas waived her right to a speedy trial prior to the filing of the superseding indictments filed against her, and Wallace waived his right to a speedy trial within the speedy trial period and the charges against him have never been amended against him, *Nelson* applies, not *Agee, Genden*, or *Williams*. In *Nelson*, the Florida Supreme Court unequivocally held that a pre-expiration continuance operates as a waiver of a defendant's speedy trial rights as to all charges emanating from the same criminal episode, including any newly filed charges arising out of that criminal episode. *Nelson*, 26 So. 3d at 576–77.

We, therefore, conclude that the trial court correctly denied both defendants' motions to dismiss the charges against them based on a violation of the speedy trial rule.

*Wallace*, 189 So. 3d at 1027–28. In the instant case, there has been "no interruption in, or cessation of, the prosecution," thus, the original Rule 3.181 notice remained in

effect and the trial court exceeded its jurisdiction by finding that the superseding indictment vitiated that notice and precluded the State from seeking death.

Additionally, in precluding the State from seeking death in this case, the trial court abdicated its duty to balance equities of the State and defense interests. Such a balancing often comes into play where notice, discovery, and even speedy trial deadlines are at issue. *Cf. State v. Naveira*, 873 So. 2d 300, 308 (Fla. 2004) (explaining speedy trial rule is for procedural protection and any constitutional right to a speedy trial is grounded in reasonableness and prejudice and not measured by any specific number of days). The Florida Supreme Court considered the balancing of equities irrespective of a technical violation of the habitual offender notice statute, i.e, §775.084(3)(b), Fla. Stat. There the Court stated that it is permissible for courts to conduct a harmless error analysis for such noncompliance. *See Massey v. State*, 609 So. 2d 598 (Fla. 1992) (finding legislature did not intend to permit a defendant to avoid application of a statute on technical grounds). The intent of that notice requirement is equally applicable here as it is designed to let a defendant know of the State's intent and provide an opportunity to prepare for that hearing. *Id.* at 600. *See also Krisher v. School Bd. Of Dade County*, 555 So. 2d 436 (Fla 3rd DCA 1990) (finding technical violation of notice provision in employment statute is subject to harmless error and therefore lack of prejudice to employee does not require reversal of termination order).

19

By precluding the State from seeking death in this case, the trial court granted Demons a windfall even though he had counsel from first appearance; the discovery process and capital sentencing challenges were litigated; depositions were taken and the case set for trial. Demons cannot and did not show prejudice arising from the fact that he was not re-noticed of the State's continued intent to seek death for this double homicide now under a superseding indictment that alleged the same two counts of first-degree murder but included that the homicides were committed in furtherance of gang activity. Nothing in the statute or rule requires re-notification and the fact that the State had sought to amend its Rule 3.181 notice shortly before the superseding indictment was filed indicates its intent to proceed with capital sentencing. The lack of a re-notification could not have had any impact on Demons' trial or sentencing investigation or preparation. By imposing the harshest of sanctions, the trial court exceeded its jurisdiction and interfered with the State's discretion to seek death in the prosecution of an aggravated first-degree murder.

Further, the notice requirement of §782.04(1)(b) and Rule 3.181 is a result of *Hurst*, it is not a constitutional requirement and is more procedural in nature. Florida courts have recognized that "notice" requirements, whether notice of alibi or other discovery provisions under Rule 3.220 Fla. R. Crim. P. are designed to eliminate surprise and ensure that both parties know what the relevant information is in preparation for trial. *See Small v. State*, 630 So. 2d 1087, 1088-89 (Fla.

20

1994)(explaining that severity of sanction must be based on prejudicial impact caused by discovery violation); *State v. Schopp*, 653 So. 2d 1016 (Fla. 1995)(finding that *per se* reversible error for discovery violation elevates form over substance and proper inquiry includes whether non-offending party was prejudiced); *Briseno v. State*, 449 So. 2d 312 (5th DCA 1984)(focusing solely on fact alibi notice was late in determination to exclude witness is too drastic and courts must decide whether prejudice occurred and what other remedies are available to overcome any disadvantage); *Bryant v. State*, 186 So. 3d 25 (4th DCA 2016)(finding exclusion of DNA evidence improper for violation of timely notice requirement where five week recess afforded defendant additional time to prepare.) Those criminal discovery rules were "never intended to furnish a defendant with a procedural device to escape justice." *State v. Rolack*, 104 So. 3d 1286, 1289 (Fla. 5th DCA 2013) (*quoting Shrum v. State*, 401 So. 2d 941, 943 (Fla. 5th DCA 1981); *Gardner v. State*, 821 So.2d 1220, 1222 (Fla. 2d DCA 2002) (stating "[a] lack of notice can be deemed harmless where there is no showing of actual prejudice or unfair surprise to the defendant."); *State v. Paille*, 601 So. 2d 1321 (Fla. 2d DCA 1992) (holding lack of notice was harmless where it was apparent that the defendant knew of the other crime's evidence, and the defendant knew of the State's intent to introduce the evidence at trial). Rule 3.181, promulgated in response to §782.04(1)(b) is a notice requirement

to provide discovery to the defense.   That procedural requirement was accomplished by the State's April 18, 2019, Notice of Intent to Seek the Death Penalty.

Even if this Court finds that re-notification is required under Rule 3.181, there may be cases where equities demand that the State may be precluded from seeking the death penalty, *see Chantiloupe.* However, the instant case does not demand such a severe sanction.   As explained above, Demons was on notice that the State was seeking death.   Discovery and motion practice showed that the parties understood the death penalty was at issue.   To impose the harshest of sanctions automatically for a discovery/notice infraction without any balance of equities analysis by a trial court is the antithesis of what is required of trial courts. *See Small*; *Schoop.*   The trial court should have at least considered barring the State from adding any aggravators based on the new language of the superseding indictment.

Although the Florida law outlined above supports the State's contention that the trial court exceeded its authority, a review of out-of-state authority lends support to the State's position.   In Tennessee, a notice of intent to seek the death penalty constitutes notice of possible punishment of life without parole. Tenn. Code § 39-13208.   For late notice, the State is not precluded from seeking death. Instead, the court is directed to grant the defendant a reasonable continuance for trial. *Id.   See also, Mesa v. Granville*, 241 Ariz. 201, 204–05, 386 P. 3d 387, 390–91 (2016) (rejecting claims that failing to file a timely notice of intent amounts to jurisdictional

error precluding the State from seeking the death penalty); *Holmberg v. DeLeon*, 189 Ariz 109, 111 P. 2d 1110 (1987) (same).

The ruling of the trial court here establishes that it exceeded its authority by reading a renotification and jurisdiction component into the statute and rule. The Legislature did not authorize the draconian sanction imposed by the trial court. Further, the unauthorized sanction gave the defense a windfall where he was not prejudiced. It interfered with the State's discretion to seek death in this capital first-degree murder case. The trial court left the State with no adequate appellate remedy forcing it to seek an extraordinary writ. The writ of prohibition should issue.

## GROUND II

**THIS COURT SHOULD GRANT CERTIORARI AS THE TRIAL COURT DEPARTED FROM THE ESSENTIAL REQUIREMENTS OF THE LAW BY READING A RENOTIFICATION REQUIREMENT INTO SECTION 782.04(1)(b), FLA. STAT. (2017) AND RULE 3.181, FLA. R. CRIM. P. THAT WAS NOT THERE AND IMPOSING THE HARSHEST SANCTION.**

Alternately, the trial court's order precluding the State from seeking death here was a departure from the essential requirements of the law resulting in material injury which cannot be corrected on a post-judgment appeal. The trial court's determination that the notice statute must be construed in such a way as to bar the State from seeking a valid sentence merely because it did not re-notice Demons that

23

it was continuing to seek the death penalty after a superseding indictment was filed is a departure from the essential requirements of the law.

**A. Standard of Review**

A writ of certiorari provides for "review certain 'non-final orders of lower tribunals other than as prescribed by rule 9.130.' Fla. R. App. P. 9.030(b)(2)(A). The 'extraordinary writ is reserved for those situations where there has been a violation of a clearly established principle of law resulting in a miscarriage of justice.' *State v. Pettis*, 520 So. 2d 250, 254 (Fla. 1988)." *Chantiloupe*, 248 So. 3d at 1195. Certiorari relief is appropriate when a petitioner establishes three elements: (1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the case (3) that cannot be corrected on post-judgment appeal. *Williams v. Oken*, 62 So. 3d 1129, 1132 (Fla. 2011) (quotation marks omitted) *quoting Reeves v. Fleetwood Homes of Fla., Inc.*, 889 So. 2d 812, 822 (Fla. 2004) *citing Board of Regents of State v. Snyder*, 826 So .2d 382, 387 (Fla. 2d DCA 2002); *Chantiloupe*, 248 So. 3d at 1195.

**B. Argument**

The State incorporates its analysis provided above to support a finding that there was a departure from the essential requirements of the law by imposing a requirement not included in §782.04(1)(b) or Rule 3.181 rule and failing to conduct a balance of equities when there, at the best for the defense, has been a technical

violation of a notice provision, i.e., where the State missed a filing deadline for giving re-notification. *See, Naveira*; *Massey; Krisher*; *Small; Schopp*. By imposing a *per se* violation and failing to employ a harmless error analysis for a re-notification violation, the trial court departed from the essential requirements of the law, elevated form over substance, and ignored settled law.

The trial court's decision caused the State material injury as it precluded the State from seeking a valid, constitutional sentence for an aggravated double homicide and left the State with no adequate remedy on appeal should the defendant be acquitted or receive a life sentence. The balance of equities weighs on the State's side as a missed notice deadline may be remedied without resorting to the draconian sanction of precluding a death sentence. While the aggravation noted in the April 18, 2019 notice remain, additional time may be afforded the defense to investigate the facts of the case and develop defenses to that aggravation the State intends to offer at the penalty phase. The ruling made below departed from the essential requirements of the law and supports the granting of the writ of certiorari.

## CONCLUSION

This Court should issue a writ of prohibition quashing the trial court's July 6, 2022, Order upon finding the trial court exceeded its jurisdiction by reading into §782.04(1)(b) and Rule 3.181 a re-notification provision and precluding the State from seeking death. Alternately, this Court should issue a writ of certiorari upon a

finding that the trial court departed from the essential requirements of the law in requiring a re-notification and for not conducting a balance of equites especially in light of the fact that the defense suffered no prejudice as it had been noticed previously.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

__/S/ Leslie T. Campbell_____
Leslie T. Campbell
Senior Assistant Attorney General
Florida Bar No. 0066631

OFFICE OF THE ATTORNEY GENERAL
1515 N. Flagler Dr. #900
West Palm Beach, FL 33401
Telephone: (561) 837-5016
Facsimile: (561) 837-5108
capapp@myfloridalegal.com [and]
Leslie.Campbell@myfloridalegal.com

COUNSEL FOR STATE OF FLORIDA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true copy of the foregoing filing has been furnished by email to: Stuart Adelstein, Esq., Law Office of Stuart Adelstein, P.A. 2929 S.W. Third Av, Suite 412, Miami, FL 33129 at adelsteinslaw@aol.com; David Howard, Esq. David A. Howard P.A. 25 SE 2nd Av, Suite 1105, Miami, FL 33131-1605 at david@davidhowardlaw.com; Raven Liberty, Esq., 153 NE 97th St., Miami Shores,

26

FL 33138-2332 at pleadings.liberty@gmail.com;  Joel Silvershein, Assistant State Attorney at JSilvershein@sao17.state.fl.us at Broward State Attorney's Office, Appellate Division, 201 SE 6th St., Suite 13165, Fort Lauderdale, FL 33301-3303; Kristine Bradley, Assistant State Attorney at KBradley@sao17.state.fl.us, Broward State Attorney's Office, Homicide Trial Unit, 201 SE 6th St., Fort Lauderdale, FL 33301-3303; and the Honorable Andrew L. Siegel, Circuit Court Judge, Seventeenth Judicial Circuit, Broward County Courthouse, 201 SE 6th St., Fort Lauderdale, FL 33301 at divfk@17th.flcourts.org and attention Sabrina Albert at Salbert@17th.flcourts.org. this 11th day of July, 2022.

_/s/Leslie T. Campbell_____
COUNSEL FOR STATE OF FLORIDA

## CERTIFICATE OF FONT COMPLIANCE

I HEREBY CERTIFY that the size and style of type used in the foregoing is 14-point New Time Roman, in compliance with Fla. R. App. P. 9.210(a)(2).

/s/ Leslie T. Campbell_____
COUNSEL FOR STATE OF FLORIDA

## CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY that according to the Word program on which this brief was written the brief contains 6,890.

/s/ Leslie T. Campbell_____
COUNSEL FOR STATE OF FLORIDA

27

Filing # 190599972 E-Filed 01/26/2024 09:57:00 AM

Filing # 190545656 E-Filed 01/25/2024 02:16:54 PM

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

| | | |
|---|---|---|
| STATE OF FLORIDA | ) | CASE NO.: 19-1872 CF10A |
| | ) | |
| | ) | JUDGE: MURPHY |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| JAMELL DEMONS | ) | |
| | ) | |
| _____Defendant_____ | ) | |

**NOTICE OF APPEAL**

**NOTICE IS GIVEN** that the State of Florida, Plaintiff/Appellant, appeals to the Fourth District Court of Appeal, pursuant to Fla.R.App.P. 9.140(c)(1)(B), the non-final Orders of this Court: (1) the non-final orders suppressing evidence as noted in the Omnibus Order on Defendant's Motions to Suppress Evidence 1-13 issued on December 20, 2023 (Exhibit I) and rendered after the denial of the State's Motion for Rehearing on January 11, 2024 (Exhibit II); (2) the non-final Order of this Court denying the State's Motion for Reconsideration of the Court's Omnibus Order on Defendant's

1

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 01/25/2024 02:16:54 PM.****

Motion to Suppress Evidence 1-13 as noted in the Court's Order issued on January 25, 2024 (Exhibit III); and (3) the non-final order of this Court granting the Defendant's Motion in Limine Re: Promotional Video issued on January 25, 2024 (Exhibit IV).

The nature of orders (1) and (2), as reflected above, are the granting of the following non-final orders noted in the omnibus order suppressing evidence, as well as the denial of the non-final order denying the State's Motion for Reconsideration, as follows:

1. Order partially granting the Defendant's Motion to Suppress number three regarding the evidence obtained as a result of the search warrant on the iCloud account associated with IMEI number 310260165212834, iPhone X with Phone Number 772-713-9807 signed by Judge Usan on November 14, 2018.

2. Order partially granting the Defendant's Motion to Suppress number four regarding the evidence obtained as a result of the search warrant for Snapchat username ID Melly.Montana dated December 6, 2018 signed by Judge Bober.

3. Order partially granting the Defendant's Motion to Suppress number six regarding the evidence obtained as a result of the search warrant of January 8, 2019 to www.facebook.com/JamellDemons; www.facebook.com/Mookie.Guwop9; and www.facebook.com/YNWMelly772.

4. Order partially granting the Defendant's Motion to Suppress number seven regarding the evidence obtained as a result of the search warrant of January 23, 2019 on the Instagram account of User YNW.Melly.

5. Order partially granting the Defendant's Amended Motion to Suppress number 11 regarding the evidence obtained as a result of the search warrant issued on March 7, 2019 for Apple iPhone X with serial number FFNXHV1VKPHF, IME number 357277094960369.

6. Order partially granting the Defendant's Motion to Suppress number 12 regarding the evidence obtained as a result of the search warrant to Google for ynwmelly100kmjmt@gmail.com and ynwmellybooking@gmail.com.

7. Order granting the Defendant's Motion to Suppress number 13 regarding the evidence obtained as a result of the search warrant to Google for ynwmellybooking@gmail.com signed by Judge Duffy on May 15, 2022.


HAROLD F. PRYOR
State Attorney

By: _____ #21444

JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar No. 608092
Room 07130
201 S.E. 6th Street
Fort Lauderdale, Florida 33301
Telephone: (954)831-7913
courtdocs@sao17.state.fl.us
jsilvershein@sao17.state.fl.us

3

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was furnished by e-mail to Daniel Aaronson, Esquire (daaronson@benjaminaaronson.com), James Benjamin (sexlaw@bellsouth.net), Raven Liberty, Esquire (pleadings.liberty@gmail.com), and Stuart Adelstein, Esquire (adelsteinlaw@aol.com) attorneys for the Defendant Jamell Demons, this _25_ day of January, 2024.

HAROLD F. PRYOR
State Attorney

By: _____ #21444

JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar #608092
Room 07130
201 S.E. 6th Street
Fort Lauderdale, Florida 33301
Telephone (954)831-7913
courtdocs@sao17.state.fl.us
jsilvershein@sao17.state.fl.u

STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true and correct copy of the original as it appears on record and file in the office of the Circuit Court Clerk of Broward County, Florida.
WITNESS my hand and Official Seal at Fort Lauderdale, Florida, this the _26_ day of _January_ A.D. 20_24_.
Brenda D. Forman

Deputy Clerk

4

# EXHIBIT I

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,               )        CASE NO.:  19-1872CF10A
                                )
          Plaintiff,            )        Filed In Open Court
                                )        CLERK OF THE CIRCUIT COURT
v.                              )        ON _____ DEC 2 0 2023
                                )        BY _____
JAMELL DEMONS,                  )
                                )
          Defendant.            )        JUDGE:     JOHN J. MURPHY III
_____ )

**OMNIBUS ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS 1-13**

**THIS CAUSE** came before the Court on the following Motions to Suppress

Evidence:

1) Motion to Suppress No. 1 - Motion to Suppress Evidence re: Search Warrant Requiring Disclosure by the Provider of an Electronic Communication Service or the Contents of the Wire or Electronic Communication Service or the Contents of the Wire or Electronic Communications in Electric Storage in an Electronic Systems for 180 Days or Less re: Phone Number 772-713-9807 Signed on October 29, 2018 - Filed on September 21, 2023.

2) Motion to Suppress No. 2 - Motion to Suppress Search and Seizure of Mellythemenance@YNWMelly Twitter Account as Authorized by Warrant Signed by Judge Tobin-Singer on October 31, 2018 - Filed on September 21, 2023.

3) Motion to Suppress No. 3 - Motion to Suppress Evidence Seized Pursuant to Warrant for iCloud Account Associated with IMEI Number 310260165212834, iPhone X with Phone Number 772-713-9807 Signed by Judge Usan on November 14, 2018 - Filed on September 21, 2023.

4) Motion to Suppress No. 4 - Motion to Suppress Search Warrant for Snapchat Username ID Melly.Montana dated December 6, 2018, by the Honorable Bernard Bober - Filed on September 21, 2023.

5) Motion to Suppress No. 5 - Motion to Suppress Illegal Search and Seizure based upon Warrant to Google, LLC signed by Judge Orlando on January 15, 2019 - Filed on September 21, 2023

6) Motion to Suppress No. 6 - Motion to Suppress Evidence based upon Illegal Search and Seizure re: Search Warrant of January 8, 2019, to www.facebook.com/JamellDemons; www.facebook.com/Mookie.Guwop.9 and www.facebook.com/YNWMelly772 - Filed on September 21, 2023

7) Motion to Suppress No. 7 - Motion to Suppress Evidence Received Pursuant to January 23, 2019, Warrant Signed by the Honorable Judge Lynch re: Instagram User YNW.Melly - Filed on September 21, 2023

8) Motion to Suppress No. 8 - Motion to Suppress Evidence Seized Under Warrant Prospectively Requiring Provider of Electronic Communication Service to Disclose Real-time /Live Cell Site Location Information (CSLI), GPS, Electronic Data and Related Cell Phone Records for Telephone Number (772) 713-9807 - Filed on September 21, 2023

9) Motion to Suppress No. 9 - Motion to Suppress Evidence Seized Pursuant to Search Warrant Acquiring Contents of Wire or Electronic Communications, and Electronic Storage and Electronic Communications Systems for 180 Days or Less to be Disclosed by Provider of Electronic Communication Services, Cell Phone number (772) 713-9807 - Filed on September 21, 2023.

10) Motion to Suppress No. 10 - Amended Motion to Suppress Evidence Seized Pursuant to Warrant Issued by Judge Kollra on February 20, 2019, in Reference to Apple iPhone X with IMSI Number 310260165212834 and IMEI Number 354873092118610 - Filed on November 16, 2023

11) Motion to Suppress No. 11 - Amended Motion to Suppress Evidence Obtained through Search Warrant for Apple iPhone X with Serial Number FFNXHV1VKPHF, IME Number 357277094960369 - Filed on November 26, 2023

12) Motion to Suppress No. 12 - Motion to Suppress Evidence Seized and Obtained Through Search Warrant to Google for ynwmelly100kmjmt@gmail.com and ynwmellybooking@gmail.com - Filed on September 21, 2023

13) Motion to Suppress No. 13 - Motion to Suppress Evidence Seized and Obtained Pursuant to the Search Warrant Signed by the Honorable Barbara Duffy on May 15, 2022, re: ynwmellybooking@gmail.com - Filed on September 21, 2023

The State filed an Omnibus Response on November 6, 2023. The Court held a hearing on Defendant's motions and heard testimony from Assistant State Attorney Michelle Boutros and Miramar Police Department Detective Mark Moretti. Having considered Defendant's motions, the State's omnibus response, the evidence

presented[1], arguments of counsel, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

### *Franks v. Delaware*

Defendant argues that all evidence found pursuant to the thirteen search warrants that were issued based on Detective Moretti's search warrant affidavits should be suppressed because the affidavits included deliberate falsehoods and/or omissions.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Under *Franks,* the movant is required to: (1) point out the specific portion of the affidavit alleged to be defective; (2) allege that the defect consisted either of a deliberate falsehood or a statement in reckless disregard of the truth; and (3) offer proof supporting the allegations in the form of affidavits or other sworn or reliable statements of witnesses, or satisfactorily explain their absence. *Johnson v. State*, 660 So. 2d 648, 655 (Fla. 1995).

> [T]he *Franks* standard applies to alleged omissions from probable cause affidavits except that (1) the reviewing court must determine whether the omitted material, *if added* to the affidavit, would have defeated probable cause, and (2) the reviewing court must find that the omission resulted from intentional or reckless police conduct that amounts to deception. Absent these factors and the other *Franks* requirements, the motion for a *Franks* hearing will be summarily denied.

*Id.* at 656.

---

[1] The Court did not consider any testimony in determining whether probable cause to search existed within the four corners of the search warrant affidavits at issue in these motions.

Although the Court agreed to hear testimony from Detective Moretti and ASA Boutros, Defendant did not move for a *Franks* hearing, nor did the Court grant one. Defendant failed to establish that he is entitled to a *Franks* hearing, that any alleged falsehoods, omissions, or misrepresentations resulted from intentional or reckless police conduct, or that the deliberate falsehoods, omissions, or misrepresentations would have affected the magistrate's probable cause determination as to any of the search warrants at issue in this Order.

### Probable Cause

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The facts set forth in an affidavit for the issuance of a search warrant must establish 1) that a particular person has committed a crime (the commission element), and, 2) that evidence relevant to the probable criminality is likely located at the place to be searched (the nexus element). *Burnett v. State*, 848 So. 2d 1170, 1173 (Fla. 2d DCA 2003) (citing *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999)). The affidavit must set forth case-specific facts regarding the likelihood that evidence of the crime suspected will be found in a particular place. *See id.* at 1173-74. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Where probable cause for the issuance of a search warrant is at issue, the reviewing court is required to give "great deference" to the magistrate's probable cause finding. *Mesa v. State*, 77 So. 3d 218, 221 (Fla. 4th DCA 2011). The reviewing court must determine whether the magistrate had a substantial basis for concluding that probable cause existed and whether, based on the four corners of the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *Id.* (citations omitted).

### General Warrants, the Particularity Requirement, and Overbreadth

> Under the Fourth Amendment of the United States Constitution and Article I, Section 12 of the Florida Constitution, a warrant must particularly describe the place or places to be searched. Historically, the purpose of this requirement was to prevent the use of general warrants and wide-ranging exploratory searches.

*Bennett v. State*, 150 So. 3d 842, 844 (Fla. 4th DCA 2014). The particularity requirement limits the searching officer's discretion in the execution of a search warrant. *Haire v. Florida Dept. of Agric. & Consumer Services*, 870 So. 2d 774, 789 (Fla. 2004). This purpose is served so long as the affidavit supports probable cause for the search of the named properties and those properties are described with particularity. *Id.*

A search warrant is constitutionally overbroad if it fails to adequately specify the material to be seized, thus leaving the scope of the seizure to the unfettered discretion of the executing officer. *Dinkins v. State*, 278 So. 3d 828, 837 (Fla. 5th DCA 2019). The use of broad categories and generalities can render a search warrant overly broad. *Russ v. State*, 185 So. 3d 622, 626 (Fla. 5th DCA 2016).

Florida courts appear to use the term overbroad to describe warrants lacking in constitutional specificity or particularity. *See, e.g., Ingraham v. State*, 811 So. 2d 770,

773 (Fla. 2d DCA 2002); Dinkins, 278 So. 3d at 836; Russ, 185 So. 3d at 626. However, some federal courts have drawn a distinction between "general" warrants and "overly broad" warrants. General warrants give government officials the "unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 820 (2022) (quoting *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002)). "By contrast, an overly broad warrant 'describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause.' *Id.* (quoting *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d at 149). Likewise, in *United States v. Purcell*, the Second Circuit Court of Appeal recognized that a search warrant that comports with the particularity requirements may nevertheless be defective due to overbreadth. 967 F.3d 159, 179 (2d Cir. 2020).

### Good Faith Exception

The good faith exception to the exclusionary rule applies when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and has acted within its scope. *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The exclusionary rule should not be applied to deter objectively reasonable law enforcement activity. *Id.* at 920. Evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant should not later be excluded. *Id.* at 922-23. However, an officer does not manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable." *Id.* at 923 (quoting *Brown v. Illinois*, 420 U.S. 590, 610-611, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)), *see also Mesa*, 77 So. 3d at 233 ("When an affidavit for a search warrant is so lacking in indicia of probable cause 'as to render an official's belief in its existence entirely unreasonable,' the good faith exception is not applicable") (quoting *Dyess v. State*, 988 So. 2d 146, 149 (Fla. 1st DCA 2008).

The Court should not defer to the magistrate's determination of probable cause if there is no substantial basis for concluding that probable cause existed. *Mesa*, 77 So. 3d at 233. (citations omitted).

The Court may look beyond the four corners of the affidavit to determine whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. *See United States v. Mitchell*, 22-12084, 2023 WL 3620913, at *3 (11th Cir. May 24, 2023).

### Partial Suppression and the Doctrine of Severability

If a court finds that only a portion of a search warrant is invalid, the court need not invalidate the entire warrant. *See Johnson v. State*, 660 So. 2d 637, 643–44 (Fla. 1995); *State v. Nuckolls*, 617 So. 2d 724, 728 (Fla. 5th DCA 1993) (citing *United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984)); *Dinkins v. State*, 278 So. 3d at 838. Although partial suppression of evidence found pursuant to invalid portions of a search warrant is not an issue that has been widely addressed by Florida appellate courts, the Florida Supreme Court noted in Johnson that "American jurisdictions are in general agreement that partial invalidity of a warrant does not in itself render the remainder invalid." 660 So. 2d

at 644, fn. 3. The Court was unable to find Florida authority regarding how to sever invalid portions of a search warrant. Federal cases addressing the federal doctrine of severability provide guidance for analyzing how to address the partial invalidity of a warrant.

> The severance doctrine is animated by the need to balance the considerable social costs of suppressing evidence of guilt against the need to deter police misconduct, and the judgment that it would be unduly "harsh medicine" to suppress evidence whose seizure was authorized by a particularized portion of a warrant simply because other portions of the warrant failed that requirement.

*United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013). Some federal courts of appeal have developed a step-by-step methodology for warrant redaction as follows:

1) The court must separate the warrant into its constituent clauses.

2) The court must examine each individual clause to determine if it is sufficiently particularized and supported by probable cause.

3) The court must determine whether the valid clauses are distinguishable from the invalid clauses.

4) The Court must also determine whether the valid portions make up only an insignificant or tangential part of the warrant, precluding the applicability of the doctrine of severability.

5) The Court must then sever valid portions from invalid portions and partially suppress evidence accordingly.

*Id.* at. 448-449; *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018); *United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006); *United States v. Cotto*, 995 F.3d 786, 799 (10th Cir. 2021), *cert. denied,* 142 S. Ct. 820 (2022). However, the "greater part" inquiry does not apply when the challenged provisions are invalid due to a lack of probable

cause, and courts need only determine whether any of the evidence seized was obtained pursuant to the invalid provision. *Cotto*, 995 F.3d at 799.

Federal courts have also applied the doctrine of severability when the challenged provision is overly broad due to a failure to include a reasonable temporal limitation. *See, e.g., United States v. Honeysucker*, 21-2614, 2023 WL 142265, at *5 (6th Cir. Jan. 10, 2023) ("the remedy for temporal overbreadth would be to 'sever the infirm portion ... from the remainder which passes constitutional muster."); *United States v. Neuhard*, 770 Fed. Appx. 251, 254 (6th Cir. 2019) (But even if the warrant should have included a date restriction, suppression is not the right remedy. When a warrant is overbroad, we "sever the infirm portion ... from the remainder which passes constitutional muster."); *United States v. Eller*, 20-10425, 2023 WL 395938, at *1 (9th Cir. Jan. 25, 2023), *cert. denied sub nom. Eller v. United States.*, 23-5490, 2023 WL 6558671 (U.S. Oct. 10, 2023) ("even if the search warrant was overbroad as to Eller's pre-2012 data, we need not decide the issue because the trial exhibits in dispute are from 2013 to 2014—a period for which the warrant affidavit gave probable cause and is therefore 'sufficiently specific and particular' to support severance."); *United States v. Flores*, 802 F.3d 1028, 1045 (9th Cir. 2015).

## MOTIONS TO SUPPRESS 1-13

### Defendant's Motion to Suppress No. 1 - Search Warrant to Provider - Phone number 9807 - Issued on 10/29/2018

The Court finds that the October 29, 2018, search warrant for T-mobile to provide the historical wire or electronic communications (historical cell site location information or CSLI) for the T-mobile phone number ending in 9807 from 1:00 AM on October 26,

2018, to 6:00 AM on October 26, 2018, is supported by probable cause. The search warrant affidavit states that Anthony Williams and Christopher Thomas were the victims of a homicide and provides a sufficient nexus between the crimes committed and the items to be searched. Defendant left the recording studio with Henry and the victims at approximately 3:20 AM on October 26, 2018. At approximately 4:35 AM on the same day, Henry drove to the Emergency Room at Memorial Miramar with the victims. Henry alleged that he, along with the two victims, were the victims of a drive by shooting somewhere along Miramar Parkway. Henry was unable to identify the exact location of the shooting. The Miramar Police Department's investigation revealed that Defendant had been using his phone around the time of the homicides. It is clear that Defendant's physical location would be germane to finding the location of the crime scene and determining his role in the shooting.

The affidavit certainly could have better explained the connection between Defendant's physical location and the historical cell site data stored by T-mobile. However, in evaluating search warrant applications, judges may consider what is or should be common knowledge. *See United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015). "[A]ffidavits for search warrants are not to be scrutinized for technical niceties." *State v. Hart*, 308 So. 3d 232, 236 (Fla. 5th DCA 2020). It is common knowledge that historical cell site data can reveal the user's approximate physical location at a given time when the phone is in use. Based on the above, the search warrant affidavit established probable cause to search the historical cell site data for Defendant's phone ending in 9807.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 1 is **DENIED**.

**Defendant's Motion to Suppress No. 2 - Twitter Account - Issued on October 31, 2018**

The Court finds that the search warrant for data from Defendant's Twitter accounts from October 1, 2018, to October 31, 2018, is supported by probable cause, with the exception of all past searches saved by the account, for which there is no probable cause.

The search warrant affidavit for the Twitter accounts contains a similar recitation of facts as the previous search warrant. In addition, the affidavit states that Defendant and his associates have been identified as Blood Gang associates and that they were feuding with another gang from the North Broward area. Members of a rival gang took credit for the homicides on YouTube. Detective Moretti also read messages on Twitter from users claiming responsibility for the murder which tagged Defendant's Twitter account, including users affiliated with rival gangs. Based on the above, there was probable cause to believe a further search of Defendant's Twitter account within the specified one-month time period would reveal further information about who was responsible for the homicides and provide context for individual posts. However, the portion of the warrant authorizing a search of records of past Twitter searches outside of the specified date range is not supported by probable cause and any evidence found pursuant to this particular provision must be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 2 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 3 - iCloud Account - Issued on November 14, 2018**

The Court finds that while some provisions of the search warrant are supported by probable cause *with the addition of a temporal limitation*, there was no substantial basis for the magistrate to find that probable cause existed as to other provisions of the search warrant, which must be severed from the valid portions of the search warrant.

The search warrant affidavit provides ample support for the establishment of the commission aspect of probable cause. However, it is the nexus requirement that is at issue. It is clear from the search warrant affidavit that Defendant's physical location during and shortly after the homicides is of vital importance. Police officers had reason to believe the occupants of the vehicle were on the phone at the time of the shooting, that Defendant had called his mother just after the shooting, that Defendant's phone was in use and communicating with cell towers around the time of the shootings, and that call data records revealed that Defendant was using other forms of communication on his phone, although the police could not pinpoint which specific forms of communication were used.

Once again, Detective Moretti could have better explained the connection between iCloud storage and Defendant's cell phone. However, it is common knowledge that iPhones will backup data to iCloud unless the user has turned off iCloud backup. Based on the four corners of the affidavit, there is probable cause to search Defendant's iCloud account for evidence of Defendant's location during the shooting and for evidence of any forms of communication during and shortly after the shooting. However,

the search warrant authorized a much broader search than was reasonable given the facts in the affidavit supporting the warrant.

The affidavit is completely lacking in nexus as to any provisions of the search warrant outside this narrow category, so much so that no objectively reasonable officer could have relied on the magistrate's finding of probable cause. The lack of any temporal limitations in the search warrant is highly concerning given that iCloud accounts contain an enormous amount of data not just from the purchase of a particular iPhone, but from the inception of the Apple ID associated with the iCloud account. This search warrant essentially gave Detective Moretti unfettered access to a lifetime's worth of private emails, texts, messages, photographs, videos, and documents.

Detective Moretti was well aware of the relevant time frame at issue in his affidavit. There is nothing in the affidavit to suggest that the scope of the homicides went beyond the early morning hours of October 26, 2018. Search warrants should be limited to the time period that the affidavit suggested the criminal activity occurred. *See United States v. Hanna*, 661 F.3d 271, 287 (6th Cir. 2011). The failure to limit broad descriptive terms by relevant times, when such times are available to the police, will render a warrant overbroad. *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999). The Eleventh Circuit Court of Appeal has even noted that "the preferred method of limiting the scope of a search warrant for a cloud account will usually be time-based." *United States v. McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023). There has been no reason advanced as to why this preferred method could not have applied to the iCloud search warrant.

There may be cases which justify a more generalized search or seizure. This case, involving what appears to be an isolated crime based on the four corners of the affidavit, is not one of them. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (a generalized seizure of business documents may be justified if the government establishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity); *Cf. United States v. Purcell*, 967 F.3d 159, 181 (2d Cir. 2020) (because there was reason to believe that the suspected criminal activity pervaded the entire account, seizure of all records of the account was appropriate); *United States v. Brown*, 627 F. Supp. 3d 206, 229 (E.D.N.Y. 2022) (the complexity and duration of the alleged criminal activities may render a time frame less significant than in a case that requires a search for a small set of discrete items related to one or only a few dates).

Detective Moretti could not have in good faith believed it was reasonable to search the entirety of Defendant's iCloud account for evidence limited to a span of less than twenty four hours. Common sense dictates that Detective Moretti did not need to search through everything on Defendant's iCloud account to look for evidence of his location and his communications with others on the morning of the homicides. "If you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable." *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999).

In his affidavit Detective Moretti emphasizes the inability of electronic communication service providers to distinguish between evidence of the crimes and other records. However, there is nothing to indicate that cloud providers are unable to

sort data or records by responsive categories and/or time frames. While this rationale explains the necessity of the two-step seizure (property to be provided by Apple) and subsequent search (search conducted by law enforcement)[2], it does not justify the virtually unlimited scope of either step. Even if Detective Moretti needed to cast a wide net to "seize" or obtain relevant data from Apple, he could have and should have limited his search to those specific categories that were supported by probable cause in the affidavit.

As such, only evidence found pursuant to the following provisions of the search warrant are admissible:

1) Subscriber information.

2) Photo Stream records and all metadata and EXIF data associated with these albums and photographs/videos from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

3) Backups of all data such as text messages, GPS location logs, photographs, videos, email account information and emails, iMessages, instant messages, notes, contacts, voice memos, social networking information, and associated metadata and EXIF data from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

4) Emails to include but not limited to email addresses, any and all incoming and outgoing emails, dates and times of emails, saved emails, email drafts, and deleted emails from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

---

[2] The two-step procedure used in this search warrant is similar to the two-step procedure authorized by Fed. R. Crim. P. 41(e)(2)(B), which authorizes the seizure or copying of electronically stored information and a later review of the information consistent with the warrant.

5) Find My iPhone data from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 3 is <u>**GRANTED**</u> in part and <u>**DENIED**</u> in part.

**Defendant's Motion to Suppress No. 4 - Snapchat Warrant - Issued on December 6, 2018**

Although the search warrant affidavit provides probable cause to search Defendant's Snapchat account for evidence of his whereabouts and communications on the morning of the homicides, it is temporally overbroad. As previously discussed, Defendant's physical location on the morning of the homicides is a key piece of evidence. Additionally, this search warrant affidavit establishes that Defendant was communicating with others on the morning of the homicides over the phone and through data-based apps, including Snapchat. There is nothing in the search warrant affidavit that provides a nexus to any information on Defendant's Snapchat account outside of this narrow temporal range.

Unlike several of the search warrants at issue, the Snapchat search warrant does include a date range from October 1, 2018, to November 25, 2018. However, based on a review of the temporal inconsistencies in the various warrants and based on Detective Moretti's testimony, this date range seems arbitrary. The Court cannot find that Detective Moretti relied on the temporally overbroad search warrant in good faith. When questioned about temporal limitations in the search warrants, it became clear that Detective Moretti relied on his subjective belief that this was a reasonable timeframe rather than on any objective case-specific reasons for a broader time frame. The

exclusionary rule's purpose of discouraging police misconduct applies squarely to situations involving such arbitrary decision making.

Based on the above, only those Snapchat records/data found within a time period from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018, shall be admissible at trial.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 4 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 5 - Google - Issued on January 8, 2019**

The search warrant affidavit provides sufficient probable cause for the issuance of the Google search warrant for GPS and other location history data between the hours of 3:50 AM and 4:35 AM on October 26, 2018.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 5 is **DENIED**.

**Defendant's Motion to Suppress No. 6 - Facebook - Issued on January 8, 2019**

Although some provisions of the Facebook search warrant, *with added temporal limitations*, are supported by probable cause in the search warrant affidavit, there is no nexus for other provisions, which must be severed from the valid portions of the search warrant.

The search warrant affidavit establishes the commission element of probable cause. However, it is the nexus element that is at issue. The affidavit provides probable cause to search for any evidence of Defendant's physical location on the morning of the murder and shows that he frequently used his phone over the course of that morning. Call Data Records show that Defendant was using other methods of communication

that morning, and as the investigation progressed, investigators learned that Defendant had been communicating via social media on the morning of the homicides. Defendant and co-defendant Cortlen Henry were tagged in photographs wearing shirts memorializing the deceased victims. The affidavit ends with Detective Moretti speculating that because people generally share personal information with one another on Facebook, "giving a glimpse into their private lives," this warrant will assist in obtaining additional information to further the criminal investigation.

The search warrant affidavit provides probable cause to believe that evidence of Defendant's physical location and communications during and shortly after the homicides would be found in his Facebook account. The search warrant affidavit also provides probable cause to believe, based on the pictures described in the affidavit, that evidence relevant to the homicides would be found in Defendant's messages, posts, and other interactions on Facebook *after* the morning of the homicides. However, the search warrant affidavit contains no temporal limitations, which appears to have been an oversight on Detective Moretti's part. As previously discussed, the Court does not find that Detective Moretti could have relied on such a temporally overbroad warrant in good faith. Therefore, the Court finds that it is necessary to sever the temporally overbroad portions of the search warrant and suppress all evidence outside of the date range of October 26, 2018 (the day of the homicides) to January 8, 2019 (the date the warrant was issued).

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 6 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 7 - Instagram Account - Issued on January 23, 2019**

Similar to the preceding Facebook search warrant, the Instagram warrant is also temporally overbroad and the Court must sever those portions of the search warrant that are supported by probable cause from those portions of the search warrant for which there was no substantial basis to believe probable cause existed.

In addition to the commission element, the search warrant affidavit establishes the nexus element for Defendant's physical locations and communications on the morning of the homicides. The search warrant affidavit also provides probable cause to believe, based on the pictures described in the affidavit, that evidence relevant to the homicides would be found in Defendant's messages, posts, comments, and other interactions on Instagram *after* the morning of the homicides.

Unlike the Facebook search warrant, the Instagram search warrant does include a time limitation from October 1, 2018, to January 15, 2019. Since the search warrant affidavit only provides probable cause to search Defendant's Instagram after the homicides occurred, and there is no nexus between the homicides and any prior Instagram records, any evidence found pursuant to this warrant before October 26, 2018, shall be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 7 is **GRANTED** in part and **DENIED** in part.

INTENTIONALLY LEFT BLANK

Page 19 of 29

**Defendant's Motion to Suppress No. 8 - T-Mobile Prospective Real-Time Cell Site Location Information - Issued on February 5, 2019**

The search warrant affidavit for prospective real-time cell site location information provided probable cause to believe that Defendant had committed the two homicides on October 26, 2018, which is all that is required to issue a warrant for real-time cell site location information tracking. *See State v. Sylvestre*, 254 So. 3d 986, 989 (Fla. 4th DCA 2018). Defendant has not specified what evidence was seized pursuant to this warrant. Since the purpose of this warrant was to track Defendant's real-time whereabouts once the police had ascertained that he was a suspect, it is unclear what, if any, evidence was obtained pursuant to this warrant.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 8 is **DENIED**.

**Defendant's Motion to Suppress No. 9 - T-mobile Warrant - Issued on January 20, 2019**

The search warrant affidavit for historical cell site information for Defendant's phone in the month preceding the homicide provided probable cause for the search warrant. In any event, Detective Moretti testified that he did not find any relevant evidence pursuant to this search, and Defendant has not specified what specific evidence he is moving to suppress.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 9 is **DENIED**.

INTENTIONALLY LEFT BLANK

**Defendant's Motion to Suppress No. 10 - Search Warrant for Apple iPhone X - Issued on February 28, 2019**

The Court denies Defendant's motion to suppress because Detective Moretti testified that although he received the cell phone extraction pursuant to this search warrant, he did not conduct a search of the data pursuant to this warrant because the warrant and affidavit accidentally referenced the wrong IMEI number for the cell phone. Rather, the phone was searched pursuant to a subsequently obtained search warrant, which is the subject of Defendant's eleventh motion to suppress.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 10 is **DENIED**.

**Defendant's Motion to Suppress No. 11 - Search Warrant for Apple iPhone X - Issued on March 7, 2019**

Although the search warrant at issue is not a "general" warrant per se, it is "overly broad" because there are significant portions of the warrant that are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The search warrant affidavit provides probable cause to search and seize only a minute fraction of the incredibly vast amount of records and data that the warrant authorizes law enforcement to both seize and then later search. Therefore, any evidence seized pursuant to invalid portions of the search warrant must be suppressed.

The affidavit provides a nexus between Defendant's phone (the place to be searched) and the homicides only as follows: Defendant frequently used his phone on the morning of the homicides, which would then contain relevant information about his physical location during the homicides. Defendant was also in constant communication

with people through his phone and through social media on the morning of the homicides and throughout the rest of that day. After co-defendant Cortlen Henry was released from the hospital, Defendant had contact with him and his other associates and allegedly discarded two firearms in an undisclosed area. Clearly Defendant's phone could provide evidence of his physical location and communications during this period of time as well. There is nothing in the search warrant affidavit to suggest that there is a fair probability of finding evidence of the homicides on Defendant's cell phone from any period of time before October 26, 2018.

In *Riley v. California*, the Supreme Court held that cell phone searches were exempt from the search incident to arrest doctrine. 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). The Supreme Court's careful consideration of the impact of modern cell phones on daily life provides a framework for determining the contours of the Fourth Amendment's protection of an individual's private cell phone records and data. In discussing the unique nature of cell phones, the Court noted that a cell phone collects many distinct types of information in one place. *Id.* at 394. A cell phone's capacity allows even just one type of information to convey far more than previously possible. *Id.* Data and records from a cell phone can be used to reconstruct "the sum of an individual's private life." *Id.* The data on the phone can date back to the date of purchase, or even earlier. *Id.*

The Court also noted the qualitative difference between data stored on cell phones and physical records. *Id.* at 395. Internet search and browsing histories could reveal an individual's private interests and concerns, including health-related issues. *Id.*

Data on cell phones can reveal where a person has been. *Id.* at 396. The Court also discussed how mobile applications pervade a person's daily life.

> Mobile application software on a cell phone, or "apps," offer a range of tools for managing detailed information about all aspects of a person's life. There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime; apps for improving your romantic life. There are popular apps for buying or selling just about anything, and the records of such transactions may be accessible on the phone indefinitely. There are over a million apps available in each of the two major app stores; the phrase "there's an app for that" is now part of the popular lexicon. The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life.

*Id.*

Not only would a cell phone search typically expose to the government far more private information than the most exhaustive search of a house, it would also contain "a broad array of private information never found in a home in any form—unless the phone is." *Id.* A few years later, the Supreme Court observed that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. U.S.*, 585 U.S. ____, 138 S.Ct. 2206, 2220, 201 L.Ed.2d 507 (2018) (citing *Riley,* 573 U.S., at 385).

Detective Moretti testified in court that he needed access to the entirety of the data and records on Defendant's cell phone to establish a "pattern of life." Although he does not include this rationale in the search warrant affidavit, he did seek authorization to search "any files or data contained on the seized items and electronic storage media that show the ownership or control over the seized items" and "any files or data contained on the seized items and electronic storage media relevant to showing which

individual had control of the seized items at the time of the violations, where data was created, accessed, or modified." Such a search is patently overbroad. In *Nuckolls*, the Fifth District Court of Appeal found similar language impermissibly overbroad and affirmed the suppression of evidence seized pursuant to this provision. 617 So. 2d, at 728. Of note is that *Nuckolls* involved physical documents, not the expansive and diverse cell phone data and records involved in this case. The overbreadth of the search warrant is of even greater consequence here with the heightened privacy concerns that accompany cell phone searches. Detective Moretti cannot in good faith rely on the type of language that has been held insufficient to justify a search by a Florida appellate court.

Accessing such a wide swath of data merely because "(1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data" is speculative at best and cannot support such an invasion into Defendant's privacy rights.

The State conflates law enforcement's inability to determine what data or records are evidence of a crime without individually reviewing the data or records with its inability to sort categories of data or records based on file type, creation date and time, metadata, and the originating application. The State also does not account for why law enforcement cannot limit the scope of their search of broad categories of data and records even though it is necessary to first seize these broad categories by downloading the contents of the cell phone. Nor has it satisfactorily explained why law enforcement could not conduct a temporally targeted search. Furthermore, much of

Detective Moretti's search warrant affidavit for the cell phone records refers to computer specific systems such as Windows and IBM. The search warrant affidavit does not explain what limitations, if any, are imposed by the iOS operating system on iPhones, or the extent to which users can manipulate data on iPhones.

Had the search warrant affidavit restricted its scope to the homicide, the Court would not have needed to consider the doctrine of severability. *See Castro*, 881 F.3d at 965 (a warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime). However, those provisions of the search warrant enabling a general data grab for the purpose of showing ownership or control over the cell phone cut against such a finding. If such a justification were to stand, there would be no limits on what cell phone data law enforcement could seize or search in any given case.

The Court is cognizant that State and federal courts are still grappling with how to address the scope of cell phone search warrants post-*Riley*. However, given the unique and heightened privacy concerns that are inherent in cell phone searches, the application of the exclusionary rule would discourage law enforcement officials from essentially establishing a data dragnet in the name of finding evidence of identity and ownership.

Therefore, only data and records created between October 26, 2018, and February 13, 2019, when Defendant was arrested, will be admissible at trial. All evidence found outside of these parameters shall be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 11 is **GRANTED** in part and **DENIED** in part.

**Motion to Suppress No. 12 - Search warrant for two Google user accounts -
Issued January 21, 2020**

 The search warrant affidavit provides probable cause to believe evidence of
Defendant's location on the morning of the homicides will be found in one or both of his
Google user accounts. The search warrant affidavit also provides probable cause to
believe Defendant's location after Henry was discharged from the hospital, at which
point Defendant is alleged to have discarded two firearms in an unknown wooded area,
would be found in one or both of Defendant's Google accounts. It is common knowledge
that an individual's Google user account is linked to all Google applications if the user is
logged in, such as Google Maps. It is not speculative to expect users to be logged into
their Google accounts on Google applications. Based on the search warrant affidavit,
there was probable cause to believe that applications on Defendant's cell phone,
including Google applications, would reveal information about Defendant's location on
October 26, 2018. The search warrant affidavit also provides probable cause to believe
that Defendant was using his phone to communicate with others on the morning of the
homicides as well as after Cortlen Henry was released from the hospital. It is common
knowledge that Gmail is an email application capable of communication.

 However, the search warrant's temporal limitation of October 1, 2018, to
November 1, 2018, is overbroad. The search warrant affidavit does not provide a nexus
for records created prior to the homicides. On the other hand, it was not unreasonable
to extend the outer end of the date range to November 1, 2018, to account for replies to
email threads that may have begun on October 26, 2018.

Based on the above, any records created before October 26, 2018, shall be suppressed. All records created between October 26, 2018, and November 1, 2018, shall be admissible.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 12 is **GRANTED** in part and **DENIED** in part.

**Motion to Suppress No. 13 - Search warrant for Google user account ynwmellybooking@gmail.com - Issued on March 15, 2022**

The search warrant affidavit is completely devoid of a nexus between the Google user account and the homicides. The affidavit establishes that Defendant committed the homicides and that Defendant is affiliated with a gang. However, gang affiliation, without more, is not evidence that Defendant committed the homicides. The search warrant affidavit contains nothing to indicate that the homicides were gang-related. While it would be rank speculation to conclude that the homicides were gang-related merely because Defendant is alleged to have gang affiliations, the search warrant affidavit does not even include such a conclusion. It merely states that the Grand Jury which returned the February 23, 2022, superseding indictment heard evidence of Defendant's gang membership.

The Court finds that there was no substantial basis for concluding that there was probable cause to believe that evidence of the homicides would be found in a search of Defendant's Google user account before October 26, 2018. The search warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The Court finds that the good faith exception does not apply.

Even if the text messages did provide a minimal nexus for the search warrant, these text messages were sent on September 7, 2018. These text messages were found after an impermissible search of a portion of Defendant's cell phone records pursuant to the constitutionally infirm and severed portions of the cell phone search warrant. When the text messages, which are fruit of the poisonous tree[3], are excised from the affidavit, there was no substantial basis to find that the Google user account would contain evidence of the homicides. *See Davis v. State*, 834 So. 2d 322, 328 (Fla. 5th DCA 2003).

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 13 is **GRANTED**.

The Court has not been moved to consider the suppression of specific evidence. It is up to the parties to inform the Court as to what specific evidence falls within the suppression order and what specific evidence is admissible pursuant to this Order[4].

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Broward County, Florida, this ⟨26⟩ day of December, 2023.

JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

---

[3] *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[4] Nothing in this Order precludes the possibility of reconsideration in the event that the door to suppressed evidence is opened at trial. *See Smithey v. State*, 310 So. 3d 1104, 1108 (Fla. 5th DCA 2020) (trial counsel rendered ineffective assistance of counsel by opening the door to the appellant's previously suppressed statements made during a custodial interrogation after appellant had invoked her right to remain silent).

Copies furnished to:

Service List

Alixandra Buckelew, Esq.
Justin Griffith, Esq.
Taylor Collins, Esq.

Assistant State Attorneys

Raven Liberty, Esq.
Stuart Adelstein, Esq.
Daniel R. Aaronson, Esq.
Peter T. Patanzo, Esq.
James. S. Benjamin, Esq.

Attorneys for Defendant

# EXHIBIT II

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,       )     CASE NO.:  19-1872CF10A
                    )
     Plaintiff,    )
v.                 )
                    )
JAMELL DEMONS,     )
                    )
     Defendant.   )     JUDGE:    JOHN J. MURPHY III
_____)

## ORDER ON THE STATE'S MOTION FOR REHEARING/RECONSIDERATION

**THIS CAUSE** came before the Court on the State's Motion for Rehearing pursuant to Fla. R. Crim. P. 3.192 and the State's Motion for Reconsideration, filed on December 29, 2023.[1] Defendant filed a Response on January 8, 2024, and the State filed a Reply on January 9, 2024.

Having considered the State's motion, Defendant's Response, the State's Reply, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

Fla. R. Crim. P. 3.192 allows the State to file a motion for rehearing of an order granting a motion to suppress. The motion for rehearing shall state with particularity the points of law or fact that, in the opinion of the state, the court has overlooked or misapprehended in its decision, and **shall not** present issues not previously raised in the proceeding.

The State has not established that the Court overlooked or misapprehended any points of law or fact. The State's argument about Defendant's lack of standing, which would only apply to Defendant's cellular phone, is not well taken. Defendant has

---

[1] The Court shall address the State's motion for clarification in a separate order.

established a possessory interest in the cellular phone at issue in his motion to suppress and there was no evidence presented that Defendant disclaimed his possessory interest in the cellular phone or otherwise abandoned it. Trial counsel's strategy at the first trial is not evidence. As clearly stated in the Court's Omnibus Order granting, denying, or granting in part and denying in part Defendant's thirteen motions to suppress, the Court's ruling in no way precludes reconsideration of the order if it becomes apparent at any point in the proceedings, including during trial, that Defendant is disclaiming a possessory interest in the cellular phone. *See* Omnibus Orders on Defendant's Motion to Suppress 1-13, p. 28, fn. 4.

The State also takes issue with the Court's decision to allow Defendant to elicit testimony from Detective Mark Moretti at the hearings on Defendant's motions to suppress. However, as stated in the Court's Omnibus Order, the Court did not consider Detective Moretti's testimony when determining whether probable cause existed within the four corners of the search warrant affidavits at issue. Rather, the Court only considered Detective Moretti's testimony as it related to the issue of whether he relied on the search warrants in good faith, which is a separate inquiry undertaken after a determination that no probable cause existed within the four corners of the affidavit.

The State relies on cases in support of its argument regarding "Limitations of Scope from Service Providers" that are inapplicable to the instant case. *U.S. v. Hargus* did not involve the search of documents provided by an internet service provider; rather, it involved the search of several cabinets, all of which contained categories of records within the scope of the search warrant. 128 F.3d 1358, 1363 (10th Cir. 1997). Likewise,

*U.S. v. Williams* involved the search of a computer, not service providers. 592 F.3d 511 (4th Cir. 2010).

The State, once again, conflates the service provider's inability to search through the contents of the records requested to determine which records are relevant to the homicides with the service provider's ability to narrow the category of data based on criteria such as file type and date ranges that are unrelated to the actual contents of the records or data. The Court did not find that service providers have the ability to determine what data is evidence of a crime. Rather, nothing presented in either the search warrant or in Detective Moretti's testimony indicates that service providers cannot limit production of data based on categories and time-frames which are unrelated to the substantive contents of those records. And, once again, the State conflates the necessity of *seizing* wide categories of records and data based on service providers' inability to determine what records or data contain evidence of a crime with the authority for law enforcement to *search* the entirety of the records and data provided. While law enforcement may have had to search through records to determine whether they contained evidence of a crime, there was nothing to indicate that law enforcement was unable to restrict their search based on non-substantive record categories and/or time frames.

The State also argues that the time limitations imposed in the Omnibus Order are arbitrary because the time frames imposed for different warrants are not the same. As clearly required by the law, the Court could only look to the four corners of each individual search warrant affidavit to determine the appropriate time limitations based on the facts in each individual search warrant. The Court cannot incorporate the facts present in the Facebook or Instagram affidavits into other affidavits for the convenience of uniform time

frames. Likewise, the Court will not consider any of the extrinsic facts set forth by the State in its motion for rehearing.

> Certainly it is not the function of a petition for rehearing to furnish a medium through which counsel may advise the court that they disagree with its conclusion, to reargue matters already discussed in briefs and oral argument and necessarily considered by the court, or to request the court to change its mind as to a matter which has already received the careful attention of the judges, or to further delay the termination of litigation.

*Barnes v. State*, 743 So. 2d 1105, 1113 (Fla. 4th DCA 1999) (citing *State v. Green*, 105 So. 2d 817, 818-819 (Fla. 1st DCA 1958)). The State's motion for rehearing pursuant to Rule 3.192 is merely an attempt to reargue matters already addressed and to request the Court to change its mind as to matters which were carefully considered before the Court issued its rulings on the motions to suppress.

Fla. R. Crim. P. 3.192 does not allow the State to move for rehearing based on the inevitable discovery or independent source doctrines, issues which the State failed to raise prior to the Court's ruling, even though the State filed a detailed omnibus response and had ample time to present argument at the hearings. However, Rule 3.192 does not preclude the Court from exercising its inherent authority to reconsider a motion to suppress while the Court still has jurisdiction over the case. The Court will not exercise its discretion to reconsider issues that were already considered and ruled on in its Omnibus Order on the motions to suppress. The Court finds that the State's arguments as to those issues have no merit, and there is no good cause for the Court to reconsider those issues.

While the Court will not reconsider its prior ruling based on any of the issues addressed in the Omnibus Order, nor will it hear further evidence or argument on those issues, the Court shall hold a limited evidentiary hearing in which the State will have the

opportunity to present evidence and argument only as they pertain to the inevitable discovery and independent source doctrines. The Court finds that it would serve the interests of justice to allow the State to present evidence and argument on these new issues because of the vast amount of records and data that were seized pursuant to the search warrants at issue in this case. In order for the Court to thoroughly analyze and consider the newly raised issues of the inevitable discovery and independent source doctrines, the State will have to introduce evidence pertaining to the specific records and/or data that it believes would be exempt from the exclusionary rule based solely on these doctrines.

Based on the above, it is

**ORDERED and ADJUDGED** that the State's Motion for Rehearing pursuant to Fla. R. Crim. P. 3.192 is **DENIED**; and it is further

**ORDERED and ADJUDGED** that the State's Motion for Reconsideration is **GRANTED IN PART** and **DENIED IN PART**.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Broward County, Florida, this __11__ day of January, 2024.

_____
JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

Copies furnished to:

<u>Service List</u>

Alixandra Buckelew, Esq.
Justin Griffith, Esq.
Taylor Collins, Esq.

Assistant State Attorneys

Raven Liberty, Esq.
Stuart Adelstein, Esq.
Daniel R. Aaronson, Esq.
Peter T. Patanzo, Esq.
James. S. Benjamin, Esq.

Attorneys for Defendant

# EXHIBIT III

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,              )        CASE NO.:   19-1872CF10A
                               )
         Plaintiff,            )
v.                             )
                               )
JAMELL DEMONS,                 )
                               )
         Defendant.            )        JUDGE:     JOHN J. MURPHY III
_____)

## ORDER DENYING THE STATE'S MOTION FOR RECONSIDERATION

**THIS CAUSE** came before the Court on the State's Motion for Rehearing pursuant to Fla. R. Crim. P. 3.192 and the State's Motion for Reconsideration, filed on December 29, 2023. Defendant filed a Response on January 8, 2024, and the State filed a Reply on January 9, 2024. The Court granted an evidentiary hearing on the State's motion for reconsideration but limited it to the applicability of the inevitable discovery doctrine and the independent source doctrine. The hearing was held on January 18, 2024 and continued into January 19, 2024.

The Court heard testimony from Detective Danny Polo of the Broward Sheriff's Office. Detective Polo first became involved in this case in 2022. At the time, he was assigned to the gang investigation unit. Detective Polo reviewed Defendant's public social media profile and posts and YouTube channel, as well as the victim Anthony Williams' public social media profile and posts. Detective Polo also reviewed the contents of Defendant's phone within the time limits imposed in this Court's prior omnibus order

granting in part Defendant's motion to suppress evidence found on his cellular phone[1]. Detective Polo reviewed information found on Williams' cellular phone and found messages that were sent and received prior to the date of the homicides which showed there may have been some conflict between Williams and Defendant. He also found audio recordings and audio files that were shared through the Notes feature on both phones. However, no evidence was presented as to when Detective Polo conducted this search or when law enforcement came into possession of data from Williams' phone.

Detective Polo searched Defendant's cellular phone and found messages between Defendant and his manager referencing conversations and events that occurred before the date of the homicides. There were messages sent at some point after the homicides occurred referencing Defendant's music video for the song, "Mama Cry." Defendant had texted that he wanted 10/26/18, the date of the homicide, printed on the jumpsuit he was going to wear in the music video. Detective Polo also found messages on Defendant's phone between Defendant and his manager indicating that there might have been witness tampering or a coverup.

Detective Polo reviewed publicly available social media posts, jail calls made by Defendant and a YouTube video posted on December 10, 2019, which he believed provided probable cause for the issuance of a search warrant for Defendant's Instagram, Facebook, and Snapchat accounts. However, there was no testimony regarding when law enforcement came into possession of these publicly available posts, jail calls or YouTube videos or even whether any law enforcement officer conducted a search of publicly available information before executing the search warrants with the exception of

---

[1] The Court issued its order on December 20, 2023, which is the earliest that Detective Polo could have conducted this search.

the Gmail #2 search warrant. Detective Polo testified that he could have sought a search warrant for Mariah Hamilton's Snapchat account because law enforcement knew she had conversations with Defendant. However, no evidence was presented that any law enforcement officer actually sought such a search warrant or found any evidence on her Snapchat account.

When questioned about what connection Defendant's gang affiliation had with the homicides, Detective Polo concluded that the homicides were gang related because there was conflict between Defendant and Williams and because it was Defendant's job to enforce Blood laws. Detective Polo testified that he could have sought a search warrant for Defendant's phone to search for evidence of gang activity as it relates to charges of racketeering and criminal enterprise by a gang under the gang prevention statute. However, no evidence was presented that such an investigation had actually been initiated at any point in time, or that Detective Polo had sought a search warrant.

The Court reviewed and considered all evidence adduced at the hearing.

Having considered the State's motion, Defendant's Response, the State's Reply, evidence and testimony presented at the evidentiary hearing, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

### Inevitable Discovery Doctrine

The State moves the Court to reconsider its rulings on Defendant's Motions to Suppress 3 (iCloud), 4 (Snapchat), 6 (Facebook), 7 (Instagram), 11 (Apple iPhone X IMEI 0369), 12 (Gmail #1), and 13 (Gmail #2) based on the inevitable discovery doctrine[2]. For

---

[2] The State appears to conflate the inevitable discovery doctrine with the related yet distinct independent source doctrine. "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct

the reasons stated below, the Court finds that the inevitable discovery doctrine is inapplicable to any of the motions to suppress.

The Supreme Court first established the inevitable discovery doctrine as an exception to the exclusionary rule in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2401, 81 L.Ed.2d 377 (1984). The Supreme Court reasoned that if the prosecution can establish **by a preponderance of the evidence**[3] that information revealed through an unlawful search ultimately or inevitably *would have* been discovered by lawful means, then the deterrence rationale of the exclusionary rule has so little basis that evidence should be admitted. *Id.* at 444 (emphasis added).

The inevitable discovery doctrine requires that the State's investigation must be ongoing and the State must show that the facts **already known** by the police **at the moment of the unconstitutional procedure** would have led to the evidence notwithstanding the police misconduct. *See Rodriguez v. State*, 187 So. 3d 841, 846 (Fla. 2015); *Fitzpatrick v. State*, 900 So. 2d 495, 514 (Fla. 2005), *as revised on denial of reh'g* (Apr. 21, 2005), *abrogated on other grounds by Alahad v. State*, 362 So. 3d 190 (Fla. 2023); *Moody v. State*, 842 So. 2d 754, 759 (Fla. 2003); *Rodgers v. State*, 264 So. 3d 1119, 1123 (Fla. 2d DCA 2019). There can be no speculative elements. *See Rodriguez*,

---

2501, 81 L.Ed.2d 377 (1984). None of the contested evidence was actually discovered by any means other than searches conducted pursuant to the partially or wholly deficient search warrants.

[3] The State argues that the standard for the inevitable discovery doctrine is not absolute certainty, but "reasonable probability," relying on *State v. Ruiz*, 502 So. 2d 87 (Fla. 4th DCA 1987) and *State v. LeCroy*, 435 So. 2d 354 (Fla. 4th DCA 1983), *reh'g denied and opinion modified*, 441 So. 2d 1182 (Fla. 4th DCA 1983), and *approved in part, quashed in part*, 461 So. 2d 88 (Fla. 1984). Both decisions were based on the holding in *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980). However, *Brookins* was decided before *Nix* and has since been overruled in *United States v. Watkins*, 10 F.4th 1179, 1182 (11th Cir. 2021), in which the Eleventh Circuit Court of Appeals recognized that its predecessor court's reasonable probability standard could no longer stand in light of the *Nix* holding requiring a preponderance of the evidence standard. Since issuing its decisions in *Ruiz* and *LeCroy*, the Fourth District Court of Appeal has recognized that the standard to be applied is preponderance of the evidence. *See Rowell*, 83 So. 3d at 995.

187 So. 3d at 846. The State cannot argue that some possible further investigation would have revealed the evidence. *See Moody*, 842 So. 2d at 759. Rather, the State must show that the evidence would have been discovered "by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure." *Craig v. State*, 510 So. 2d 857, 863 (Fla. 1987).

Florida courts that have considered the inevitable discovery doctrine have generally done so in the context of warrantless searches and have held that the inevitable discovery doctrine requires the prosecution to prove that the police were pursuing a search warrant prior to the unlawful search. *See, e.g., Rodriguez*, 187 So. 3d at 849. Federal courts have modified this inquiry and applied the inevitable discovery doctrine to evidence found pursuant to a search warrant that was later found to be deficient. In *United States v. Streett*, the Tenth Circuit Court of Appeal modified the active pursuit of a warrant requirement to require the court to consider whether the detective who obtained the search warrant *would have* obtained a subsequent proper warrant if the deficient application had originally been denied. 83 F.4th 842, 850 (10th. Cir. 2023). In finding that this requirement had been met, the court noted that the detective would have only had to add a single sentence, an easy fix using information he already had in his possession. *Id.* at 851.

Just as Florida courts have focused on whether the information in possession of the police **at the time of the unlawful search** would have inevitably led to the discovery of evidence from an unlawful search, the court in *Streett* similarly focused on what was known to the police at the time the warrant application was submitted. In rejecting the defendant's argument that the application of the inevitable discovery doctrine to cases

involving deficient search warrants would defeat the probable cause requirement, the court noted that "[w]ithout a showing by the Government that the officer had probable cause **at the time the warrant application was submitted**, the Government could not show that an alternative properly obtained warrant inevitably would have been issued." *Id.* at 849 (emphasis added).

Likewise, in *United States v. Sabile*, the Third Circuit Court of Appeals specified that the applicability of the inevitable discovery doctrine is based on "historical facts capable of ready verification" ... "as they existed at the instant **before** the unlawful search." 633 F.3d 219, 245-46 (3d Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 194 (3d Cir. 1998)) (emphasis added).

In *Sabile*, law enforcement agents had submitted a search warrant affidavit for the defendant's 120 GB hard drive to search for evidence of child pornography. *Id.* at 228. However, the search warrant accidentally authorized law enforcement to search a different 40 GB hard drive instead. *Id.* Evidence of child pornography was found on the 40 GB hard drive. *Id.* That evidence was then included in an application for a subsequent search warrant for five other hard drives that were seized from the defendant, including the 120 GB hard drive. *Id.* The 120 GB hard drive was then found to contain evidence of child pornography. *Id.*

Although the first search warrant was deficient because there was probable cause only to search the 120 GB hard drive, not the 40 GB hard drive, and although the second search warrant was deficient because it was based on evidence unlawfully obtained from the 40 GB hard drive, the evidence obtained was nevertheless admissible under the inevitable discovery doctrine. *Id.* at p. 245. The court reasoned that had the first search

warrant authorized the search of the correct 120 GB hard drive, law enforcement would have still found evidence of child pornography, which would have then provided probable cause for a search warrant for all the hard drives. *Id.*

The State has not presented any evidence as to what facts were actually known by law enforcement officers before any of the search warrants were issued in this case. All of the search warrants that were challenged by Defendant were issued pursuant to affidavits authored by Detective Mark Moretti. Detective Moretti did not testify at the hearing on the State's motion for reconsideration. Detective Polo only began working on this case in 2022, so he could not have been involved in any of the search warrant applications other than the Gmail #2 search warrant, which was issued in 2022. There is no evidence that Detective Moretti was aware of the public social media posts, YouTube videos, jail calls, or data from either Williams' phone or Defendant's phone before he submitted his application for search warrants.

For the same reason, the State cannot rely on information found on Defendant's cellular phone within the approved date ranges to justify the search of information outside of that date range because Detective Moretti could not have had access to the information on Defendant's phone before the search was conducted.

Although Detective Polo did work in conjunction with Detective Moretti before Detective Moretti submitted his search warrant application in 2022 (Gmail #2), at the evidentiary hearing, the Court was not presented with untainted evidence providing a link between the homicides and Defendant's gang affiliation beyond Detective Polo's speculation that everything Defendant did was in accordance with Blood laws.

Additionally, the inevitable discovery doctrine only applies if law enforcement officers were actively pursuing the alternate means by which evidence would inevitably be discovered. *See Rowell v. State*, 83 So. 3d 990, 996 (Fla. 4th DCA 2012) (the prosecution failed to show that efforts to obtain the evidence through lawful means, in this case a search warrant, were being actively pursued prior to the occurrence of the illegal conduct); *Murray v. State*, 155 So. 3d 1210, 1218 (Fla. 4th DCA 2015) (even if the search warrant for Defendant's DNA was not supported by probable cause, the State would have inevitably discovered the defendant's DNA through a CODIS system match where the assigned forensic biologist ran the DNA evidence from the victim through the nationwide CODIS system in addition to comparing it to the defendant's DNA sample).

What is key is not whether law enforcement officers were actively investigating Defendant but whether they were actively pursuing **the lawful means** which would have made discovery inevitable **prior to the occurrence of the illegal misconduct**. *See United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (emphasis added). "Any other rule would effectively eviscerate the exclusionary rule." *Id.*

Detective Polo's testimony that he could have obtained a search warrant for Defendant's phone for racketeering charges and that he could have obtained a search warrant for Mariah Hamilton's Snapchat account, which would then provide information sufficient to provide probable cause for a wider search warrant for Defendant's Snapchat account, is rank speculation that cannot justify the application of the inevitable discovery doctrine. No racketeering investigation was commenced, no search warrant for Mariah Hamilton's Snapchat account was sought, and no evidence was found on her Snapchat

account that would justify the issuance of a wider search warrant for Defendant's Snapchat account.

*United States v. Lauria*, 70 F.4th 106 (2nd Cir. 2023), with facts similar to the instant case, explains why the inevitable discovery doctrine cannot apply based solely on Detective Polo and the State's post hoc theorizing about what evidence could have been discovered had they been previously made aware of legal defects in the actual discovery of the evidence.

> [T]he inevitable discovery doctrine does not apply simply because "a reasonable police officer *could have*" lawfully discovered the evidence at issue; rather, it applies where the record establishes "with a sufficiently high degree of certainty that a reasonable police officer *would have*" lawfully discovered the evidence regardless of the disclosure of any legal defect in the actual discovery of the evidence.

*Id.* at 123 (quoting *United States v. Heath*, 455 F.3d 52, 58 (2d Cir. 2006)) (emphasis in original). "[T]he investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed." *Id.* For the inevitable discovery doctrine to apply, the State must show by a preponderance of the evidence that it would have discovered the evidence by lawful means even if no warrant had been issued or challenged. *Id.* at 124.

In holding that the defendant's motion to suppress should not have been denied on the basis of the inevitable discovery doctrine, the court noted:

> The record here indicates that, but for the defense's exposure of misstatements in the warrant affidavits, the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means to procure the evidence at issue. **Certainly, the record is bereft of any evidence that, in the two-month interval between the government learning of Molina's link to the -4879 cell phone and Molina's suppression motion, the government took any steps to seek new warrants lawfully to obtain the challenged evidence.** Similarly, no record evidence

indicates that, before Molina's suppression motion highlighted dating and other errors in the warrant affidavits, the government took any steps to correct those affidavits or otherwise ensure probable cause for the warrants they supported.

*Id.* at 124. (emphasis added).

Similarly, Detective Polo only conducted a search of Defendant's cellular phone to look for evidence that would support the issuance of a wider search warrant after the Court issued its suppression order and in preparation for the evidentiary hearing on the State's motion for reconsideration. Although it is unclear when Detective Polo learned of the public social media posts, YouTube videos, Defendant's emails, text messages and audio files found on Defendant's phone, text messages and audio files found on Williams' phone, and posts on Williams' social media accounts, it is clear that neither Detective Moretti nor Detective Polo actually sought amended search warrants based on these new leads.

Based on the record, the Court cannot find by a preponderance of the evidence that law enforcement officers would have found the evidence previously suppressed by the Court by lawful means had Defendant not filed motions to suppress. Therefore, the Court finds that the inevitable discovery doctrine does not exempt the unlawfully obtained evidence which was previously suppressed by this Court from the exclusionary rule.

INTENTIONALLY LEFT BLANK

Based on the above, it is

Page 10 of 11

ORDERED and ADJUDGED that the State's Motion for Reconsideration is DENIED.

DONE AND ORDERED in Chambers, Fort Lauderdale, Broward County, Florida, this _25_ day of January, 2024.

JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

Copies furnished to:

Service List

Alixandra Buckelew, Esq.
Justin Griffith, Esq.
Taylor Collins, Esq.

Assistant State Attorneys

Raven Liberty, Esq.
Stuart Adelstein, Esq.
Daniel R. Aaronson, Esq.
Peter T. Patanzo, Esq.
James. S. Benjamin, Esq.

Attorneys for Defendant

Page 11 of 11

# EXHIBIT IV

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,        )      CASE NO.:   19-1872CF10A
                     )
     Plaintiff,       )      JUDGE:   MURPHY
                     )
v.                   )
                     )
JAMELL DEMONS,     )
                     )
     Defendant.     )

**ORDER GRANTING DEFENDANT'S MOTION IN LIMINE RE: PROMOTIONAL VIDEO**

THIS CAUSE comes before the Court upon Defendant's Motion in Limine Re: Promotional Video.  Having considered Defendant's motion, the written response of the State, arguments heard at a hearing before this Court on January 19, 2024, applicable law, and being otherwise fully advised in the premises, this Court finds as follows:

Defendant moves to prohibit at trial a specific portion of a promotional/documentary-type video from coming into evidence.  The portion at issue in this order is a fourteen-second portion (20:14 through 20:27), wherein the video depicts the text: "Four days after the completion of this film, YNW Melly and his friends were the targets of a drive-by shooting in Miami, Florida.  YNW Juvi and YNW Sakchaser were killed."  That portion also shows Defendant standing in the background.

Defendant claims that this clip from the video is inadmissible at trial since the text included therein is: hearsay and double hearsay, not attributable to Defendant, and irrelevant.  The State claims that this clip is an adoptive admission, an exception to the hearsay rule, under Section 90.803(18), Florida Statute.

This Court agrees with Defendant that this fourteen second portion of the video is inadmissible at trial.  The text displayed on the screen is not attributable to any specific

1

person.  While this short video focuses on Defendant's life, it is mere speculation to guess who decided to add the text statement at the 20:14 mark.  It could have been the director, the producer, an editor, Defendant, or any number of people.  Thus, without knowing the source of the comment, it holds no evidentiary value.

Next, this Court finds the State's argument that the text statement in this clip is an 'adoptive admission' by Defendant to be without merit.  Pursuant to Section 90.803(18)(b), for an adoptive admission to be considered an exception to the hearsay rule, it must be "a statement that is offered against a party and is a statement of which the party has manifested an adoption or belief in its truth."  Merely because the entirety of the video was posted on Defendant's Youtube page does not make everything contained thereon an adoptive admission.  As the Fourth DCA pointed out in *Philip Morris USA, Inc. v. Pollari*, 228 So. 3d 115 (Fla. 4th DCA 2017):

> When an adverse party manifests a belief in or adopts the statement as his or her own, the statement is treated as an adoptive admission under section 90.803(18)(b).  An adoptive admission occurs either when there is a *direct expression* by the adverse party assenting to the statement of another *or when the conduct of the adverse party circumstantially indicates the party's assent* to the truth of the statement.

*Id.* at 124.

In the instant matter, with regard to the text at the 20:14 mark, there is certainly no direct expression by Defendant assenting to that statement.  Furthermore, the act of posting the video on his Youtube site is not conduct circumstantially indicating his assent to the truth of that particular statement.

> Consistent with both the Florida and Federal rules, it is not enough that an opposing party 'merely repeats' the underlying hearsay; indeed, the party must make use of the hearsay in a manner that 'manifest[s] a belief in [its] trustworthiness,' or otherwise reflects the party's incorporation of the substance of the hearsay into a statement that the party itself either made or authorized.

*Id.* at 125.

2

The statement is neither attributable to Defendant nor do the circumstances demonstrate his adoption and assent to the statement. The evidence points to nothing indicating Defendant manifested an adoption or belief in the truth of the unattributed statement. Thus, the text at 20:14 through 20:27 remains inadmissible hearsay.

Accordingly,

**ORDERED AND ADJUDGED** that Defendant's Motion is **GRANTED** to the extent that the fourteen second portion of the video at 20:14 through 20:27 is not admissible at trial.

**DONE AND ORDERED** on this _25_ day of January, 2024, in Chambers, Fort Lauderdale, Broward County, Florida.

JOHN J. MURPHY, III
CIRCUIT JUDGE

Copies furnished to:

Daniel R. Aaronson, Esq., James S. Benjamin, Esq., Raven Liberty, Esq., Stuart Adelstein, Esq., Attorneys for Defendant

Alexandra Buckelew, Esq., Taylor Collins, Esq., Justin L. Griffis, Esq., Office of the State Attorney

3

Filing # 192109765 E-Filed 02/16/2024 10:42:23 AM

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

STATE OF FLORIDA,

     Petitioner,

v.                       Case No. 4D24-
                          L.T. Case No.: 2019-1872CF10A

JAMELL DEMONS,

     Respondent.

_____/

## **PETITION FOR WRIT OF CERTIORARI**

## **INTRODUCTION**

Pursuant to Florida Rule of Appellate Procedure 9.100, Petitioner, State of Florida (hereinafter referred to as "the State"), by and through undersigned counsel, respectfully petitions this Honorable Court for a writ of certiorari quashing the circuit court's order **precluding completely** the State of Florida, from cross-examining defense witness Ms. Michelle Boutros. The witness is an Assistant State Attorney for the Broward State Attorney's Office and has been employed for the past 20 years. Ms. Boutros has never been involved in the prosecution of the defendant, Jamell Demons, who is on trial for the first-degree murders of Anthony Williams and

1

Christopher Thomas. In support of this Petition,[1] the State argues as follows:

## I. BASIS FOR INVOKING JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to issue a writ of certiorari under Article V, Section 4(b)(3) of the Florida Constitution and Florida Rule of Appellate Procedure 9.030(b)(2)(A). As determined by the Florida Supreme Court, the State is entitled to seek certiorari review of pre-trial orders rendered in criminal cases. In *State v. Pettis*, 520 So. 2d 250 (Fla. 1988), the Court explained as follows:

> The ability of the district courts of appeal to entertain State petitions for certiorari to review pretrial orders in criminal cases is important to the fair administration of criminal justice in this State. Otherwise, **there will be some circumstances in which the State is totally deprived of the right of appellate review of orders** which effectively negate its ability to prosecute.

*Pettis*, 520 So. 2d at 253 (e.a.).

For instance, if the State is forced to proceed to trial under the negative effect of a pre-trial evidentiary ruling, and the defendant is

---

[1] On January 26, 2024, the State filed its Notice of Appeal regarding suppression issues. *See* 4D24-248. On February 12, 2024, Respondent filed his Notice of Cross-Appeal. *Id.* As such, the trial proceedings are stayed.

2

acquitted, the State's ability to seek review of the trial court's non-final pre-trial is extinguished because the State has no right to a direct appeal in that event. *See LaFave v. State*, 149 So. 3d 662, 669 (Fla. 2014) (citing *Pettis*, 520 So. 2d at 251–252) (reiterating that the appellate court "'had the authority to grant certiorari to review the denial of the State's pre-trial motion in limine... for which the State would have no other avenue of review'"). *See also State v. Sills,* 279 So. 3d 1224 (Fla. 4th DCA 2019) (explaining that the inability to otherwise review a pre-trial order suppressing State's evidence is the definition of irreparable harm as there would never be review on an order that compromises the State's right to effectively prosecute its case.); *State v. Gerry,* 855 So. 2d 157 (Fla. 5th DCA 2003) (recognizing that the entitlement to call witnesses and present evidence is a due process right that belongs to both the defense as well as to the State); *State v. Dreggors*, 813 So. 2d 170, 172 (Fla. 5th DCA 2002) (granting relief as the pre-trial order prohibiting impeachment evidence would significantly impair State's ability to effectively prosecute its case).

In the instant case, the State has met its jurisdictional burden by demonstrating that it will suffer irreparable harm should it be foreclosed from seeking certiorari review of the trial court's erroneous

evidentiary ruling barring completely the cross-examination of this witness.

Additionally, the entitlement to the relief requested is warranted only if the State demonstrates that the trial court's ruling is a departure from the essential requirements of law. An example of the type of error that would warrant relief would be if the trial court erroneously applied an incorrect standard of law when making a determination about admissibility of State's evidence. *See State v. Williams,* 992 So. 2d 330, 333 (Fla. 3d DCA 2008) (finding that trial court's pre-trial order suppressing evidence based on a finding that it was not "necessary" was a clear departure of the law as the court erred in not applying the proper standard of relevancy) *see also State v. Kline,* 764 So. 2d 716, 716-717 (Fla. 5th DCA 2000) (pre-trial ruling precluding evidence that the defendant refused breathalyzer test in DUI prosecution was a departure from the essential requirements of the law where trial court misinterpreted the implied consent law which clearly permits admissibility of that refusal).

Herein, the trial court has absolutely no authority to impose a total ban on the cross-examination of defense witness, Michelle Boutros. The effect of this ruling is to insulate her completely from

4

any challenge to her credibility, and gifts to the Defendant the ability to present her direct testimony with impunity. Certiorari relief is warranted.

## II. PROCEDURAL HISTORY AND STATEMENT OF FACTS

Respondent was indicted for two counts of first-degree murder with a firearm – both charges carrying the statutory gang enhancement. A4.[2] His initial trial resulted in a hung jury.

In his first pretrial motion to dismiss the indictment, Respondent claimed that the State withheld impeaching evidence against Miramar Police Detective Moretti thereby violating his due process rights. A3. Specifically, he alleged that while executing a warrant in a tampering case against Ms. King, a different defendant, the detective acted outside of his jurisdiction because he was not in the presence of Broward Sheriff's Office ("BSO") when he served the warrant. A10.

Respondent further claimed that the detective conspired with BSO Deputy Gorel to conceal the extra-judicial warrant. *Id.* To that end, Respondent claimed a *Brady* violation and asserted that ASA

_____

[2] This petition will refer to the simultaneously filed appendix as A#.

5

Boutros – the prosecutor on the tampering case not the murder – had witnessed Moretti and Gorel conspiring while executing the warrant on the tampering defendant.

At a hearing, the State, represented by ASA Bradley, disavowed Respondent's claims. A30-31. After ASA Boutros was deposed by the defense, A44-131, wherein she Stated that the tampering case against King was "separate and apart" from what Bradley "was doing on her homicide case[,]" A50, Respondent moved to recuse the entire Broward State Attorney's Office. A132.

In his motion, Respondent argued that he would call ASA Boutros as a witness in the murder trial to malign Moretti's credibility with the alleged specific acts taken in the tampering case – a separate charge against a different defendant. A133-34. Respondent also argued that he would call ASA Bradley – who was prosecuting the instant murders – as a "fact witness" regarding Moretti's credibility. A134. According to Respondent, Bradley and Boutros' conflicted testimonies must result in Broward SAO's recusal. *Id.*

At a hearing, Boutros testified that she was investigating a case separate from the instant murders – tampering charges brought

against Ms. King. A143. Boutros testified that she obtained a subpoena to speak to Ms. King. A144.

Ms. King and her attorney arrived at Broward SAO pursuant to the investigative subpoena. A146. Boutros testified that she'd never worked with Moretti before then. A147.

According to Boutros, a BSO Sergent was with her along with Moretti, Ms. King, and King's attorney. A147-48. Boutros had approved Moretti's warrant for the seizure of Ms. King's phone in King's tampering case before the interview. *Id.*

Boutros testified that while King was giving her Statement, the BSO Sergent left the room. A148. During a "lull" in conversation, Moretti served the search warrant. A149. Boutros testified that even though she had already approved the warrant for King's phone, and they were with King, she did not expect Moretti to execute the warrant. *Id.* Boutros did not tell Moretti not to serve the warrant. *Id.*

According to Boutros, there was no one from BSO in the room when Moretti served the warrant. *Id.* King pulled out her phone and was "fumbling" and "pressing buttons." A150. Moretti told King not to turn off the phone. *Id.* When King did not comply, Moretti took the phone. A151.

7

Despite not saying anything at the time, Boutros later testified that the caselaw "suggests that you should have somebody from the jurisdiction that you're serving a search warrant or an arrest warrant in. I haven't done that research for a long time. I just knew that it was probably not what he should have been doing without a BSO deputy there." *Id.* Despite saying she would have told Moretti not to serve the warrant without BSO, Boutros testified that she told King she needed to hand over her phone pursuant to the search warrant. A152.

Boutros went on to testify that she told her supervisor she would not work with Moretti again, before being led by defense counsel that she'd forgotten part of the events. A152. After being prompted, she testified as follows:

> Detective Moretti said to Deputy Gorel, "You need to say you were here when I served that search warrant," and it was kind of like an awkward moment, some would describe it as just kind of getting punched twice in the head. So, there's a search warrant that gets served, and I'm like, "What's going on," and then the next thing he's asking this Deputy to lie for him, and again I'm like this isn't..., like I'm in the twilight zone, like this can't really be happening.

> Deputy Gorel didn't say anything of any substance. I think he said, "Is there anything I'm needed for any more,"

8

or something like that, but I don't remember if he said anything at all.

A155-56.

Boutros testified that she reported the event to her immediate supervisor and informed Broward SAO administration. A156. Boutros then testified that she heard that "[ASA] Bradley told Administration that Moretti told her that he was joking when he said what he said." A163.

Boutros did not testify why she believed that the alleged exchange which occurred in a separate case while executing a warrant against a separate defendant should be disclosed in Respondent's case. A166-67. Nor did Boutros indicate that she filed a *Brady* notice in the tampering case she was leading. *Id.* After another meeting, a *Brady* notice was drafted for Respondent's case but allegedly not filed. A171-72.

After more internal discussion about whether it was Moretti or Gorel who said it was joke, the *Brady* notice was filed in Respondent's case. A180-82. Boutros testified that the notice did not correctly reflect what occurred. A185. An amended *Brady* notice was filed in

Respondent's case. A192. Boutros did not agree with the contents of that notice either. A193. A second amended notice was filed. A197.

At the hearing, the State crossed Boutros without objection. A199-202.

ASA Bradley was also called by Respondent. A218. She testified that her *Brady* obligation was to "disclose any and all evidence that would show that the defendant did not commit a crime or any material evidence that could be used in trial." *Id.*

Bradley testified that Boutros said she would no longer be involved in the tampering investigation and did not want to work with Moretti again. A221. Bradley asked for incident reports because Boutros did not provide any details with her complaint. *Id.* Bradley contacted BSO and Moretti to determine what occurred because she took over King's tampering investigation. A222.

Deputy Gorel told Bradley that "there was no request for anyone to lie or anything of that nature." A224. "Gorel's version was that Detective Moretti asked, 'Were you the one that was outside,' or something to that effect. I was not present. I can't tell you exactly what happened." A251-52.

10

Moretti denied "that any such conversation took place, that no such event happened." A228. Bradley testified:

> A. I'm paraphrasing. But he Stated that the deputy showed up, he didn't even know who it was, and the deputy was lost. So, there was about five or six minutes in between when the sergeant had left before the deputy showed up. At that point, when the deputy showed up, Detective Moretti asked him something to the effect of, "Were you outside when this all happened?" Detective Gorel --
>
> Q. "Were you outside" is what he said?
>
> A. Yes, "when this all happened." Detective Gorel replied something to the effect of, "I can be if you needed me to." Basically Detective Gorel, if you have reviewed the surveillance footage, went to the wrong conference room and was on his phone wandering about the Seventh Floor trying to find it.

A228-29. Moretti said he did not take the comment seriously, interpreting it as a "flippant, off-the-cuff remark[.]" A250.

Bradley testified that Boutros did not take any record action after the alleged events: "And said fellow prosecutor also did not request any police reports to be done or do any additional documentation, if something had happened, to immediately follow up on such event if it had occurred." A232.

The trial court denied Respondent's motion to recuse the State Attorney's Office. A428. The court found Respondent's arguments regarding recusal to be "without any support in the evidence," and

11

"no clear violation of law or ethics by the administrators of the State Attorney's Office which would support an office wide disqualification." A434.

Because Respondent failed to establish the actual conflict required, and because there is "no inherent prejudice in allowing an assistant state attorney who is not prosecuting the case to testify," the court found no basis to grant the motion. A435.

In a footnote, the court noted: "Any prejudice can be cured by disqualifying the current lead prosecutor, Ms. Bradley, from prosecuting this case since she is likely to be called as an impeachment witness in Defendant's case in chief." *Id*. Respondent's motion to dismiss was also denied. A437.

Moretti was re-deposed to address the allegations made by Boutros. A445. He testified that the morning before Ms. King came in to give her Statement, he emailed Boutros and asked her to print the warrant for King's phone. A449. He also arranged for the BSO sergeant to be present. A451.

Moretti testified that he had the authority to seize the phone despite not being in Miramar: "That this was argued in court and Judge Fein also agreed with me as well. When there was a motion to

12

return property, I was answered, cross-examined, direct examination, and Judge Fein did rule that I have the authority to remove that cell phone outside my jurisdiction pursuant to the search warrant." A450-51. According to Moretti it's "good to have someone from your local jurisdiction there, but it's not required." A451.

The purpose of calling Ms. King in was to serve the warrant for her phone:

> Q. Okay. Did you tell Ms. Boutros that you were going to serve that warrant during the Statement?
>
> A. Yes.
>
> Q. You're sure of that?
>
> A. Specifically those words, no. But the sole purpose of that interview was to seize that cell phone.
>
> Q. My question to you was: Did you tell Ms. Boutros that during the Statement you were going to serve the search warrant and basically make her a witness?
>
> A. No, sir. It was already discussed that we were going to take that cell phone that day. That was already a preplanned discussion.

A457.

Moretti categorically denied becoming aggressive toward King or her lawyer and told defense counsel to listen to the audio recording

13

of his interaction to verify. A459. If Boutros said otherwise, Moretti

testified that she was lying. *Id.*

Repeatedly, Moretti told defense counsel to listen to the audio

recording which would contradict Boutros' later Statements:

A. Yes, as she was trying to destroy the evidence.

Q. That's your conclusion?

A. No. That was my conclusion and, if you listen to the full
audio, it was also Boutros' conclusion too. She has since
somewhat altered her testimony, but it's still -- the audio
doesn't lie.

A462-63.

Regarding Gorel's involvement, Moretti contradicted Boutros'

version of events:

A. [Gorel] arrived when Trachman and King had stepped
out.

Q. Did he say anything to you?

A. Not much. When he showed up, I asked him, you know,
where he was, was he out in the hallway, was he near.
And, you know, he just, you know-- he said-- exact words-

Q. What were his exact words you were going to say?

A. I wasn't sure. I can't remember his exact words. It was
something along the line of, you know, don't put me in
your report. It was like a joke. And I said okay. I still took
his name and badge number down, and that was it.

Q. You didn't say to him: "You need to say you were in the
room when I served the search warrant"?

14

> A. No, sir.
>
> Q. So if Ms. Boutros said something of that nature, she would also be lying on that; is that correct?
>
> A. Yes, sir.

A463. *See also* A473 ("think that was somewhere along the lines of the joke he made. You know, I asked him where he was at. And something along on the line of 'I can be anywhere you want me, just don't put me in your report.' Something along that line. I can't remember exactly.").

Despite Boutros having testified that she never worked with Moretti again, she signed three more subpoenas after seizing King's phone:

> Q. You're aware that she immediately turned over the investigation and said she would refuse to work with you ever again?
>
> A. I think that would be another one of Mrs. Boutros' lies because she signed three more subpoenas after that fact.

A464.

Boutros also discussed King's phone extraction with Moretti. A465. They had "conversations" about getting the phone downloaded after the warrant was served. *Id.*

15

At a suppression hearing shortly after Moretti's re-deposition, Moretti and Boutros testified again over the State's objection. A506. Boutros testified that she never signed another warrant for Moretti after King's phone and refused to work with him. A562. Boutros' version of events was counter to Moretti's deposition statements. A568.

Boutros testified that she was never involved in the homicide investigation. A570. She also "never questioned the validity of the investigation." A571.

Without defense objection, the State cross-examined Boutros at the suppression hearing as it did during the dismissal/recusal hearing. A575. She denied having said that the tampering investigation "was separate and apart" from the homicide investigations. A577.

Boutros denied ever having worked with Moretti after the alleged incident. A578. She denied following up with him about King's phone. A578-79. She admitted to signing off on Moretti's subpoenas after the alleged incident. A579.

On cross, Boutros was confronted with a change in her version of events as reflected in the audio recording of warrant's execution:

16

Q. Now, you also said today you weren't sure if she was trying to turn off her phone or not. Have you ever explained or answered -- actually strike that.

Previously you were sure she was trying to turn her phone off, correct?

A. No.

\*\*\*

Q. Would you be surprised to learn that on the audio recording you're very clear that she was attempting to turn off her device and that there was no other way this could have been handled?

A. I wouldn't be surprised at all.

A580.

Despite Boutros' testimony that she had never worked with Moretti before this incident, she had three cases where he was the detective and she was the prosecutor: "Actually, just for the record, three cases, State v. Alexander Frederick, State v. Laron Smith, and State v. Dunbar. Three cases involving Detective Moretti where you were the assigned prosecutor." A581.

Boutros insisted that King "yelped" and had not said "ow" as testified by Moretti, but Boutros' testimony was again inconsistent with the recording from the events:

Q. Yelped. And when you say yelped, do you mean she said ow or do you mean she said something else?

17

A. It was a yelp. It wasn't a word.

\*\*\*

Q. Would it, again, surprise you if you were to listen to the recording, that in fact she doesn't yelp. She merely says ow.

A. It wouldn't surprise me.

A581-82.

Respondent renewed his motion to dismiss based on a claim of due process violation by prosecutorial misconduct. A806. He also renewed his motion to recuse the entire office based on Boutros' contradicted testimony.

The State responded. Arguing first that Respondent lacked standing to challenge the search in King's tampering case and noting that Moretti's execution of the warrant had already been ruled lawful. A818.

Further, the State laid out in detail why Boutros' testimony and credibility had to be challenged on cross-examination – again highlighting that Boutros had never been part of Respondent's homicide prosecution and was not a part of the case. A818-19.

Regarding Boutros' insistence that she had never worked with Moretti before or after the execution of the warrant for King's phone, the State painstakingly laid out Boutros' lack of candor. A820-23.

Critically, the State found out that not only did Boutros know about Moretti seizing the phone, but she also agreed to print the warrant for him ahead of seeing King:

> **Detective Moretti emailed ASA Boutros at 7:34 AM the morning of Ms. King's Statement, asking for her to print the search warrant and informed her that he would have someone from BSO present after their interview. Ms. Boutros responded** "*no problem*" at 8:35 AM. (Exhibit 14, Email).
>
> In part 2 of Ms. King's Statement, ASA Boutros, in an attempt to calm Ms. King down, explains to her the reasons why "*we don't give people a heads up when we are going to confiscate their phone is because it can end up at the bottom of a canal, can be modified, there are a million things you can do to a phone if you have a heads up that the phone is about to be confiscated.*" (*Exhibit 15, Ms. King's Statement transcript, page 57-58*).
>
> Based on the totality of the evidence it is abundantly clear that ASA Boutros knew the search warrant would be served. The presence of the BSO deputy in the room that Moretti had advised her would appear reinforces ASA Boutros's knowledge. A 20-year veteran prosecutor would be well aware that the search warrant was going to be executed.

A823-24 (emphasis in original).

19

Despite later changing her opinion that King was trying to shut off her phone to make it impossible to access by police – and accusing Moretti of creating the exigency for the phone – the recording of the incident contradicted Boutros' testimony:

> *In the audio recording of the incident, ASA Boutros is clearly heard stating that King was attempting to turn her phone off. (*see Ms. King's Statement transcript, page 61, Exhibit 17).

> > *ASA Boutros -* "**From my perspective, which is the same as Detective Moretti's, and I am not just defending him, it looks like you were trying to turn off your phone.**"

> > *Detective Moretti (to Ms. King),* - "**Both those buttons were pushed and the screen to turn off popped up.**"

> > Boutros - "**And I saw it too.**" (referring to observing the turn off screen appearing on Ms. King's phone after [pushing] buttons on the side of the phone).

A824.

The State also provided screengrabs from security cameras showing that despite Boutros' sworn testimony that she left the room after the incident with Moretti and Gorel and did not speak to Moretti again, they were captured walking together and talking – consistent with Moretti's testimony. A825.

20

Further impugning Boutros' credibility, the State discovered that despite her insistence that she always turned over all information that could be used by a defendant at trial, she had been accused of withholding *Brady* material by Respondent's defense counsel in the past:

> Defense counsel in this very case has a pattern of making similar allegations. Notably, defense counsel has consistently and vigorously argued to the Court that ASA Boutros has an unblemished 20-year record as an Assistant State Attorney. They have vouched for her credibility throughout the proceedings due to her status as an Assistant State Attorney. However, as with any testifying witness, you put your credibility at issue and the evidence will lead to whatever it may uncover. *Butler, supra.* **ASA Boutros has in fact been accused by the Defendant's own counsel, Jamie Benjamin, of withholding Brady material (***Exhibit 25, Letter signed by Jamie Benjamin, dated November 5, 2010***) requesting that she be removed from the case.**[3]

> Counsel's accusations against ASA Boutros include the allegations that ASA Boutros took an investigative Statement in her office of a victim, who recanted her Statement that the defendant struck her. ASA Boutros did not hand over this Statement for months. Mr. Benjamin found out about the Statement and requested a copy on September 24, 2010. He left messages with her, her secretary, and even attempted calling the court reporting agency himself. At one point, ASA Boutros's secretary informed Mr. Benjamin to order a copy himself. Mr. Benjamin notes in his letter that, "***had this been from some inexperienced prosecutor in County Court, he wouldn't be so upset. But this is from a seasoned, experienced Special Unit Prosecutor. This***

21

*is ridiculous*." Mr. Benjamin went further and contacted the then Executive Director of the office to see if a new policy was in place regarding Brady material. As of November 5, 2010, Mr. Benjamin still had not been provided the Brady material. Further, he alleges ASA Boutros did not provide the sworn Statements of the two witnesses in the case, and even had to file an Emergency Motion to Compel Brady Material. In addition to alleging ASA Boutros **improperly withheld Brady material, he also alleged she had attempted ex parte to cancel his hearing for the Emergency Motion to Compel Brady Material**. And just like we have with ASA Bradley, Mr. Benjamin requested that ASA Boutros to be removed from the case. (*Exhibit 25, Letter signed by Jamie Benjamin, dated November 5, 2010*).

A827.

Boutros has also been accused of lying by the sitting Public Defender at the time, resulting in an official complaint to the Florida Bar. A827. In a separate complaint, Boutros was disciplined by the bar for failing to meet her ethical obligations and violating multiple rules of professional conduct. A828.

In sharp contrast, Detective Moretti did not have a single IA complaint against him until this incident – and he was cleared of any wrongdoing after an internal investigation:

It is only Detective Moretti whose record is unblemished, **having had no IA complaints in either his 20 years in the Military nor his 20 years as a Law Enforcement officer**. As of January 2nd, 2024, Detective

> Moretti has been cleared of any wrongdoing by Miramar
> Internal Affairs. (*Exhibit 27 – IA Closure*).

A828 (e.a.).

As to the claim that the State agreed not to cross-examine
Boutros, the State countered that it had an unassailable duty to
discover the truth. A829. Boutros' controverted testimony and lack
of credibility could not go untested. *Id.*

At a hearing on the issue, the State elaborated on why it was
compelled to cross-examine Boutros:

> To start with, with the State when we first said that
> we were not going to cross-examine, because as Mr.
> Aaronson points out, if, in fact, Ms. Boutros is coming
> forward saying this information is something that
> happened in the case, we of course want it to go before the
> Court.
>
> As she's testifying, that is when Mr. Klinger realizes
> something she just said is not consistent with her
> deposition. It's an inconsistency, and he crosses her on
> that limited issue about whether the investigation into Ms.
> King was related or not. Because that was a change in her
> testimony.
>
> Then we fast forward to the deposition of Detective
> Moretti. In the deposition that's when he is asked if, in
> fact, he had worked with Ms. Boutros afterwards and he
> says yes. Where as Ms. Boutros testified she didn't work
> with him again. Another inconsistency.
>
> That's what prompted the State to look into this.
> Because as I laid out in my motion, no matter who you are,
> if you take the stand you put your credibility at stake. And

23

so now we have concerns that things are not lining up, and as when the State went into -- when we went into, looking into exactly what was going on. And we recall, we never called Ms. Boutros a liar.

The purpose of impeachment is inconsistency. The Court and the jury will theoretically hear a Statement was made inside court, a Statement was made outside of court; those Statements don't match. They don't say, the Statement outside of court is true and the one in court is false, or the one in court is true and the one outside is false.

What the jury instruction basically reads is, if there's an inconsistency you should not consider the witness' testimony as reliable.

That's it. So what we have now is a witness whose testimony does not... is not consistent.

When we talk about the other issues that we raise in our motion, it's because the defense has vouched for Ms. Boutros. And all we have laid out is that, again, the evidence does no[t] support this claim that they are making.

***

Whether it's our office or another office, the same investigation would have resulted.

Because any witness who's gonna be taking the stand puts their credibility at stake. Had the roles been reversed, had Ms. Boutros witnessed something that would have been germane to the case and we had called her, certainly the defense would have attacked her, attacked her credibility.

Because that's the role, that's the nature of our system, that's advocacy, it's an adversarial system. We are allowed to disagree on facts and law, that's for the Court

24

> to resolve or for the jury to resolve depending upon where
> the issue lies.

A993-95; 997-98.

The trial court denied the relief Respondent was seeking by neither recusing the office, nor dismissing the charges. A1019. Instead, without reference to legal precedent, it issued a blanket prohibition on the State's due process right to cross-examine a trial witness. A1022. This petition follows.

### III. NATURE OF THE RELIEF SOUGHT

The State seeks an order granting the petition for writ of certiorari and quashing the trial court's order precluding cross-examination of the defendant's witness, Ms. Boutros.

### IV. ARGUMENT

The trial court's January 19, 2024, order foreclosing all cross-examination of Boutros is a complete departure from the essential requirements of the law. In support of the State's position, the full context in which the ruling was rendered underscores its illogical underpinnings.

As a trial strategy, the defendant chose to attack the credibility of State witness Detective Moretti[3]. A7. As part of that strategy, the defense included in its witness list both ASA Boutros and ASA Bradley.[4] Based on that strategy, the defense filed a Motion to Recuse the State Attorney's Office of the Seventeenth Judicial Circuit in and for Broward County, Florida, A132, because Bradley and Boutros are currently employed by the Broward SAO. After considering evidence and argument from both sides, the trial court rejected the Defendant's claim finding:

> **"[t]here is no inherent prejudice in allowing an assistant State attorney who is not prosecuting the case[3], to testify on behalf of the State**[4] and the State Attorney's Office need not be disqualified unless specific prejudice can be demonstrated. *State v. Clausell,* 474 So. 2d 1189, 1190 (Fla. 1985). Defendant has failed to demonstrate how he will be prejudiced by the State Attorney's Office prosecuting this case notwithstanding Ms. Boutros and Ms. Bradey testifying at trial, particularly in light of the State's representation that they do not plan on attacking the credibility of Ms. Boutros at trial.
>
> [3] Any prejudice can be cured by disqualifying the current lead prosecutor, Ms. Bradley, from

---

[3] Detective Moretti was responsible for executing multiple search warrants this case.

[4] At the time she was listed as a defense witness, Bradley, was the lead prosecutor in this case and had been since indictment. Boutros was not and had never been involved in this double homicide investigation.

26

> prosecuting this case since she is likely to be called as an impeachment witness in the Defendant's case in chief.
> 4 The Court is cognizant that Ms. Boutros and Ms. Bradley will be testifying on behalf of the Defendant, not the State.

A435 (e.a.).

Three months later, the court was asked to revisit the issue based upon the Defendant's second Motion to Dismiss for Violations of Due Process and Double Jeopardy and/or Motion to Recuse Entire State Attorney's Office of the Seventeenth Judicial Circuit. Therein the defendant accused the State Attorney's Office of several acts of misconduct including the following: the SAO has committed several *Brady* violations in this case involving Detective Moretti; Ms. Boutros was cross-examined at a suppression hearing after the SAO represented months earlier that she would not be crossed[5]; Ms. Boutros, "receives only flack from the State Attorney administration"; Ms. Boutros "has been treated rudely and without any professional dignity while on the witness stand"; Ms. Boutros "has been called a liar by this State Attorney's Office." A804. All these acts were

---

[5] No objection was made at the time Ms. Boutros was cross-examined.

committed by the Broward SAO in an effort to "win at all costs" without any consideration to justice. A804.

For these alleged misdeeds, Respondent requested that the first-degree murder charges be dismissed or that the entire State Attorney's Office be recused. At no time did the defense ever request that Ms. Boutros be permitted to testify at trial without being subjected to any cross-examination.

The trial court reaffirmed its initial ruling by denying the motion to recuse the Broward State Attorney's Office. However, because the State ultimately did cross-examine Boutros regarding misrepresentations she made under oath at a subsequent hearing. The trial court *sua sponte* fashioned its own "equitable" remedy, i.e., prohibiting the cross-examination of Boutros at all. The court explained as follows:

> This Court concludes that it must hold the State to its prior representation that it will not cross-examine Ms. Boutros if she is called as a witness by the defense at trial. While this Court would not under normal circumstances prohibit a party's cross-examination of a witness, the circumstances of this matter are exceptional. Allowing the State Attorney's Office of the Seventeenth Circuit to cross-examine and impeach Ms. Boutros with the matters it has presented in its response would contravene Defendant's fair trial rights. As the defense points out, allowing its own office to attempt to impeach one of its own attorney's

28

> would be saying to the jury that even attorneys from her own office believe that Ms. Boutros believability is in question. Such action, in itself, would result in a type of reverse vouching or bolstering. Precluding the State's cross-examination of this witness avoids prejudice to Defendant which would result if a jury were to hear an Assistant State Attorney on this case cross-examine, impeach, and question the believability of another Assistant State Attorney in its very own office.

A1022.[6]

The sweeping nature of this legally untenable ruling is premised solely on the trial court's discretion.[7] However, under Florida law, a court's discretion does not include the authority to block completely the opportunity to cross-examine a witness. To the contrary, the

---

[6] The State continues to dispute the trial court's assertion that the Broward SAO represented that it had no intention of cross-examining Ms. Boutros at trial. However, the existence and scope of any representation made by the State regarding Ms. Boutros is completely irrelevant to the outcome of this petition. Investigations are fluid and dynamics are constantly changing, therefore representations/positions taken at one stage may become moot, obsolete or untenable at another stage. Every prosecutor has a sworn duty to uphold the law, and that duty cannot be "bargained away" or abandoned when justice demands otherwise. Additionally, prosecutors have a duty to seek justice and uncover the truth, therefore a trial court does not have the authority to circumvent that duty, by extinguishing the critical right to cross-examine any witness.

[7] The trial court's decision precluding cross-examination was not premised on a single Florida case, statute, or evidentiary rule.

29

wholesale denial of any cross examination is explicitly forbidden under Florida law.

The Florida Supreme Court has long recognized the integral role that cross-examination plays in the fact-finding role of the jury, explaining that it is critical to uncovering the truth. As early as 1899, the Court determined that a trial court does not possess **any discretion** to exclude completely cross-examination and evidence that is germane to a witness's bias, motive, interest, or animus. The court explained as follows:

> Questions touching interest, motives, animus, or the status of witnesses to the suit or parties to it, are not collateral or immaterial. **As to such matter inquiry may be had, and it is not within the discretion of the court to exclude it.** In *Eldridge v. State*, 27 Fla. 162, 9 South. 448, it was announced, in accordance with the general principle, that a witness could not be cross-examined as to any fact that was collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence if he should deny it, but that the motives, interest, or animus of a witness were not collateral, and could be shown as independent evidence, and considered by the jury in estimating credibility. And in the recent case of *Wallace v. State*, 41 Fla. ——, 26 South. 713, it was said that, for the purpose of discrediting a witness, **a wide range of cross-examination was permissible as a matter of right** in regard to his motives, interest, or animus as connected with the cause or with the parties thereto, and upon such matters he may be contradicted.

*Bryan v. State*, 41 Fla. 643, 661–62, 26 So. 1022, 1028 (1899) (e.a.). There is absolutely no authority to uphold the trial court's ruling as it is a complete departure from the law.

The State asserts that the trial court's conclusion that the cross-examination of a current ASA would "result in a type of reverse vouching or bolstering" rings hollow because the court is not simultaneously prohibiting the cross-examination of Ms. Bradley who is also a current ASA. It therefore begs the question, how can a prohibition to cross-examine one prosecutor based on her status as a current ASA, not apply to the second prosecutor listed as a defense witness who possesses the exact same "prejudicial status," as she too is currently employed at the same office. In fact, under the court's logic it would be Ms. Bradley's status as **the** prosecutor in this prosecution, whose cross-examination would be most "prejudicial" given her extended previous involvement. Yet in contradiction of the court's own logic, no restriction was imposed on the State regarding cross-examination of Bradley. Instead, the court simply recused Ms. Bradley from any further involvement in the prosecution of these murders. That glaring internal conflict in the court's own reasoning further supports the State's request for relief.

31

All Florida Courts recognize the critical role that cross-examination plays in the truth-seeking process of a trial. It has been faithfully protected by Florida courts and the legislature for the past one hundred and twenty-five years. *See Clinton v. State,* 50 So. 580 (1909) (recognizing the well-known rule that all witnesses who take the stand are subject to a challenge of their veracity and truthfulness). *Baxter v. State,* 294 So. 2d 392, 393 (Fla. 4th DCA 1974) (explaining, [h]owever, when a witness, whether a party or not, and whether the case be civil or criminal, takes the witness stand he ipso facto places his credibility at issue); *see Sheiner v. State,* 82 So. 2d 657, 661 (Fla. 1966) (explaining that "confrontation and cross-examination under oath are essential to due process because it is the means recognized by which we test the probity of the evidence and eliminate that which is trumped up or of doubtful veracity."); *Cox v. State,* 41 So.2d 1169, 1169-1170 (Fla. 4th DCA 1984) (recognizing the right to cross-examine all witnesses is fundamental) *See State v. Rogers,* 955 So. 2d 1213 (Fla. 4th DCA 2007) (granting certiorari as the trial court's restriction on the State's ability to cross-examine the defendant's privately retained mental health expert would improperly impair the State's ability to prosecute its case.); *see also Gibson v.*

32

*State,* 661 So. 2d 288, 291 (Fla. 1995) (recognizing that under §90.608 (2) *Fla. Stat.* the right to cross-examination is liberally construed to permit evidence regarding credibility of any witness by any party) *see generally* , *Mardis v. State,* 122 So. 3d 950, 953 (Fla. 4th DCA 2013) ( affirming §90.806 (2) authorizes a party to attack the credibility of any witness who takes the stand) .

The pivotal importance of cross-examination cannot be overstated. In *State v. Sule,* 968 So. 2d 99, 105-106. (Fla. 4th DCA 2007) this Court upheld a trial court's decision to prohibit a defense witness from invoking his fifth amendment right to avoid cross-examination. Therein the court explained that the purpose of cross-examination is to test credibility of the evidence presented during direct examination. Therefore, insulating that witness from cross-examination is error as it frustrates the purpose of the process. *See also Troy v. State,* 948 So. 2d 635, 647-648 (Fla. 2006) (upholding trial court's denial of capital defendant's request to preclude his cross-examination at sentencing before the jury); *Smith v. State,* 28 So. 3d 838 (Fla. 2010) (upholding trial court's refusal to allow defendant to present his videotaped statement to the jury because it would deprive the State the right to cross-examination); *State v.*

*Mizell,* 773 So. 2d 618, 621 (Fla. 1st DCA 2009) (warning that admissibility of expert testimony regarding PTSD must be circumscribed to prevent a defendant who "may skillfully present the defendant's testimony by the backdoor, negating the State's right to cross-examination.").

In summary, the trial court's ruling is a departure from the essential requirements of the law as it undermines completely the truth finding function of cross-examination codified by statute in §90.608(2), as well as protected under decades of caselaw. The substantial injury for which there is no adequate remedy at law, unfairly and completely compromises the State's ability and its due process right to challenge the credibility of a defendant's evidence for which the State possesses germane, competent, and objective evidence in rebuttal. This wholesale prohibition to cross-examining Ms. Boutros dangerously weakens the crux of the truth-finding process as it precludes a jury from hearing critical and relevant evidence that could be central to their fact-finding duty as jurors in this double first-degree murder prosecution.

Moreover, the harm to the State's ability is further exacerbated by the nature of the recently uncovered impeachment evidence

34

against Ms. Boutros which is significant and disturbing. (See Pet. at 18-24).

"[T]he jury alone determines the credibility of witnesses." *Calloway v. State*, 210 So. 3d 1160, 1189 (Fla. 2017). *See also Fitzpatrick v. State*, 900 So. 2d 495, 508 (Fla. 2005) ("the weight of the evidence and the witnesses' credibility are questions solely for the jury."). It is not the trial court's role to usurp the jury's critical function.

"[I]t is a denial of due process if the jury is misled as to facts bearing on the credibility of a witness." *Enmund v. State*, 399 So. 2d 1362, 1368 (Fla. 1981), *judgment rev'd on other grounds*, 458 U.S. 782 (1982). Hamstringing the jury's function by barring the State from testing Boutros' credibility in the way all witnesses are tested, is a clear due process violation.

If the court's erroneous order were to stand, the jury would be ignorant of the conflict in Boutros' version of events from not just the other witnesses, but the audio recording of the event as well. Moreover, Boutros' clear inconsistencies from her original statements, to deposition, to hearing testimony, to trial, would go unchallenged.

35

The jury would hear Boutros' statement that she always turned over all evidence to the defense, without knowing that she had been accused of withholding *Brady* material from the very defense attorney calling her to testify. They would have no idea that she had previously violated her ethical and professional duties and had been admonished for it – while Moretti's career was unblemished.

Critically, the jury would not know that despite Boutros' assertion that a *Brady* notice should be filed in Respondent's case, Boutros never testified that she filed a *Brady* notice in the actual tampering case against King where the alleged impropriety occurred. Not only would the jury be misled regarding Boutros' credibility, but they would surely be confused by her involvement in Respondent's trial – as no prosecutorial involvement exists.

The State has provided concrete and significant examples of cross-examination necessary for the jury to serve its function as the arbiter of credibility. *See* A817-957. It would be a gross due process violation to shield Boutros from cross-examination when no testifying witness is afforded such a boon. It would also be unprecedented.

It cannot be ignored that the trial court's erroneous order barring the State from cross-examining Boutros stems from another

36

error. The instant order is premised on the legally incorrect determination that recusing the entire State Attorney's Office was ever the proper remedy.[8] It was not.

"[T]here is no inherent prejudice in allowing an assistant state attorney who is not prosecuting the case to testify on behalf of the state." *State v. Clausell*, 474 So. 2d 1189, 1190 (Fla. 1985). Recusal is only proper if actual prejudice is shown. *Id. See also Brown v. State*, 455 So. 2d 583, 583–84 (Fla. 5th DCA 1984) ("other members of a state attorney's office are not disqualified from prosecuting a criminal case merely because one prosecuting attorney in the office is ... [a] witness in the case").

Here, the trial court had already found that Respondent failed to demonstrate actual prejudice to support disqualification of the office. A433-34. The court cited to *Huggins v. State*, 889 So. 2d 743

---

[8] "Piecemeal litigation is uniformly condemned, not only in civil cases, but in all litigation." *Demorizi v. Demorizi*, 851 So. 2d 243, 247 (Fla. 3d DCA 2003)( Ramirez, J., dissenting). While recusal of the office is not the order under review, the court's position on recusal being a proper remedy triggered its fashioning of the instant alternative. In the interests of avoiding another improper remedy, this Court should remand with instructions that the trial court enforce its previous ruling on recusal barring some material and substantial change in Respondent's prejudice showing.

(Fla. 2004) for the proposition that Respondent "failed to allege facts indicating that disqualification would have prevented "prejudice that [Huggins] otherwise would not bear." The failure to disclose the *Brady* material was remedied by the trial court's order of a new trial, and Ashton's disqualification would not have provided any further remedy." *Id.* at 768.

Because Respondent failed to show "specific prejudice" or how that prejudice would be cured by disqualification, he was not entitled to recusal of the office. A35. *See State v. Cote,* 538 So. 2d 1356, 1358 (Fla. 5th DCA 1989) ("without a showing of prejudice to the defendant, the mere 'appearance of impropriety' or 'potential for conflict' is insufficient to require the disqualification of the entire state attorney's office"). Respondent's second attempt at recusing Broward SAO did not materially change from the first.

Thus, recusal was never the proper remedy. As such, there was no basis for the court to fashion the alternative and extreme remedy of barring cross-examination. This is especially true because the court had already determined that any possible prejudice was cured by having removed Bradley as the prosecuting attorney – deeming

38

that she could be a witness at trial. *See* A436 at Footnote 3. The was no basis to deviate from this original ruling.

Finally, as in *Huggins*, there is no basis for recusal where "disqualification would not have provided any further remedy." Because recusal of the Broward SAO would merely result in a different prosecutors' office cross-examining Boutros, Respondent is not entitled to disqualification:

> We **reject the contention** that allowing an assistant state attorney to testify in a case prosecuted by a member of the same office gives undue weight and credibility to the testimony of the assistant state attorney. In our opinion, any enhancement of the state attorney's credibility results from his position as a prosecutor and the jury's view of that credibility **would not be changed if the case were prosecuted by a state attorney from another circuit**.

*Clausell*, 474 So. 2d 1189, 1191 (Fla. 1985) (e.a.).

"'The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary.'" *State v. Hayes*, 997 So. 2d 446, 448 (Fla. 4th DCA 2008) (quoting *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003)). Here, recusal is patently unnecessary without Respondent's showing of actual conflict and prejudice – a condition which the trial court already found Respondent did not meet.

"[D]isqualification of a prosecutor is only proper when it is necessary to prevent the accused from suffering prejudice that he otherwise would not bear." *Id.* at 449 (quote omitted). Critically, because another prosecutor's office could cross-examine Boutros, Respondent will never be able to show that recusal is warranted. *See State v. Fields*, 954 So. 2d 1218, 1220 (Fla. 3d DCA 2007) (defendant can never establish requisite prejudice where substitute state attorney's office has the same right to examine a witness regardless of status).

## **CONCLUSION**

Based on the foregoing arguments and the authorities cited therein, the State respectfully requests that this Honorable Court grant the Petition for Writ of Certiorari and quash the trial court's order precluding any cross-examination of the defense witness Boutros.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL
Tallahassee, Florida

CELIA TERENZIO
Assistant Attorney General
Bureau Chief

40

Florida Bar No. 656879

JESSENIA J. CONCEPCION
Assistant Attorney General
Florida Bar No. 88984
1515 North Flagler Drive, 9th Floor
West Palm Beach, FL 33401
(561) 837-5016
CrimAppWPB@MyFloridaLegal.com

Counsels for Petitioner

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been electronically filed with the Court via the Florida Courts E-Filing Portal and e-served on Raven Liberty, Esquire, 153 NE 97th St., Miami Shores, FL 33138 at Pleadings.Liberty@gmail.com; Stuart Adelstein, Esquire, 2929 SW 3rd Ave., Miami, Suite 410, FL 33129-2770 at adelsteinslaw@aol.com; Jamie Benjamin, Esquire, 1700 East Las Olas Blvd., Suite 202, Fort Lauderdale, FL 33301 at sexlaw@bellsouth.net; Danny Aaronson, Esquire, 1700 East Las Olas Blvd., Suite 202, Fort Lauderdale, FL 33301 at danaaron@bellsouth.net on February 16, 2024.

s/Celia Terenzio
Assistant Attorney General
Bureau Chief

41

<u>s/Jessenia  J.  Concepcion</u>
JESSENIA J. CONCEPCION
Senior Assistant Attorney General

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document was computer generated using Bookman Old Style 14-point font and double spaced. It is in compliance with the word limit established by rule.

<u>s/Celia Terenzio</u>
Assistant Attorney General
Bureau Chief

<u>s/Jessenia  J.  Concepcion</u>
JESSENIA J. CONCEPCION
Senior Assistant Attorney General

42

Filing # 192203524 E-Filed 02/19/2024 09:11:11 AM

Filing # 192125938 E-Filed 02/16/2024 12:30:27 PM

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

|                        |     |                                    |
| ---------------------- | --- | ---------------------------------- |
| STATE OF FLORIDA       | )   | CASE NO.: 23-10594 CF10A           |
|                        | )   |                                    |
|                        | )   | JUDGE: MURPHY                      |
|                        | )   |                                    |
| vs.                    | )   | UCN:062023CF010594A88810           |
|                        | )   |                                    |
|                        | )   |                                    |
| JAMELL DEMONS          | )   |                                    |
|                        | )   |                                    |
| _____Defendant_____| )   |                                    |

**NOTICE OF APPEAL**

**NOTICE IS GIVEN** that the State of Florida, Plaintiff/Appellant, appeals to the Fourth District Court of Appeal, pursuant to Fla.R.App.P. 9.140(c)(1)(B), the non-final Amended Order of this Court on the State's Motion for Pretrial Determination of Admissibility of Evidence resulting in the suppression of evidence rendered on February 16, 2024 (Exhibit I). The nature of the order is a non-final order suppressing evidence relying on its previous

I

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 02/16/2024 12:30:01 PM.****

ruling noted in the omnibus Order on the Defendant's Motions to Suppress in case number 19-1872 CF10A (Exhibit II)[1].


HAROLD F. PRYOR
State Attorney


By: _____
JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar No. 608092
Room 07130
201 S.E. 6th Street
Fort Lauderdale, Florida 33301
Telephone: (954)831-7913
courtdocs@sao17.state.fl.us
jsilvershein@sao17.state.fl.us


STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record
and file in the office of the Circuit Court Clerk of Broward
County, Florida.
WITNESS my official seal at Fort Lauderdale,
Florida, this the ____ day of ____ A.D. 20__
                                    Brenda D. Forman
                                    Deputy Clerk

---

[1] The appeal of certain orders suppressing evidence in case number 19-1872 CF10A is currently before the Fourth District Court of Appeal in case number 4D2024-0248.

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was furnished by e-mail to Daniel Aaronson, Esquire (daaronson@benjaminaaronson.com), James Benjamin (sexlaw@bellsouth.net), Raven Liberty, Esquire (pleadings.liberty@gmail.com), and Stuart Adelstein, Esquire (adelsteinlaw@aol.com) attorneys for the Defendant Jamell Demons, this 16th day of February, 2024.

HAROLD F. PRYOR
State Attorney

By: _____

JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar #608092
Room 07130
201 S.E. 6th Street
Fort Lauderdale, Florida 33301
Telephone (954)831-7913
courtdocs@sao17.state.fl.us
jsilvershein@sao17.state.fl.u

# EXHIBIT I

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:23-010594CF10A

STATE OF FLORIDA,         :

        Plaintiff,      :

                        :

vs.                       :

JAMELL DEMONS,:

        Defendant.     :

_____

JUDGE: JOHN MURPHY III

## AMENDED ORDER ON STATE'S MOTION FOR PRETRIAL DETERMINATION OF ADMISSIBILITY OF EVIDENCE

THIS CAUSE came before the Court on the State's Motion for Pre-Trial Determination of Admissibility of Evidence, filed on January 30, 2024. Defendant filed a Motion to Strike the State's Motion on February 8, 2024. The Court held a hearing on February 9, 2024. The Court issued an order on February 9, 2024. The State filed a Motion to Amend the Court's Order on February 13, 2024.

Having considered the State's Motions, Defendant's Motion to Strike, arguments of counsel, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

The State moves for a pretrial determination of the admissibility of the following evidence based on this Court's omnibus order in Seventeenth Judicial Circuit Case No. 19-1872CF10A, entered on December 20, 2023, which granted in part and denied in part Defendant's motions to suppress:

1. Snapchat records with a date range of October 1, 2018, through November 25, 2018.

2. Gmail records from October 1, 2018, through November 1, 2018.

3. Gmail records from September 1, 2018, through October 1, 2018.

4. Apple iPhone (IMEI 0369) records

5. Promotional Video

The Court finds that the evidence listed above shall be excluded from trial in this case based on the Court's ruling on the motions to suppress in its omnibus order and motion in limine regarding the promotional video in case no. 19-1872CF10A. The Court adopts and incorporates the findings and analysis in the omnibus order and the order on the motion in limine re: promotional video, in case no. 19-1872CF10A.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Broward County, Florida, this __16__ day of February, 2024.

JOHN J. MURPHY III
CIRCUIT COURT JUDGE

copies furnished:
ASA Alixandra Buckelew, Esq., Counsel for the State
ASA Taylor Collins, Esq., Counsel for the State
ASA Justin Griffis, Esq., Counsel for the State
Raven Liberty, Esq., Counsel for the Defendant

2

# EXHIBIT II

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,      )        CASE NO.:  23-10594CF10A

     Plaintiff,        )

v.                    )

JAMELL DEMONS,       )

     Defendant.      )       JUDGE:    JOHN J. MURPHY III

## ORDER ON STATE'S MOTION FOR PRETRIAL DETERMINATION OF ADMISSIBILITY OF EVIDENCE

**THIS CAUSE** came before the Court on the State's Motion for Pre-Trial Determination of Admissibility of Evidence, filed on January 30, 2024. Defendant filed a Motion to Strike the State's Motion on February 8, 2024. The Court held a hearing on February 9, 2024.

Having considered the State's Motion, Defendant's Motion to Strike, arguments of counsel, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

The State moves for a pretrial determination of the admissibility of the following evidence based on this Court's omnibus order in Seventeenth Judicial Circuit Case No. 19-1872CF10A, entered on December 20, 2023, which granted in part and denied in part Defendant's motions to suppress:

1) Snapchat records with a date range of October 1, 2018, through November 25, 2018.

2) Gmail records from October 1, 2018, through November 1, 2018.

3) Gmail records from September 1, 2018, through October 1, 2018.

Page 1 of

    4)  Apple iPhone (IMEI 0369) records

The Court finds that the evidence listed above shall be excluded from trial in this case based on the Court's ruling on the motions to suppress in its omnibus order in case no. 19-1872CF10A. The Court adopts and incorporates the findings and analysis in the omnibus order in case no. 19-1872CF10A.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Broward County, Florida, this ___9___ day of February, 2024.

_____
JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

Copies furnished to:

Service List

Alixandra Buckelew, Esq.
Justin Griffis, Esq.
Taylor Collins, Esq.

Assistant State Attorneys

Raven Liberty, Esq.

Attorney for Defendant

Page 2 of

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,              )      CASE NO.:  19-1872CF10A
                              )
        Plaintiff,            )              Filed in Open Court
v.                            )              CLERK OF THE CIRCUIT COURT
                              )              ON        DEC 2 0 2023
JAMELL DEMONS,               )              BY
                              )
        Defendant.           )      JUDGE:    JOHN J. MURPHY III
_____ )

## OMNIBUS ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS 1-13

**THIS CAUSE** came before the Court on the following Motions to Suppress

Evidence:

1) Motion to Suppress No. 1 - Motion to Suppress Evidence re: Search Warrant Requiring Disclosure by the Provider of an Electronic Communication Service or the Contents of the Wire or Electronic Communication Service or the Contents of the Wire or Electronic Communications in Electric Storage in an Electronic Systems for 180 Days or Less re: Phone Number 772-713-9807 Signed on October 29, 2018 - Filed on September 21, 2023.

2) Motion to Suppress No. 2 - Motion to Suppress Search and Seizure of Mellythemenance@YNWMelly Twitter Account as Authorized by Warrant Signed by Judge Tobin-Singer on October 31, 2018 - Filed on September 21, 2023.

3) Motion to Suppress No. 3 - Motion to Suppress Evidence Seized Pursuant to Warrant for iCloud Account Associated with IMEI Number 310260165212834, iPhone X with Phone Number 772-713-9807 Signed by Judge Usan on November 14, 2018 - Filed on September 21, 2023.

4) Motion to Suppress No. 4 - Motion to Suppress Search Warrant for Snapchat Username ID Melly.Montana dated December 6, 2018, by the Honorable Bernard Bober - Filed on September 21, 2023.

5) Motion to Suppress No. 5 - Motion to Suppress Illegal Search and Seizure based upon Warrant to Google, LLC signed by Judge Orlando on January 15, 2019 - Filed on September 21, 2023

6) Motion to Suppress No. 6 - Motion to Suppress Evidence based upon Illegal Search and Seizure re: Search Warrant of January 8, 2019, to www.facebook.com/JamellDemons; www.facebook.com/Mookie.Guwop.9 and www.facebook.com/YNWMelly772 - Filed on September 21, 2023

7) Motion to Suppress No. 7 - Motion to Suppress Evidence Received Pursuant to January 23, 2019, Warrant Signed by the Honorable Judge Lynch re: Instagram User YNW.Melly - Filed on September 21, 2023

8) Motion to Suppress No. 8 - Motion to Suppress Evidence Seized Under Warrant Prospectively Requiring Provider of Electronic Communication Service to Disclose Real-time /Live Cell Site Location Information (CSLI), GPS, Electronic Data and Related Cell Phone Records for Telephone Number (772) 713-9807 - Filed on September 21, 2023

9) Motion to Suppress No. 9 - Motion to Suppress Evidence Seized Pursuant to Search Warrant Acquiring Contents of Wire or Electronic Communications, and Electronic Storage and Electronic Communications Systems for 180 Days or Less to be Disclosed by Provider of Electronic Communication Services, Cell Phone number (772) 713-9807 - Filed on September 21, 2023.

10) Motion to Suppress No. 10 - Amended Motion to Suppress Evidence Seized Pursuant to Warrant Issued by Judge Kollra on February 20, 2019, in Reference to Apple iPhone X with IMSI Number 310260165212834 and IMEI Number 354873092118610 - Filed on November 16, 2023

11) Motion to Suppress No. 11 - Amended Motion to Suppress Evidence Obtained through Search Warrant for Apple iPhone X with Serial Number FFNXHV1VKPHF, IME Number 357277094960369 - Filed on November 26, 2023

12) Motion to Suppress No. 12 - Motion to Suppress Evidence Seized and Obtained Through Search Warrant to Google for ynwmelly100kmjmt@gmail.com and ynwmellybooking@gmail.com - Filed on September 21, 2023

13) Motion to Suppress No. 13 - Motion to Suppress Evidence Seized and Obtained Pursuant to the Search Warrant Signed by the Honorable Barbara Duffy on May 15, 2022, re: ynwmellybooking@gmail.com - Filed on September 21, 2023

The State filed an Omnibus Response on November 6, 2023. The Court held a hearing on Defendant's motions and heard testimony from Assistant State Attorney Michelle Boutros and Miramar Police Department Detective Mark Moretti. Having considered Defendant's motions, the State's omnibus response, the evidence

presented[1], arguments of counsel, the court file, applicable law, and otherwise being fully advised, this Court finds as follows:

### *Franks v. Delaware*

Defendant argues that all evidence found pursuant to the thirteen search warrants that were issued based on Detective Moretti's search warrant affidavits should be suppressed because the affidavits included deliberate falsehoods and/or omissions.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Under *Franks,* the movant is required to: (1) point out the specific portion of the affidavit alleged to be defective; (2) allege that the defect consisted either of a deliberate falsehood or a statement in reckless disregard of the truth; and (3) offer proof supporting the allegations in the form of affidavits or other sworn or reliable statements of witnesses, or satisfactorily explain their absence. *Johnson v. State*, 660 So. 2d 648, 655 (Fla. 1995).

> [T]he *Franks* standard applies to alleged omissions from probable cause affidavits except that (1) the reviewing court must determine whether the omitted material, *if added* to the affidavit, would have defeated probable cause, and (2) the reviewing court must find that the omission resulted from intentional or reckless police conduct that amounts to deception. Absent these factors and the other *Franks* requirements, the motion for a *Franks* hearing will be summarily denied.

*Id.* at 656.

---

[1] The Court did not consider any testimony in determining whether probable cause to search existed within the four corners of the search warrant affidavits at issue in these motions.

Although the Court agreed to hear testimony from Detective Moretti and ASA Boutros, Defendant did not move for a *Franks* hearing, nor did the Court grant one. Defendant failed to establish that he is entitled to a *Franks* hearing, that any alleged falsehoods, omissions, or misrepresentations resulted from intentional or reckless police conduct, or that the deliberate falsehoods, omissions, or misrepresentations would have affected the magistrate's probable cause determination as to any of the search warrants at issue in this Order.

### Probable Cause

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The facts set forth in an affidavit for the issuance of a search warrant must establish 1) that a particular person has committed a crime (the commission element), and, 2) that evidence relevant to the probable criminality is likely located at the place to be searched (the nexus element). *Burnett v. State*, 848 So. 2d 1170, 1173 (Fla. 2d DCA 2003) (citing *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999)). The affidavit must set forth case-specific facts regarding the likelihood that evidence of the crime suspected will be found in a particular place. *See id*. at 1173-74. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Where probable cause for the issuance of a search warrant is at issue, the reviewing court is required to give "great deference" to the magistrate's probable cause finding. *Mesa v. State*, 77 So. 3d 218, 221 (Fla. 4th DCA 2011). The reviewing court must determine whether the magistrate had a substantial basis for concluding that probable cause existed and whether, based on the four corners of the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *Id.* (citations omitted).

### General Warrants, the Particularity Requirement, and Overbreadth

> Under the Fourth Amendment of the United States Constitution and Article I, Section 12 of the Florida Constitution, a warrant must particularly describe the place or places to be searched. Historically, the purpose of this requirement was to prevent the use of general warrants and wide-ranging exploratory searches.

*Bennett v. State*, 150 So. 3d 842, 844 (Fla. 4th DCA 2014). The particularity requirement limits the searching officer's discretion in the execution of a search warrant. *Haire v. Florida Dept. of Agric. & Consumer Services*, 870 So. 2d 774, 789 (Fla. 2004). This purpose is served so long as the affidavit supports probable cause for the search of the named properties and those properties are described with particularity. *Id.*

A search warrant is constitutionally overbroad if it fails to adequately specify the material to be seized, thus leaving the scope of the seizure to the unfettered discretion of the executing officer. *Dinkins v. State*, 278 So. 3d 828, 837 (Fla. 5th DCA 2019). The use of broad categories and generalities can render a search warrant overly broad. *Russ v. State*, 185 So. 3d 622, 626 (Fla. 5th DCA 2016).

Florida courts appear to use the term overbroad to describe warrants lacking in constitutional specificity or particularity. *See, e.g., Ingraham v. State*, 811 So. 2d 770,

773 (Fla. 2d DCA 2002); Dinkins, 278 So. 3d at 836; Russ, 185 So. 3d at 626. However, some federal courts have drawn a distinction between "general" warrants and "overly broad" warrants. General warrants give government officials the "unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 820 (2022) (quoting *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002)). "By contrast, an overly broad warrant 'describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause.' *Id.* (quoting *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d at 149). Likewise, in *United States v. Purcell*, the Second Circuit Court of Appeal recognized that a search warrant that comports with the particularity requirements may nevertheless be defective due to overbreadth. 967 F.3d 159, 179 (2d Cir. 2020).

### Good Faith Exception

The good faith exception to the exclusionary rule applies when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and has acted within its scope. *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The exclusionary rule should not be applied to deter objectively reasonable law enforcement activity. *Id.* at 920. Evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant should not later be excluded. *Id.* at 922-23. However, an officer does not manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable." *Id.* at 923 (quoting *Brown v. Illinois*, 420 U.S. 590, 610-611, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)), *see also Mesa*, 77 So. 3d at 233 ("When an affidavit for a search warrant is so lacking in indicia of probable cause 'as to render an official's belief in its existence entirely unreasonable,' the good faith exception is not applicable") (quoting *Dyess v. State*, 988 So. 2d 146, 149 (Fla. 1st DCA 2008).

The Court should not defer to the magistrate's determination of probable cause if there is no substantial basis for concluding that probable cause existed. *Mesa*, 77 So. 3d at 233. (citations omitted).

The Court may look beyond the four corners of the affidavit to determine whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. *See United States v. Mitchell*, 22-12084, 2023 WL 3620913, at *3 (11th Cir. May 24, 2023).

### Partial Suppression and the Doctrine of Severability

If a court finds that only a portion of a search warrant is invalid, the court need not invalidate the entire warrant. *See Johnson v. State*, 660 So. 2d 637, 643–44 (Fla. 1995); *State v. Nuckolls*, 617 So. 2d 724, 728 (Fla. 5th DCA 1993) (citing *United States v. Gomez–Soto,* 723 F.2d 649, 654 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984)); *Dinkins v. State,* 278 So. 3d at 838. Although partial suppression of evidence found pursuant to invalid portions of a search warrant is not an issue that has been widely addressed by Florida appellate courts, the Florida Supreme Court noted in *Johnson* that "American jurisdictions are in general agreement that partial invalidity of a warrant does not in itself render the remainder invalid." 660 So. 2d

at 644, fn. 3. The Court was unable to find Florida authority regarding how to sever invalid portions of a search warrant. Federal cases addressing the federal doctrine of severability provide guidance for analyzing how to address the partial invalidity of a warrant.

> The severance doctrine is animated by the need to balance the considerable social costs of suppressing evidence of guilt against the need to deter police misconduct, and the judgment that it would be unduly "harsh medicine" to suppress evidence whose seizure was authorized by a particularized portion of a warrant simply because other portions of the warrant failed that requirement.

*United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013). Some federal courts of appeal have developed a step-by-step methodology for warrant redaction as follows:

1) The court must separate the warrant into its constituent clauses.

2) The court must examine each individual clause to determine if it is sufficiently particularized and supported by probable cause.

3) The court must determine whether the valid clauses are distinguishable from the invalid clauses.

4) The Court must also determine whether the valid portions make up only an insignificant or tangential part of the warrant, precluding the applicability of the doctrine of severability.

5) The Court must then sever valid portions from invalid portions and partially suppress evidence accordingly.

*Id.* at. 448-449; *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018); *United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006); *United States v. Cotto*, 995 F.3d 786, 799 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 820 (2022). However, the "greater part" inquiry does not apply when the challenged provisions are invalid due to a lack of probable

cause, and courts need only determine whether any of the evidence seized was obtained pursuant to the invalid provision. *Cotto*, 995 F.3d at 799.

Federal courts have also applied the doctrine of severability when the challenged provision is overly broad due to a failure to include a reasonable temporal limitation. *See, e.g., United States v. Honeysucker*, 21-2614, 2023 WL 142265, at *5 (6th Cir. Jan. 10, 2023) ("the remedy for temporal overbreadth would be to 'sever the infirm portion ... from the remainder which passes constitutional muster."); *United States v. Neuhard*, 770 Fed. Appx. 251, 254 (6th Cir. 2019) (But even if the warrant should have included a date restriction, suppression is not the right remedy. When a warrant is overbroad, we "sever the infirm portion ... from the remainder which passes constitutional muster."); *United States v. Eller*, 20-10425, 2023 WL 395938, at *1 (9th Cir. Jan. 25, 2023), *cert. denied sub nom. Eller v. United States.*, 23-5490, 2023 WL 6558671 (U.S. Oct. 10, 2023) ("even if the search warrant was overbroad as to Eller's pre-2012 data, we need not decide the issue because the trial exhibits in dispute are from 2013 to 2014—a period for which the warrant affidavit gave probable cause and is therefore 'sufficiently specific and particular' to support severance."); *United States v. Flores*, 802 F.3d 1028, 1045 (9th Cir. 2015).

### MOTIONS TO SUPPRESS 1-13

### Defendant's Motion to Suppress No. 1 - Search Warrant to Provider - Phone number 9807 - Issued on 10/29/2018

The Court finds that the October 29, 2018, search warrant for T-mobile to provide the historical wire or electronic communications (historical cell site location information or CSLI) for the T-mobile phone number ending in 9807 from 1:00 AM on October 26,

2018, to 6:00 AM on October 26, 2018, is supported by probable cause. The search warrant affidavit states that Anthony Williams and Christopher Thomas were the victims of a homicide and provides a sufficient nexus between the crimes committed and the items to be searched. Defendant left the recording studio with Henry and the victims at approximately 3:20 AM on October 26, 2018. At approximately 4:35 AM on the same day, Henry drove to the Emergency Room at Memorial Miramar with the victims. Henry alleged that he, along with the two victims, were the victims of a drive by shooting somewhere along Miramar Parkway. Henry was unable to identify the exact location of the shooting. The Miramar Police Department's investigation revealed that Defendant had been using his phone around the time of the homicides. It is clear that Defendant's physical location would be germane to finding the location of the crime scene and determining his role in the shooting.

The affidavit certainly could have better explained the connection between Defendant's physical location and the historical cell site data stored by T-mobile. However, in evaluating search warrant applications, judges may consider what is or should be common knowledge. *See United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015). "[A]ffidavits for search warrants are not to be scrutinized for technical niceties." *State v. Hart*, 308 So. 3d 232, 236 (Fla. 5th DCA 2020). It is common knowledge that historical cell site data can reveal the user's approximate physical location at a given time when the phone is in use. Based on the above, the search warrant affidavit established probable cause to search the historical cell site data for Defendant's phone ending in 9807.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 1 is <u>DENIED</u>.

**Defendant's Motion to Suppress No. 2 - Twitter Account - Issued on October 31, 2018**

The Court finds that the search warrant for data from Defendant's Twitter accounts from October 1, 2018, to October 31, 2018, is supported by probable cause, with the exception of all past searches saved by the account, for which there is no probable cause.

The search warrant affidavit for the Twitter accounts contains a similar recitation of facts as the previous search warrant. In addition, the affidavit states that Defendant and his associates have been identified as Blood Gang associates and that they were feuding with another gang from the North Broward area. Members of a rival gang took credit for the homicides  on YouTube. Detective Moretti also read messages on Twitter from users claiming responsibility for the murder which tagged Defendant's Twitter account, including users affiliated with rival gangs. Based on the above, there was probable cause to believe a further search of Defendant's Twitter account within the specified one-month time period would reveal further information about who was responsible for the homicides and provide context for individual posts. However, the portion of the warrant authorizing a search of records of past Twitter searches outside of the specified date range is not supported by probable cause and any evidence found pursuant to this particular provision must be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 2 is <u>GRANTED</u> in part and <u>DENIED</u> in part.

**Defendant's Motion to Suppress No. 3 - iCloud Account - Issued on November 14, 2018**

The Court finds that while some provisions of the search warrant are supported by probable cause *with the addition of a temporal limitation*, there was no substantial basis for the magistrate to find that probable cause existed as to other provisions of the search warrant, which must be severed from the valid portions of the search warrant.

The search warrant affidavit provides ample support for the establishment of the commission aspect of probable cause. However, it is the nexus requirement that is at issue. It is clear from the search warrant affidavit that Defendant's physical location during and shortly after the homicides is of vital importance. Police officers had reason to believe the occupants of the vehicle were on the phone at the time of the shooting, that Defendant had called his mother just after the shooting, that Defendant's phone was in use and communicating with cell towers around the time of the shootings, and that call data records revealed that Defendant was using other forms of communication on his phone, although the police could not pinpoint which specific forms of communication were used.

Once again, Detective Moretti could have better explained the connection between iCloud storage and Defendant's cell phone. However, it is common knowledge that iPhones will backup data to iCloud unless the user has turned off iCloud backup. Based on the four corners of the affidavit, there is probable cause to search Defendant's iCloud account for evidence of Defendant's location during the shooting and for evidence of any forms of communication during and shortly after the shooting. However,

the search warrant authorized a much broader search than was reasonable given the facts in the affidavit supporting the warrant.

The affidavit is completely lacking in nexus as to any provisions of the search warrant outside this narrow category, so much so that no objectively reasonable officer could have relied on the magistrate's finding of probable cause. The lack of any temporal limitations in the search warrant is highly concerning given that iCloud accounts contain an enormous amount of data not just from the purchase of a particular iPhone, but from the inception of the Apple ID associated with the iCloud account. This search warrant essentially gave Detective Moretti unfettered access to a lifetime's worth of private emails, texts, messages, photographs, videos, and documents.

Detective Moretti was well aware of the relevant time frame at issue in his affidavit. There is nothing in the affidavit to suggest that the scope of the homicides went beyond the early morning hours of October 26, 2018. Search warrants should be limited to the time period that the affidavit suggested the criminal activity occurred. *See United States v. Hanna*, 661 F.3d 271, 287 (6th Cir. 2011). The failure to limit broad descriptive terms by relevant times, when such times are available to the police, will render a warrant overbroad. *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999). The Eleventh Circuit Court of Appeal has even noted that "the preferred method of limiting the scope of a search warrant for a cloud account will usually be time-based." *United States v. McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023). There has been no reason advanced as to why this preferred method could not have applied to the iCloud search warrant.

There may be cases which justify a more generalized search or seizure. This case, involving what appears to be an isolated crime based on the four corners of the affidavit, is not one of them. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (a generalized seizure of business documents may be justified if the government establishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity); *Cf. United States v. Purcell*, 967 F.3d 159, 181 (2d Cir. 2020) (because there was reason to believe that the suspected criminal activity pervaded the entire account, seizure of all records of the account was appropriate); *United States v. Brown*, 627 F. Supp. 3d 206, 229 (E.D.N.Y. 2022) (the complexity and duration of the alleged criminal activities may render a time frame less significant than in a case that requires a search for a small set of discrete items related to one or only a few dates).

Detective Moretti could not have in good faith believed it was reasonable to search the entirety of Defendant's iCloud account for evidence limited to a span of less than twenty four hours. Common sense dictates that Detective Moretti did not need to search through everything on Defendant's iCloud account to look for evidence of his location and his communications with others on the morning of the homicides. "If you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable." *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999).

In his affidavit Detective Moretti emphasizes the inability of electronic communication service providers to distinguish between evidence of the crimes and other records. However, there is nothing to indicate that cloud providers are unable to

sort data or records by responsive categories and/or time frames. While this rationale explains the necessity of the two-step seizure (property to be provided by Apple) and subsequent search (search conducted by law enforcement)[2], it does not justify the virtually unlimited scope of either step. Even if Detective Moretti needed to cast a wide net to "seize" or obtain relevant data from Apple, he could have and should have limited his search to those specific categories that were supported by probable cause in the affidavit.

As such, only evidence found pursuant to the following provisions of the search warrant are admissible:

1) Subscriber information.

2) Photo Stream records and all metadata and EXIF data associated with these albums and photographs/videos from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

3) Backups of all data such as text messages, GPS location logs, photographs, videos, email account information and emails, iMessages, instant messages, notes, contacts, voice memos, social networking information, and associated metadata and EXIF data from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

4) Emails to include but not limited to email addresses, any and all incoming and outgoing emails, dates and times of emails, saved emails, email drafts, and deleted emails from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

---

[2] The two-step procedure used in this search warrant is similar to the two-step procedure authorized by Fed. R. Crim. P. 41(e)(2)(B), which authorizes the seizure or copying of electronically stored information and a later review of the information consistent with the warrant.

5) Find My iPhone data from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 3 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 4 - Snapchat Warrant - Issued on December 6, 2018**

Although the search warrant affidavit provides probable cause to search Defendant's Snapchat account for evidence of his whereabouts and communications on the morning of the homicides, it is temporally overbroad. As previously discussed, Defendant's physical location on the morning of the homicides is a key piece of evidence. Additionally, this search warrant affidavit establishes that Defendant was communicating with others on the morning of the homicides over the phone and through data-based apps, including Snapchat. There is nothing in the search warrant affidavit that provides a nexus to any information on Defendant's Snapchat account outside of this narrow temporal range.

Unlike several of the search warrants at issue, the Snapchat search warrant does include a date range from October 1, 2018, to November 25, 2018. However, based on a review of the temporal inconsistencies in the various warrants and based on Detective Moretti's testimony, this date range seems arbitrary. The Court cannot find that Detective Moretti relied on the temporally overbroad search warrant in good faith. When questioned about temporal limitations in the search warrants, it became clear that Detective Moretti relied on his subjective belief that this was a reasonable timeframe rather than on any objective case-specific reasons for a broader time frame. The

exclusionary rule's purpose of discouraging police misconduct applies squarely to situations involving such arbitrary decision making.

Based on the above, only those Snapchat records/data found within a time period from 3:00 AM on October 26, 2018, to 9:00 AM on October 26, 2018, shall be admissible at trial.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 4 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 5 - Google - Issued on January 8, 2019**

The search warrant affidavit provides sufficient probable cause for the issuance of the Google search warrant for GPS and other location history data between the hours of 3:50 AM and 4:35 AM on October 26, 2018.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 5 is **DENIED**.

**Defendant's Motion to Suppress No. 6 - Facebook - Issued on January 8, 2019**

Although some provisions of the Facebook search warrant, *with added temporal limitations*, are supported by probable cause in the search warrant affidavit, there is no nexus for other provisions, which must be severed from the valid portions of the search warrant.

The search warrant affidavit establishes the commission element of probable cause. However, it is the nexus element that is at issue. The affidavit provides probable cause to search for any evidence of Defendant's physical location on the morning of the murder and shows that he frequently used his phone over the course of that morning. Call Data Records show that Defendant was using other methods of communication

that morning, and as the investigation progressed, investigators learned that Defendant had been communicating via social media on the morning of the homicides. Defendant and co-defendant Cortlen Henry were tagged in photographs wearing shirts memorializing the deceased victims. The affidavit ends with Detective Moretti speculating that because people generally share personal information with one another on Facebook, "giving a glimpse into their private lives," this warrant will assist in obtaining additional information to further the criminal investigation.

The search warrant affidavit provides probable cause to believe that evidence of Defendant's physical location and communications during and shortly after the homicides would be found in his Facebook account. The search warrant affidavit also provides probable cause to believe, based on the pictures described in the affidavit, that evidence relevant to the homicides would be found in Defendant's messages, posts, and other interactions on Facebook *after* the morning of the homicides. However, the search warrant affidavit contains no temporal limitations, which appears to have been an oversight on Detective Moretti's part. As previously discussed, the Court does not find that Detective Moretti could have relied on such a temporally overbroad warrant in good faith. Therefore, the Court finds that it is necessary to sever the temporally overbroad portions of the search warrant and suppress all evidence outside of the date range of October 26, 2018 (the day of the homicides) to January 8, 2019 (the date the warrant was issued).

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 6 is **GRANTED** in part and **DENIED** in part.

**Defendant's Motion to Suppress No. 7 - Instagram Account - Issued on January 23, 2019**

Similar to the preceding Facebook search warrant, the Instagram warrant is also temporally overbroad and the Court must sever those portions of the search warrant that are supported by probable cause from those portions of the search warrant for which there was no substantial basis to believe probable cause existed.

In addition to the commission element, the search warrant affidavit establishes the nexus element for Defendant's physical locations and communications on the morning of the homicides. The search warrant affidavit also provides probable cause to believe, based on the pictures described in the affidavit, that evidence relevant to the homicides would be found in Defendant's messages, posts, comments, and other interactions on Instagram *after* the morning of the homicides.

Unlike the Facebook search warrant, the Instagram search warrant does include a time limitation from October 1, 2018, to January 15, 2019. Since the search warrant affidavit only provides probable cause to search Defendant's Instagram after the homicides occurred, and there is no nexus between the homicides and any prior Instagram records, any evidence found pursuant to this warrant before October 26, 2018, shall be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 7 is **GRANTED** in part and **DENIED** in part.

INTENTIONALLY LEFT BLANK

**Defendant's Motion to Suppress No. 8 - T-Mobile Prospective Real-Time Cell Site Location Information - Issued on February 5, 2019**

The search warrant affidavit for prospective real-time cell site location information provided probable cause to believe that Defendant had committed the two homicides on October 26, 2018, which is all that is required to issue a warrant for real-time cell site location information tracking. *See State v. Sylvestre*, 254 So. 3d 986, 989 (Fla. 4th DCA 2018). Defendant has not specified what evidence was seized pursuant to this warrant. Since the purpose of this warrant was to track Defendant's real-time whereabouts once the police had ascertained that he was a suspect, it is unclear what, if any, evidence was obtained pursuant to this warrant.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 8 is **DENIED**.

**Defendant's Motion to Suppress No. 9 - T-mobile Warrant - Issued on January 20, 2019**

The search warrant affidavit for historical cell site information for Defendant's phone in the month preceding the homicide provided probable cause for the search warrant. In any event, Detective Moretti testified that he did not find any relevant evidence pursuant to this search, and Defendant has not specified what specific evidence he is moving to suppress.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 9 is **DENIED**.


INTENTIONALLY LEFT BLANK


Page 20 of 29

**Defendant's Motion to Suppress No. 10 - Search Warrant for Apple iPhone X - Issued on February 28, 2019**

The Court denies Defendant's motion to suppress because Detective Moretti testified that although he received the cell phone extraction pursuant to this search warrant, he did not conduct a search of the data pursuant to this warrant because the warrant and affidavit accidentally referenced the wrong IMEI number for the cell phone. Rather, the phone was searched pursuant to a subsequently obtained search warrant, which is the subject of Defendant's eleventh motion to suppress.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 10 is **DENIED**.

**Defendant's Motion to Suppress No. 11 - Search Warrant for Apple iPhone X - Issued on March 7, 2019**

Although the search warrant at issue is not a "general" warrant per se, it is "overly broad" because there are significant portions of the warrant that are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The search warrant affidavit provides probable cause to search and seize only a minute fraction of the incredibly vast amount of records and data that the warrant authorizes law enforcement to both seize and then later search. Therefore, any evidence seized pursuant to invalid portions of the search warrant must be suppressed.

The affidavit provides a nexus between Defendant's phone (the place to be searched) and the homicides only as follows: Defendant frequently used his phone on the morning of the homicides, which would then contain relevant information about his physical location during the homicides. Defendant was also in constant communication

with people through his phone and through social media on the morning of the homicides and throughout the rest of that day. After co-defendant Cortlen Henry was released from the hospital, Defendant had contact with him and his other associates and allegedly discarded two firearms in an undisclosed area. Clearly Defendant's phone could provide evidence of his physical location and communications during this period of time as well. There is nothing in the search warrant affidavit to suggest that there is a fair probability of finding evidence of the homicides on Defendant's cell phone from any period of time before October 26, 2018.

In *Riley v. California*, the Supreme Court held that cell phone searches were exempt from the search incident to arrest doctrine. 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). The Supreme Court's careful consideration of the impact of modern cell phones on daily life provides a framework for determining the contours of the Fourth Amendment's protection of an individual's private cell phone records and data. In discussing the unique nature of cell phones, the Court noted that a cell phone collects many distinct types of information in one place. *Id*. at 394. A cell phone's capacity allows even just one type of information to convey far more than previously possible. *Id*. Data and records from a cell phone can be used to reconstruct "the sum of an individual's private life." *Id*. The data on the phone can date back to the date of purchase, or even earlier. *Id*.

The Court also noted the qualitative difference between data stored on cell phones and physical records. *Id*. at 395. Internet search and browsing histories could reveal an individual's private interests and concerns, including health-related issues. *Id*.

Data on cell phones can reveal where a person has been. *Id.* at 396. The Court also

discussed how mobile applications pervade a person's daily life.

> Mobile application software on a cell phone, or "apps," offer a range
> of tools for managing detailed information about all aspects of a
> person's life. There are apps for Democratic Party news and
> Republican Party news; apps for alcohol, drug, and gambling
> addictions; apps for sharing prayer requests; apps for tracking
> pregnancy symptoms; apps for planning your budget; apps for
> every conceivable hobby or pastime; apps for improving your
> romantic life. There are popular apps for buying or selling just about
> anything, and the records of such transactions may be accessible
> on the phone indefinitely. There are over a million apps available in
> each of the two major app stores; the phrase "there's an app for
> that" is now part of the popular lexicon. The average smart phone
> user has installed 33 apps, which together can form a revealing
> montage of the user's life.

*Id.*

Not only would a cell phone search typically expose to the government far more

private information than the most exhaustive search of a house, it would also contain "a

broad array of private information never found in a home in any form—unless the phone

is." *Id.* A few years later, the Supreme Court observed that "cell phones and the services

they provide are 'such a pervasive and insistent part of daily life' that carrying one is

indispensable to participation in modern society." *Carpenter v. U.S.*, 585 U.S. ____, 138

S.Ct. 2206, 2220, 201 L.Ed.2d 507 (2018) (citing *Riley,* 573 U.S., at 385).

Detective Moretti testified in court that he needed access to the entirety of the

data and records on Defendant's cell phone to establish a "pattern of life." Although he

does not include this rationale in the search warrant affidavit, he did seek authorization

to search "any files or data contained on the seized items and electronic storage media

that show the ownership or control over the seized items" and "any files or data

contained on the seized items and electronic storage media relevant to showing which

individual had control of the seized items at the time of the violations, where data was created, accessed, or modified." Such a search is patently overbroad. In *Nuckolls*, the Fifth District Court of Appeal found similar language impermissibly overbroad and affirmed the suppression of evidence seized pursuant to this provision. 617 So. 2d, at 728. Of note is that *Nuckolls* involved physical documents, not the expansive and diverse cell phone data and records involved in this case. The overbreadth of the search warrant is of even greater consequence here with the heightened privacy concerns that accompany cell phone searches. Detective Moretti cannot in good faith rely on the type of language that has been held insufficient to justify a search by a Florida appellate court.

Accessing such a wide swath of data merely because "(1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data" is speculative at best and cannot support such an invasion into Defendant's privacy rights.

The State conflates law enforcement's inability to determine what data or records are evidence of a crime without individually reviewing the data or records with its inability to sort categories of data or records based on file type, creation date and time, metadata, and the originating application. The State also does not account for why law enforcement cannot limit the scope of their search of broad categories of data and records even though it is necessary to first seize these broad categories by downloading the contents of the cell phone. Nor has it satisfactorily explained why law enforcement could not conduct a temporally targeted search. Furthermore, much of

Detective Moretti's search warrant affidavit for the cell phone records refers to computer specific systems such as Windows and IBM. The search warrant affidavit does not explain what limitations, if any, are imposed by the iOS operating system on iPhones, or the extent to which users can manipulate data on iPhones.

Had the search warrant affidavit restricted its scope to the homicide, the Court would not have needed to consider the doctrine of severability. *See Castro*, 881 F.3d at 965 (a warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime). However, those provisions of the search warrant enabling a general data grab for the purpose of showing ownership or control over the cell phone cut against such a finding. If such a justification were to stand, there would be no limits on what cell phone data law enforcement could seize or search in any given case.

The Court is cognizant that State and federal courts are still grappling with how to address the scope of cell phone search warrants post-*Riley*. However, given the unique and heightened privacy concerns that are inherent in cell phone searches, the application of the exclusionary rule would discourage law enforcement officials from essentially establishing a data dragnet in the name of finding evidence of identity and ownership.

Therefore, only data and records created between October 26, 2018, and February 13, 2019, when Defendant was arrested, will be admissible at trial. All evidence found outside of these parameters shall be suppressed.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 11 is **GRANTED** in part and **DENIED** in part.

**Motion to Suppress No. 12 - Search warrant for two Google user accounts - Issued January 21, 2020**

The search warrant affidavit provides probable cause to believe evidence of Defendant's location on the morning of the homicides will be found in one or both of his Google user accounts. The search warrant affidavit also provides probable cause to believe Defendant's location after Henry was discharged from the hospital, at which point Defendant is alleged to have discarded two firearms in an unknown wooded area, would be found in one or both of Defendant's Google accounts. It is common knowledge that an individual's Google user account is linked to all Google applications if the user is logged in, such as Google Maps. It is not speculative to expect users to be logged into their Google accounts on Google applications. Based on the search warrant affidavit, there was probable cause to believe that applications on Defendant's cell phone, including Google applications, would reveal information about Defendant's location on October 26, 2018. The search warrant affidavit also provides probable cause to believe that Defendant was using his phone to communicate with others on the morning of the homicides as well as after Cortlen Henry was released from the hospital. It is common knowledge that Gmail is an email application capable of communication.

However, the search warrant's temporal limitation of October 1, 2018, to November 1, 2018, is overbroad. The search warrant affidavit does not provide a nexus for records created prior to the homicides. On the other hand, it was not unreasonable to extend the outer end of the date range to November 1, 2018, to account for replies to email threads that may have begun on October 26, 2018.

Based on the above, any records created before October 26, 2018, shall be suppressed. All records created between October 26, 2018, and November 1, 2018, shall be admissible.

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 12 is **GRANTED** in part and **DENIED** in part.

**Motion to Suppress No. 13 - Search warrant for Google user account ynwmellybooking@gmail.com - Issued on March 15, 2022**

The search warrant affidavit is completely devoid of a nexus between the Google user account and the homicides. The affidavit establishes that Defendant committed the homicides and that Defendant is affiliated with a gang. However, gang affiliation, without more, is not evidence that Defendant committed the homicides. The search warrant affidavit contains nothing to indicate that the homicides were gang-related. While it would be rank speculation to conclude that the homicides were gang-related merely because Defendant is alleged to have gang affiliations, the search warrant affidavit does not even include such a conclusion. It merely states that the Grand Jury which returned the February 23, 2022, superseding indictment heard evidence of Defendant's gang membership.

The Court finds that there was no substantial basis for concluding that there was probable cause to believe that evidence of the homicides would be found in a search of Defendant's Google user account before October 26, 2018. The search warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The Court finds that the good faith exception does not apply.

Even if the text messages did provide a minimal nexus for the search warrant, these text messages were sent on September 7, 2018. These text messages were found after an impermissible search of a portion of Defendant's cell phone records pursuant to the constitutionally infirm and severed portions of the cell phone search warrant. When the text messages, which are fruit of the poisonous tree[3], are excised from the affidavit, there was no substantial basis to find that the Google user account would contain evidence of the homicides. *See Davis v. State*, 834 So. 2d 322, 328 (Fla. 5th DCA 2003).

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Suppress No. 13 is **GRANTED**.

The Court has not been moved to consider the suppression of specific evidence. It is up to the parties to inform the Court as to what specific evidence falls within the suppression order and what specific evidence is admissible pursuant to this Order[4].

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Broward County, Florida, this _28_ day of December, 2023.

JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

---

[3] *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[4] Nothing in this Order precludes the possibility of reconsideration in the event that the door to suppressed evidence is opened at trial. *See Smithey v. State*, 310 So. 3d 1104, 1108 (Fla. 5th DCA 2020) (trial counsel rendered ineffective assistance of counsel by opening the door to the appellant's previously suppressed statements made during a custodial interrogation after appellant had invoked her right to remain silent).

Copies furnished to:

Service List

Alixandra Buckelew, Esq.
Justin Griffith, Esq.
Taylor Collins, Esq.

Assistant State Attorneys

Raven Liberty, Esq.
Stuart Adelstein, Esq.
Daniel R. Aaronson, Esq.
Peter T. Patanzo, Esq.
James. S. Benjamin, Esq.

Attorneys for Defendant